UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE

| | |
|---|---|
| COURTNEY CATES, BRIAN STOVER, and JASON MILLER, on behalf of themselves and all others similarly situated<br><br>                  Plaintiffs,<br><br>  v.<br><br>CRYSTAL CLEAR TECHNOLOGIES LLC; CARBINE & ASSOCIATES LLC; HOOD DEVELOPMENT, LLC; TOLLGATE VILLAGE ASSOCIATION INC.; BRIDGEMORE VILLAGE OWNERS' ASSOCIATION INC.; CANTERBURY HOMEOWNERS ASSOCIATION INC.; and DIRECTV, LLC,<br><br>                  Defendants. | Case No. _____<br><br>JURY DEMAND REQUESTED |

**CLASS ACTION COMPLAINT**

1. Plaintiffs, on behalf of themselves and all others similarly situated, for its complaint against the Defendant Crystal Clear Technologies, LLC ("Crystal Clear") and Carbine & Associates, LLC ("Carbine"), Hood Development LLC ("Hood"), Tollgate Village Association Inc. ("Tollgate POA"), Bridgemore Village Owners' Association Inc. ("Bridgemore POA"), Canterbury Homeowners Association Inc. ("Canterbury POA") and DirecTV, LLC ("DirecTV"and collectively with Crystal Clear, Carbine, Tollgate POA Bridgemore POA, and the Canterbury POA the "Defendants"), alleges as follows based on (a) personal knowledge; (b) the investigation of their counsel; and (c) information and belief.

## I. INTRODUCTION

2. Plaintiffs are individual residents who own their own homes in three neighborhoods in Thompson Station (Bridgemore, Tollgate, and Canterbury, collectively the "Neighborhoods") that receive telecommunications from Crystal Clear and this this civil action alleges that Crystal Clear and Carbine and Hood acting among and through the Bridgemore POA, the Tollgate POA, and the Canterbury POA unlawfully require residents of the Neighborhoods to purchase telecommunications from Crystal Clear and that Defendants' actions violate federal antitrust law, federal telecommunications law, and the Tennessee unfair business practices law.

3. Plaintiffs seek to recover monetary damages as a result of Defendants unlawful conduct, a declaration that the Defendants' conduct is unlawful, and an injunction against Defendants from preventing other telecommunications providers to serve the Neighborhoods.

## II. JURISDICTION AND VENUE

4. This action under section 2 of the Sherman Act, 15 U.S.C. § 2, and section 4 of the Clayton Act, 15 U.S.C. § 15(a). Plaintiffs and the Class seek preliminary and/or permanent injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26.

5. The Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1337(a), and 15 U.S.C. § 15.

6. This Court has personal jurisdiction over Defendants because Defendants transacts business within this District, and carries out interstate trade and commerce in substantial part in this District and/or has an agent or agents in this District and/or can be found in this District.

7. Venue is appropriate within this District under section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. §§ 1391(b) and (c).

### III. PARTIES

8. Plaintiff Courtney Cates is a resident of the Canterbury neighborhood and owns and resides at the residence of 2196 Chaucer Park Lane, Thompsons Station, TN 37179. Plaintiff Courtney Cates purchased her residence in November of 2014.

9. Plaintiff Dr. Jason Miller is a resident of the Bridgemore neighborhood and owns and resides at the residence of 3738 Covered Bridge Rd. Thompsons Station, TN 37179.

10. Plaintiff Brian Stover is a resident of the Tollgate neighborhood and owns and resides at the residence of 2059 Bungalow Drive Thomson Station, TN 37179.

11. Defendant Crystal Clear is a Tennessee limited liability corporation with its principal place of business at 621 Bradley Ct., Franklin, TN 37067 and may be served through its resident agent James Carbine at the same address.

12. Defendant Carbine is a Tennessee limited liability corporation with its principal place of business at 621 Bradley Ct., Franklin, TN 37067 and may be served through its registered agent James Carbine at the same address.

3

13. Defendant Hood is a Tennessee limited liability corporation with its principal place of business at 121 1st Ave S, Ste. 210, Franklin, TN 37064 and may be served through its registered agent K. Thomas Sidwell at the same address.

14. Defendant Tollgate POA is a Tennessee non-profit corporation with its principal place of business at 50 Vantage Way, Ste 100, Nashville TN and may be served through its registered agent Ghertner and Company at 50 Vantage Way, Ste. 100, Nashville, TN 37228.

15. Defendant Bridgemore POA is a Tennessee non-profit corporation with its principal place of business at 50 Vantage Way, Ste 100, Nashville TN and may be served through its registered agent Ghertner and Company at 50 Vantage Way, Ste. 100, Nashville, TN 37228.

16. Defendant Canterbury POA is a Tennessee non-profit corporation with its principal place of business at 50 Vantage Way, Ste 100, Nashville TN and may be served through its registered agent Ghertner and Company at 50 Vantage Way, Ste. 100, Nashville, TN 37228.

17. Defendant DirecTV is a California limited liability corporation with its principal place of business at 2260 E Imperial Hwy, El Segundo, CA 90245-3501 USA and may be served through its registered agent CT Corporation 800 S. Gay St., Ste. 2021, Knoxville, TN 37929.

### IV. FACTUAL BACKGROUND

18. On October 11, 2005, Crystal Clear obtained a non-exclusive franchise agreement from the City of Thompson's Station that granted it the right to use the Streets and dedicated easements within a certain service area for the construction, operation, and maintenance of a cable system that was meant to provide television and high-speed internet to Crystal Clear's subscribers. The territory covered by this franchise agreement includes the Neighborhoods.

19. The Neighborhoods are in relatively close proximity to one another. Tollgate is located along Columbia Pike just north of the intersection with Tennessee State Route 840. Bridgemore and Canterbury are located on Critz Ln which intersects with Columbia Pike just south of the intersection with Tennessee State Route 840. Each Neighborhood consists of hundreds of houses with common facilities like swimming pools and playgrounds that can be used by the residence of each Neighborhood.

20. Under the terms of the franchise agreement with the City of Thompson Station, Crystal Clear did not obtain the exclusive right to serve the Neighborhoods, it only obtained a non-exclusive right to use right of way and other public property rights to construct and operate its telecommunications network, which would allow Crystal Clear to maintain its telecommunications network (i.e. its lines, switches, conduit, fiber, electrical stations, etc.) within the public right-of-way.

21. In March of 2006, Crystal Clear and Tollgate POA entered into a "Communications Services Agreement." A copy of this agreement is attached as Exhibit A, the "Tollgate Communications Agreement").

22. In January of 2007, Crystal Clear and Bridgemore POA entered into a nearly identical agreement as the Tollgate POA Agreement. A copy of this agreement is attached as Exhibit B, (the "Bridgemore Communications Agreement").

23. On information and belief, in or around 2007, Crystal Clear and the Canterbury POA entered into an agreement that is similar to the Tollgate Communications Agreement and the Bridgemore Communications Agreement. Despite repeated request for this agreement, Crystal Clear and its affiliates have refused to provide a copy of this agreement. For purposes of this complaint, this agreement will be referred to as the Canterbury Communications Agreement.

24. At the time the Tollgate Communications Agreement and the Bridgemore Communications Agreement were executed the Tollgate POA and the Bridgemore POA remained in the control of the developer Carbine. It is customary when developers create neighbors like the Neighborhoods to also create home owners' association that are nominally for the benefit of future homeowners but ultimately are used to bind homeowners to a set of rules that purportedly promote neighborhood cohesion and to help facilitate the administration of the common space and area. Typically a developer will "promise" that once a certain percentage of the homes are built and sold the developer will give control of the home owners' association over to the homeowners. On information and belief, both the Tollgate POA and the Bridgemore POA remain under the control of Carbine, meaning that Carbine exercises sufficient voting authority under the bylaws and/or articles of incorporation to direct the actions of the corporations.

25. Crystal Clear and Carbine although nominally separate entities are functionally the same entity. They operate from the same business address, have the same registered agent, and on information and belief share overlapping boards of directors, officers, and shareholders.

26. Because Crystal Clear are under the same management as Carbine and because Carbine, at the time the Tollgate Communications Agreement and the Bridgemore Communications Agreement were executed, controlled the Tollgate POA and Bridgemore POA, the Tollgate Communications Agreement and the Bridgemore Communications Agreement are not "arm's length transactions" that were the result of vigorous negotiations between the parties. Both agreements represent self-dealing transactions.

27. On information and belief, at the time the Canterbury POA executed the Canterbury Communications Agreement, the Canterbury POA remained under the exclusive

control of the developer(s). Carbine is not the exclusive developer of the Canterbury neighborhood. Instead Defendant Hood is the developer of the Canterbury neighborhood.

28. Both the Tollgate Communications Agreement and the Bridgemore Communications Agreement bind all future homeowners in Tollgate and Bridgemore to entering into a service agreement with Crystal Clear. On information and belief, the Canterbury Communications Agreement similarly binds all future homeowners in Canterbury to entering into an agreement with Crystal Clear.

29. The Tollgate Communications Agreement and the Bridgemore Communications Agreement reference the existence of an "easement" granted to Crystal Clear to provide telecommunications to Tollgate and Bridgemore. On information and belief, a similar easement exists related to Canterbury (and together with the easements for Tollgate and Bridgemore, the "Private Service Easements"). Given that Crystal Clear already obtained a franchise agreement with Thompsons Station, these Private Service Easements are meant only to create an unlawful barrier to entry for other telecommunications providers to install equipment to provide telecommunications in the Neighborhood.

30. On information and belief every homeowner who has purchased a home in the Neighborhoods have had to pay the developer and/or Crystal Clear $1,500 to cover installation of the lines and infrastructure for Crystal Clear's telecommunications network. Absent the arranagements between Carbine, Crystal Clear, and Hood, homeowners would not be responsible for this expense. Such infrastructure costs are normally absorbed by the developer as part of developing a subdivision like the Neighborhoods.

7
Case 3:16-cv-00008  Document 1  Filed 01/05/16  Page 7 of 20 PageID #: 7

31. The Tollgate Communications Agreement requires homeowners to purchase television from Crystal Clear regardless of whether a homeowner actually uses the service. The minimum fee charged to all homes regardless of usage is $75.

32. The Bridgemore Communications Agreement requires homeowners to purchase television from Crystal Clear regardless of whether a homeowner actually uses the service. The minimum fee charged to all homes regardless of usage is $65.

33. On information and belief, the Canterbury Agreement requires homeowners to purchase television from Crystal Clear regardless of whether a homeowner actually uses the service. The minimum fee charged to all homes regardless of usage is $65.

34. The Tollgate Communications Agreement, and the Bridgemore Communications Agreement also prevent homeowners from directly purchasing television and home internet service from other satellite providers, like DirecTV and/or DISH Network. On information and belief, the Canterbury Communications Agreement places a similar restriction on homeowners' ability to purchase television or home internet directly from satellite providers.

35. On information and belief, Crystal Clear does not have a separate telecommunciations network to allow it to deliver television content or high speed internet to residences in the Neighborhood. Crystal Clear must obtain this from another telecommunications provider. Crystal Clear has contracted with DirecTV to allow it to provide television and internet to the residences in the Neighborhoods. Absent the arrangement between Crystal Clear and DirecTV and absent the existence of the Tollgage Communications Agreement, the Bridgemore Communications Agreement, and the Canterbury Communications Agreement would permit residence of the Neighborhoods to purchase television and internet from other satellite providers or landline providers.

36. The net effect of the allegations set forth in the foregoing paragraphs, which include the required minimum fees regardless of usage, Private Service Easements, and the inability to negotiate directly with other providers, allows Crystal Clear a monopoly on providing television and home internet to the Neighborhoods and allows DirecTV to be the exclusive provider of telecommunications to Crystal Clear. In this arrangement Crystal Clear acts as nothing more than a reseller of DirecTV's telecommunications.

37. These arrangements are not intended to benefit homeowners of the Neighborhoods but rather give the developers Carbine, and on information and belief, Hood, another revenue stream that developers do not otherwise receive in developing property. In effect, both Carbine and Hood have used the developer controlled POAs to bind homeowners to receive service from Crystal Clear for the sole and exclusive benefit of Carbine and Hood. On information and belief Hood also receives revenue from Crystal Clear. The arrangements are also meant to ensure that DirecTV is the exclusive satellite provider to the Neighborhoods.

38. Crystal Clear's provision of television and home internet to the Neighborhoods is terrible. Originally, Crystal Clear's model was meant to allow homeowners to be able to tie directly into Crystal Clear's fiber-optic network to receive both television and home-internet. However, Crystal Clear, having no previous experience in building complex and modern communications infrastructure, failed to properly build the systems through the Neighborhoods. As a result, homeowners must have a satellite dish on their home to receive television service, but cannot by themselves deal directly with the satellite television company that provides that service, but rather must go through Crystal Clear as a middle man. This simply makes service more difficult for customers while cheating residents of the Neighborhoods out of promotional deals offered by the large satellite television providers because the homeowners are not

considered "customers" of those providers but rather customers of Crystal Clear. Crystal Clear does not pass on any promotional activities to its customers.

39. Crystal Clear has had significant service disruptions and has been historically slow to respond to customer complaints about outages, service interruptions, and other customer problems with receiving television or home internet from Crystal Clear.

40. This is not surprising given that Crystal Clear, apart from providing television and home internet to the Neighborhoods, has never operated another communications network or otherwise been in the business of providing telecommunications. The management of Crystal Clear is simply the same folks who run Carbine, in essence they are real estate developers, not telecommunications providers.

41. To date, homeowners in the Neighborhood have no other option to provide television or home internet other than Crystal Clear. Upon information and belief, AT&T would provide television and home internet in at least one of the Neighborhoods, but for Crystal Clear's monopoly on the provision of television and home internet.

42. All conditions precedent to the maintenance of this case have been satisfied.

## V. CLASS ALLEGATIONS

43. Plaintiffs bring this action pursuant to Rule 23(a) and Rule 23(b)(1), (2) and (3) of the Federal Rules of Civil Procedure on behalf of themselves and all other homeowners of the Neighborhoods (the Class") together with the following subclasses:

    a.    All homeowners in the Tollgate neighborhood (the "Tollgate Sub-Class")

    b.    All homeowners in the Bridgemore neighborhood (The "Bridgemore Sub-Class")

    c.    All homeowners or residents in the Canterbury neighborhood (the "Canterbury Sub-Class")

44. The Class is so numerous that joinder of all class members is impractical. The class consists of over a thousand homeowners in the Neighborhoods.

45. Plaintiffs' claims are typical of the claims of other class members in that Plaintiffs and the Class have been damaged by the same wrongful conduct of the Defendants and Plaintiffs have no interest that are adverse to members of the Class.

46. There are questions of law and fact that are common to Plaintiffs and all class members:

   a. Whether at the time of execution of the Tollgate Communications Agreement, the Bridgemore Communications Agreement, and the Canterbury Communications Agreement each respective property owners' association was developer controlled;

   b. Whether the Tollgate Communications Agreement, the Bridgemore Communications Agreement, and the Canterbury Communications Agreement represent unlawful tying arrangements in violation of federal antitrust laws;

   c. Whether the barriers for entry outlined in paragraphs 28-33 above are violations of the Federal Communications Commission's rules and regulations;

   d. Whether homeowners have any other choice in the provision of television or home internet other than purchasing these from Crystal Clear.

47. Plaintiffs will fairly and adequately protect the interests of the Class and Subclasses and has retained counsel experienced and competent to prosecute this class action to full completion. Plaintiffs seek the appointment of Brian Stover as class representative for the

Tollgate Subclass, Dr. Jason Miller as class representative for the Bridgemore Subclass, and Courtney Cates as class representative of the Canterbury Subclass. Collectively, these Plaintiffs will also be referenced as the "Class Representatives."

48. Plaintiffs seek appointment of Branstetter, Stranch, and Jennings PLLC as class counsel ("Class Counsel"). Class Counsel has the expertise, experience, and resources necessary to see this class action to completion.

49. Prosecuting this case as a class action will avoid the risk of inconsistent or varying adjudciations with respect to the individual class members and/or adjudication of the rights of the Plaintiffs will, as a practical matter, be dispositive of the interests of the class

50. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly situated persons to prosecute common claims in a single forum simultaneously, efficiently, and without duplication of effort and expense that numerous individual claims would engender. Class treatment will also permit the adjudication of relatively small claims by many Class members who could not afford on their own to individually litigate an antitrust claim against a corporate defendant. There are no difficulties likely to be encountered in the management of this class action that would preclude the maintenance of the class action, and no superior alternative exists for the fair and efficient adjudication of the claims.

51. Further, the Defendants have acted or refused to act on grounds that apply generally to the Class and final injunctive or corresponding declaratory relief is appropriate respecting the Class as a whole.

12
Case 3:16-cv-00008   Document 1   Filed 01/05/16   Page 12 of 20 PageID #: 12

## VI. CAUSES OF ACTION

### COUNT I

**(Unlawful Tying Claim For Violation Of Section I Of The Sherman Antitrust Act)**

52. Plaintiffs reallege, restate, and incorporate by reference the allegations made in paragraphs 1-51 above.

53. The sale of lots in the Neighborhoods is a separate good from the sale of telecommunications by Crystal Clear.

54. The Defendants have sufficient market power in the sale of lots in the Neighborhood and/or the sale of telecommunications in the Neighborhood.

55. The amount of interstate commerce affected in the market for the sale of lots in the Neighborhood and/or the sale of telecommunications in the Neighborhood is substantial.

56. Defendants force residents and homeowners in the Neighborhoods to purchase telecommunications from Crystal Clear when they might otherwise prefer to purchase such telecommunications from other providers.

57. Defendants' actions of tying the purchase of lots in the Neighborhoods to the purchase of telecommunications from Crystal Clear unreasonably restrains trade and is unlawful per se under Section 1 of the Sherman Act.

58. Defendants' actions and anticompetitive agreemetns are not reasonably necessary to further any procompetitive purpose.

59. Through the unlawful acts of tying the purchase of lots in the Neighborhoods to the purchase of telecommunications from Crystal Clear, Defendants have harmed competition for the provision of telecommunications and have damaged Plaintiffs and the Class in an amount to be proved at trial.

# COUNT II

**(Unlawful Market Allocation Claim For Violation Of Section I Of The Sherman Antitrust Act)**

60. Plaintiffs reallege, restate, and incorporate by reference the allegations made in paragraphs 1-59 above.

61. Crystal Clear and DirecTV are each a horizontal competitor for telecommunications in the Neighborhood. Crystal Clear and DirecTV have entered into agreements to allow DirecTV to provide exclusive service to the Neighborhoods through Crystal Clear's arrangements with the Tollgate POA, the Bridgemore POA, and the Canterbury POA. Crystal Clear's agreements with the three POAs are facially anticompetitive because they allocate territories for the marketing of competing telecommunications services and limit competition among Crystal Clear and DirecTV. The agreement eliminate a significant form of competition to allow DirecTV via Crystal Clear to be the exclusive provider of telecommunications within the Neighborhoods to the exclusion of other telecommunications providers or direct competition between Crystal Clear and DirecTV.

62. The agreements between Crystal Clear and DirecTV are unreasonable restraints of trade that are per se illegal under Section 1 of the Sherman Act, 15 U.S.C. § 1. No elaborate analysis is required to demonstrate the anticompetitive character of these agreements.

63. The agreements are also unreasonable restraints of trade that are unlawful under Section 1 of the Sherman Act, 15 U.S.C. § 1, under an abbreviated or "quick look" rule of reason analysis. The principal tendency of the agreement between Crystal Clear and DirecTV is to restrain competition. The nature of the restraints is obvious, and the agreemetns lack legitimate procompetitive jusitifications.

64. Through the unlawful allocation of markets in the Neighborhoods, Defendants have harmed competition for the provision of telecommunications in the Neighborhoods and have damaged Plaintiffs and the Class in an amount to be proved at trial.

## COUNT III

**(Declaratory Action That Transactions Are Void For Self-Dealing)**

65. Plaintiffs reallege, restate, and incorporate by reference all allegations in paragraphs 1-64 above.

66. The Tollgate Communications Agreement was the product of a self-dealing transaction between Carbine and Crystal Clear in that the Tollgate POA at the time it executed the Tollgate Communications Agreement was under the exclusive control of Carbine.

67. The Bridgemore Communications Agreement was the product of a self-dealing transaction between Carbine and Crystal Clear in that the Bridgemore POA at the time it executed the Tollgate Communications Agreement was under the exclusive control of Carbine.

68. With regard to the Tollgate Communications Agreement and the Bridgemore Communications Agreement, Carbine was able to obtain additional revenue that a developer does not typically obtain by giving a Carbine-controlled entity the exclusive right to provide telecommunications to the Tollgate and Bridgemore neighborhoods. The Tollgate Communications Agreement and the Bridgemore Communications Agreement were executed for the exclusive benefit of Carbine and did not benefit the homeowners in Tollgate and/or Bridgemore.

69. On information and belief the Canterbury Communications Agreement also involves a self-dealing transaction between Carbine, Hood, and Crystal Clear. On information and belief, Hood obtained benefits under the Canterbury Communications Agreement that a developer would not otherwise obtain by providing Hood and Carbine with revenue from

telecommunications that it otherwise would not receive. The Canterbury Communications Agreement was executed for the exclusive benefit of Carbine and Hood and did not benefit the homeowners in Canterbury.

70. The material facts of the Tollgate Communications Agreement, the Bridgemore Communications Agreement, and the Canterbury Communications Agreement were never disclosed to homeowners or potential homeowners and such homeowners did not ratify or approve the agreements.

71. Through this self-dealing, Carbine and Hood gained an unjust and undeserved advantage by giving exclusive communications rights to Crystal Clear.

72. These transactions are unfair to the Tollgate POA, the Bridgemore POA, and the Canterbury POA and its resident members and homeowners and they have damaged the Plaintiffs and the Class.

73. Accordingly, Plaintiffs seek a declaration from this Court that the Tollgate Communications Agreement, the Bridgemore Communications Agreement, and the Canterbury Communications Agreement are null and void.

## COUNT IV

**(Declaratory Judgment That Private Communications Agreement Violate FCC Exclusivity Order, 47 U.S.C. § 458)**

74. Plaintiffs reallege, restate, and incorporate by reference all allegations in paragraphs 1-73 above.

75. Defendants caused the Tollgate POA, the Bridgemore POA, and the Canterbury POA to enter into the Tollgate Communications Agreement, the Bridgemore Communications Agreement, and, on information and belief, the Canterbury Communications Agreement for the

sole and exclusive purpose of preventing other television providers of providing television in the Neighborhoods.

76. Pursuant to 47 U.S.C. § 548, the Federal Communications Commission promulgated the 2007 Exclusivity Order, 22 FCC Rcd 20235, a copy of which is attached hereto as Exhibit C (the "2007 Exclusivity Order").

77. The 2007 Exclusivity Order prohibits Crystal Clear from having an exclusive right to serve the Neighborhoods through the Tollgate Communications Agreement, the Bridgemore Communications, and the Canterbury Communications Agreement.

78. Tollgate Communications Agreement, the Bridgemore Communications, and the Canterbury Communications Agreement create unlawful and unreasonable barriers to entry through: 1) imposing minimum fees on all homeowners in the Neighborhood that must be paid regardless of usage; 2) creating or referencing the Private Service Easements that make it impossible for other television providers to service the Neighborhoods; and 3) granting Crystal Clear the exclusive right to negotiate with potential competitors about providing television to the Neighborhoods.

79. As a result of the barriers of entry described in the preceding paragraph, they could only offer economically competitive service to a homeowner in the Neighborhoods if such provider 1) offer service at prices that makes it economical for a homeowner to pay the such television provider *and* pay the minimum fee to Crystal Clear 2) provide service without violating the Private Service Easements; and 3) successfully negotiate entry into the market with Crystal Clear, its competitor. This is simply unreasonable and no rationale television provider could provide service along these terms or would be willing to negotiate entry into a market with a competitor.

17
Case 3:16-cv-00008   Document 1   Filed 01/05/16   Page 17 of 20 PageID #: 17

80. As a result of the barriers of entry described in Paragraph 65 and the effects on competition in paragraphs 66, the Tollgate Communications Agreement, the Bridgemore Communications, and the Canterbury Communications Agreement violate the 2007 Exclusivity Order by providing Crystal Clear with the exclusive rights to serve the Neighborhoods.

81. The homeowners in the Neighborhoods have been harmed and continue to be harmed by the continued enforcement, or threat of enforcement, of the Tollgate Communications Agreement, the Bridgemore Communications, and the Canterbury Communications Agreement.

## COUNT V

### (Unjust Enrichment)

82. Plaintiffs reallege, restate, and incorporate by reference all allegations in paragraphs 1-81 above.

83. Plaintiffs and the members of the Class conferred an economic benefit on the Defendants by their payments to Crystal Clear for television and payment of the $1,500 fee to allegedly cover Crystal Clear's communications network infrastructure.

84. Defendants, including but not limited to Crystal Clear, appreciated, accepted, and retained this economic benefit to the detriment of Plaintiffs and members of the Class.

85. Allowing Defendants to retain the economic benefit it received from telecommunications or the $1,500 fee would be inequitable to Plaintiffs and members of the Class because of the wrongful conduct alleged herein. Defendants' retention of the economic benefit it received violates the fundamental principles of justice, equity, and good conscience because Defendants knowingly entered into anticompetitive agreements in an attempt to curtail Plaintiffs and class members choice in their provider of telecommunications.

86. As a result, Plaintiffs seek an Order requiring Defendants to disgorge all of the profits, benefits, and other compensation it obtained from Plaintiffs and members of the Class as a result of its wrongful conduct.

## VII. PRAYER FOR RELIEF

87. WHEREFORE, Plaintiffs on behalf of themselves and the class, respectfully request that the Court:

    a. Determine that this action may be maintained as a class action pursuant to Fed. R. Civ. P. 23(a) and (b)(2); find Plaintiffs to be adequate representatives of the class; and appoint the undersigned class counsel;

    Enjoin Crystal Clear from enforcing any term of the Tollgate Communications Agreement, the Bridgemore Communications, and the Canterbury Communications Agreement;

    b. Declare the Tollgate Communications Agreement, the Bridgemore Communications, and the Canterbury Communications Agreement unenforceable and void;

    c. Award Plaintiffs and the Class monetary damages, including treble damages, for the unlawful conduct alleged herein;

    d. Grant Plaintiffs the costs of suit, including reasonable attorney's fees as provided by law; and

    e. Grant to Plaintiffs such other or further relief as the nature of the case may require or as may be determined to be just, equitable, and proper by this Court.

Dated: January 5, 2015

    Respectfully submitted,

    By: /s/ Benjamin A. Gastel_____
    J. Gerard Stranch, IV, Esq.
    Benjamin A. Gastel
    BRANSTETTER, STRANCH & JENNINGS PLCC
    227 Second Avenue North, Fourth Floor
    Nashville, TN 37201-1631
    (615) 254-8801
    gerards@BSJFirm.com

beng@BSJFirm.com

*Attorneys for Plaintiffs and the Proposed Class*