UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE

| | |
|---|---|
| COURTNEY CATES, et al., | ) |
|     Plaintiffs, | ) ) ) |
| v. | )    No. 3:16-cv-00008 ) |
| CRYSTAL CLEAR TECHNOLOGIES, LLC, et al., | )    Judge Trauger ) ) |
|     Defendants. | ) |

### HOOD DEVELOPMENT, LLC'S MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

Defendant, Hood Development, LLC ("Hood"), hereby submits this Memorandum in Support of its Motion to Dismiss.

### I. INTRODUCTION

Unhappy with their satellite television service and other communications services, a group of homeowners in three Williamson County residential developments file this "class action" suit against the service provider, the developers, and their own homeowners' associations. The plaintiffs allege violations of the Sherman Antitrust Act and an Order of the Federal Communications Commission ("FCC"). They also assert several state law claims.

The federal claims are meritless. As at least two federal courts have ruled – dismissing lawsuits identical to this one – a residential development is not a "relevant market" for antitrust purposes under the Sherman Act. The only other federal claim is mistakenly based on an FCC Order which applies to wireline cable operators, not to direct broadcast satellite services such as DirecTV, which is the underlying provider of the services used by the plaintiffs.

The remaining claims are also without merit but, in any event, belong in state court if they belong in any court at all.

1

The arguments set forth herein demonstrate that Plaintiffs have failed to state a cause of action for which relief can be granted. Therefore, the Court should dismiss Plaintiffs' Complaint pursuant to Fed. R. Civ. P. 12(b)(6).

## II. STATEMENT OF FACTS

Plaintiffs allege the following facts with regard to the Canterbury development, for which Hood is the developer. Plaintiff Courtney Cates ("Cates") is a resident of the Canterbury neighborhood, and purchased her residence there in November of 2014. (Compl., ECF No. 1, ¶ 8.) In her Complaint, Cates purports to bring claims individually and on behalf of "all other homeowners or residents" of the Canterbury neighborhood (the putative "Canterbury Sub-Class"). (*Id.* at ¶ 43.) Cates complains that the Canterbury Homeowners Association, Inc. ("Canterbury POA"), a Tennessee non-profit corporation of which she and the putative Canterbury Sub-Class are members, has entered into a communication services agreement ("Canterbury Communications Agreement") with defendant Crystal Clear at the direction of Hood. (*Id.* at ¶¶ 23, 27.) She complains that, pursuant to the Canterbury Communications Agreement, she and the other Canterbury homeowners have had to pay "the developer and/or Crystal Clear" fees for installation and television and Internet services regardless of whether they use the services or not. (*Id.* at ¶¶ 35, 36.) Finally, she complains that Crystal Clear has experienced significant service disruptions and is slow to respond to service calls. (*Id.* at ¶ 39.)

The Complaint sets forth five (5) causes of action allegedly arising out of these facts: 1) unlawful tying in violation of § 1 of the Sherman Act; 2) unlawful market allocation in violation of § 1 of the Sherman Act; 3) declaratory judgment that the communications agreements for each of the developments be declared void for self-dealing; 4) declaratory judgment that the communications agreements violate the FCC's Exclusivity Order; and 5) unjust enrichment. As set forth more fully below, and in Crystal Clear and Carbine's moving papers, Plaintiffs'

2

Complaint fails to state a cause of action for which relief could be granted, and should, therefore, be dismissed pursuant to Fed. R. Civ. P. 12(b)(6).

### III. ARGUMENT

**A.    STANDARD OF REVIEW.**

In analyzing a motion to dismiss, the court must "accept all factual allegations as true," and construe the complaint "in the light most favorable to the plaintiff." *Grubbs v. Sheakley Group, Inc.*, 807 F.3d 785, 792 (6th Cir. 2015) (*quoting Laborers' Local 265 Pension Fund v. iShares Trust*, 769 F.3d 399, 403 (6th Cir. 2014)). To survive a motion to dismiss, plaintiffs must plead "sufficient factual matters, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S.662, 678 (2009) (*quoting Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Plaintiffs must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

In antitrust cases, the Supreme Court has cautioned district courts that, although they must "be cautious before dismissing an antitrust complaint in advance of discovery," they must not forget that "proceeding to antitrust discovery can be expensive." *Twombly*, 550 U.S. at 558. *Twombly* instructs that "a district court must retain the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed." *Id.* "The costs of modern federal antitrust litigation and the increasing caseload of the federal district courts counsel against sending the parties into discovery when there is no reasonable likelihood that the plaintiffs can construct a claim from the events related in the complaint." *Id.* (*quoting Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1106 (7th Cir. 1984)).

Here, even accepting the factual allegations alleged in Plaintiffs' Complaint as true, and construing those allegations "in the light most favorable to the plaintiff," the Court should dismiss all five counts set forth in the Complaint because Plaintiffs have failed to state a claim to relief that

is plausible on its face. Likewise, the allegations set forth in the Complaint do not allow the Court the draw the reasonable inference that Hood should be held liable under any of the five (5) counts alleged. As set forth more fully below, Plaintiffs' Complaint should be dismissed pursuant to Fed. R. Civ. P. 12(b)(6).

**B. PLAINTIFFS' ANTITRUST CLAIMS (COUNTS I AND II) UNDER SECTION 1 OF THE SHERMAN ACT FAIL TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED.**

With regard to Plaintiffs' unlawful tying claims (Count I) and unlawful market allocation claims (Count II) under § 1 of the Sherman Act, Hood hereby adopts the substantive legal arguments set forth by Crystal Clear and Carbine in their Memorandum in Support of Motion to Dismiss (Mem. In Supp. Mot. Dismiss, ECF No. 8, pp. 4-10). In addition to the substantive legal arguments set forth by Crystal Clear and Carbine, Hood argues the following.

Plaintiffs' alleged antitrust claims for unlawful tying and unlawful market allocation are both governed by § 1 of the Sherman Act.[1] *See Michigan Division-Monument Builders of North Am. v. Michigan Cemetery Ass'n.*, 524 F.3d 726, 732 (6th Cir. 2008) (unlawful tying claims are governed by § 1 of the Sherman Act); *In re Cardizem CD Antitrust Litigation*, 332 F.3d 896, 907 (6th Cir. 2003) (*citing United States v. Topco Assocs.*, 405 U.S. 596, 608 (1972)) (horizontal market allocation claims are governed by § 1 of the Sherman Act). In order to establish a claim under § 1 of the Sherman Act:

> the plaintiff must establish that the defendants contracted, combined or conspired among each other, that the combination or conspiracy produced adverse, anticompetitive effects within the relevant product <u>and geographic markets</u>, that the objects of and conduct pursuant to that contract or conspiracy were illegal and that the plaintiff was injured as a proximate result of that conspiracy.

---

[1] Section 1 of the Sherman Act provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1.

4

*Nilavar v. Mercy Health System-Western Ohio*, 244 Fed. Appx. 690, 695, 2007 WL 264439 (6th Cir. Aug. 7, 2007) (*quoting Crane & Shovel Sales Corp. v. Bucyrus-Erie Co.*, 854 F.2d 802, 805 (6th Cir. 1988)) (emphasis added).

Plaintiffs' antitrust claims fail because Plaintiffs do not adequately allege anticompetitive effects within a relevant geographic market for antitrust purposes. In short, a residential development does not qualify as a "market" under the Sherman Act. In addition to the case law cited by Crystal Clear and Carbine on this issue, the Fifth Circuit has specifically addressed – and dismissed – identical antitrust claims brought by homeowners. *See Wampler v. Southwestern Bell Telephone Co.*, 597 F.3d 741, 745 (5th Cir. 2010). The plaintiffs in *Wampler* – like the Plaintiffs here – brought class claims on behalf of all residents of a multiple dwelling unit ("MDU") alleging that contracts whereby AT&T was granted the exclusive right to provide video, voice and broadband Internet ("Triple Play") services to the MDU violated § 1 of the Sherman Act. *Id.* at 744. The sole issue on appeal in *Wampler* was "whether a single MDU (or MDUs in the aggregate) may plausibly be considered a relevant geographic market for antitrust purposes." *Id.*

In defining the relevant geographic market, courts look at "the area of effective competition." *Id.* (*citing Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 328 (1961)). This is the area "in which the seller operates and to which buyers can practicably turn for supplies." *Id.* In addition, the proposed market must "correspond to the commercial realities of this industry and be economically significant." *Id.* (*citing Brown Shoe Co. v. United States*, 370 U.S. 294, 336-37 (1962)). These "commercial realities" include "size, cumbersomeness, and other characteristics of the relevant product" along with "regulatory contracts impeding the free flow of competing goods into an area, such as perishability of products and transportation barriers." *Id.* (*quoting Apani Sw. Inc. v. Coca-Cola Enters.*, 300 F.3d 620, 626 (5th Cir. 2002)). When determining the

5

"economic significance" of a proposed market, the court looks to whether the proposed market is "largely segregated from, independent of, or not affected by competition elsewhere." *Id.* at 745 (*quoting Apani*, 300 F.3d at 627)).

The court in *Wampler* held that the plaintiff's alleged geographic market of MDUs in San Antonio, Texas was legally insufficient to maintain a Sherman Act claim. *Id.* The court held that there are "too many competitive forces bearing on a contract for a single MDU to be sufficiently isolated and thus economically significant" for antitrust purposes. *Id.* First, the court held MDUs compete with each other for occupants' business. *Id.* Thus, an MDU owner has an incentive to provide the highest quality services and features to attract business. *Id.* Second, service providers such as AT&T compete with each other to provide Triple Play contracts in each MDU. *Id.* The court held that it is, therefore, in the interest of each service provider to provide lower-cost and higher-quality services than its competitors in order to attract the MDU's business. *Id.* Finally, the court concluded, when an occupant enters the MDU, the occupant has the opportunity to inquire into what services are available at the MDU. *Id.* Therefore, the cost and quality of Triple Play services likely plays a factor in where an occupant chooses to live. *Id.* If the occupant does not like the services of a particular MDU, then they can make other living arrangements. *Id.*

The *Wampler* court concluded: "[a]ccordingly, given the competition that exists between MDU owners, the competition that exists between service providers, and given the highly mobile nature of today's society, we cannot hold that a single MDU is so segregated as to be economically significant and thus represents a plausible geographic market." *Id.* at 746. The court, therefore, affirmed the dismissal of the plaintiff's antitrust claims. *Id.*

The district court in the Eastern District of Virginia likewise dismissed nearly identical antitrust claims to those claims presented by Plaintiffs in the instant action. *See Lansdowne on the*

6

*Potomac Homeowners Ass'n, Inc. v. OpenBand at Lansdowne, LLC*, No. 1:11-cv-872, 2011 WL 5872885 (E. D. Va. Nov. 22, 2011). In *Lansdowne*, the court dismissed the antitrust claims of the homeowners association against the developer and cable provider based on an exclusive contract to provide Triple Play services to an MDU housing development. *Id.* at *6. The district court, relying, in part, on the decision and analysis in *Wampler*, held that a single residential development is not "a relevant market for antitrust purposes," as opposed to the broader market within which the service provider competes for similar contracts. *Id.*

In so holding, the court directly addressed – and rejected – the plaintiff's arguments that the exclusive contracts gave the service provider monopoly power within the development. *Id.* at *5. In disposing of this argument, the court held:

> While it is true that, today, residents in Lansdowne cannot turn to an alternative wireline supplier, the Lansdowne residents' inability to shop around for that service is the direct result of an exclusive *contract*. The fact of that contract does not establish that OpenBand has monopoly market power in the relevant market or had monopoly power before entering into its contracts with the Developer Defendants. In short, OpenBand's "contract power" over Lansdowne does not show that OpenBand has "monopoly power" over Lansdowne. The Eleventh Circuit has addressed the plaintiff's conflation succinctly:
>
> "[W]hile a party who exercises contract power may have market power and may violate antitrust laws under some circumstances, the mere existence and exercise of contract power does not show that a defendant had market power or violated the law. In other words, courts must attempt to ascertain a defendant's economic position in the relevant market, rather than its power pursuant to a particular contract, when considering whether a defendant has market power."
>
> *Maris Distributing Co. v. Anhueser-Busch, Inc.*, 302 F.3d 1207, 1219 (11th Cir. 2002); *see also United Farmers Agents Assoc., Inc. v. Farmers Ins. Exchange*, 89 F.3d 233, 236-37 (5th Cir. 1996) ("Economic power derived from contractual agreements such as franchises … has nothing to do with market power, ultimate consumers' welfare, or antitrust." (internal quotations omitted)); *Hack v. President and Fellows of Yale College*, 237 F.3d 81, 85 (2[d] Cir. 2000) ("Economic power derived from contractual agreements affecting a distinct class of consumers cannot serve as a basis for a monopolization claim.") (*abrogated on other grounds by Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002)).

*Lansdowne*, 2011 WL 5872885, at *5. The *Lansdowne* court continued:

7

> This issue is not whether the exclusive contract has foreclosed options for customers, it is whether the exclusive contract foreclosed *competition* amounting to "a substantial share of the relevant market." In determining the relevant market, the Court's focus is not on the exclusive contract's effect on the Lansdowne residents, but on OpenBand's position relative to other providers of telecom services.

*Id.* (internal citations omitted). When viewed in this fashion, the court concluded that the plaintiff had not alleged facts sufficient to support the development as a plausible market. *Id.* at *6. Thus, the court held, "Plaintiff has failed to state a claim under federal antitrust laws." *Id.*

In the instant action, Plaintiffs do not even attempt to define the relevant geographic market for antitrust purposes. Instead, they simply rely on their conclusory argument that because the agreements at issue foreclose options for the homeowners, this amounts to *per se* violations of the Sherman Act. (Compl., ECF No. 1, pp. 13-15.) As the court in *Lansdowne* (and the substantial authority cited therein) held, these alleged facts are insufficient to support the developments as a plausible market. Moreover, as both the *Wampler* and *Lansdowne* cases instruct, the developments at issue here are not "relevant markets for antitrust purposes." Plaintiffs have thus failed to state claim under federal antitrust laws.

**C.  PLAINTIFFS' CLAIM FOR DECLARATORY JUDGMENT THAT THE CANTERBURY COMMUNICATIONS AGREEMENT IS "VOID FOR SELF-DEALING" (COUNT III) FAILS TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED.**

In support of its argument that Plaintiffs' claim for "self-dealing" (Count III) should be dismissed, Defendant Hood hereby relies upon and adopts the substantive legal argument set forth by Crystal Clear and Carbine. (*See* Mem. In Supp. Of Mot. To Dismiss, ECF No. 8, pp. 10-12.) In addition to these arguments, Hood states the following.

Plaintiffs claim that the Canterbury Homeowners Association, Inc. ("Canterbury POA") entered into the Canterbury Communications Agreement with Crystal Clear. (Compl., ECF No. 1, ¶¶ 23, 27.) They claim that Hood controlled the Canterbury POA and caused the Canterbury

POA to execute the Canterbury Communications Agreement. (*Id.* at ¶ 27.) Plaintiffs assert that Hood is guilty of self-dealing because, according to Plaintiffs, "Hood obtained benefits under the Canterbury Communications Agreement that a developer would not otherwise obtain by providing Hood and Carbine with revenue from telecommunications that it otherwise would not receive." (*Id.* at ¶ 69.) They allege – in conclusory fashion – that the "Canterbury Communications Agreement was executed for the exclusive benefit of Carbine and Hood and did not benefit the homeowners of Canterbury." (*Id.*)

Even if there were an independent cause of action for "self-dealing" under Tennessee law (which the Crystal Clear and Carbine Memorandum demonstrates there is not), any such claim would be a derivative claim of the Canterbury POA, and not the individual claims of its residents. Plaintiffs' Complaint fails to meet the requirements of Tenn. Code Ann. § 48-56-401, which governs derivative suits on behalf of Tennessee non-profit corporations, and Fed. R. Civ. P. 23.1. Therefore, Plaintiffs' state-law self-dealing claims should be dismissed.

        1.      <u>Plaintiffs' Claims Against Hood Are Derivative Claims Of The Canterbury POA, Not Individual Claims.</u>

Tennessee state law determines whether Plaintiffs' claims are derivative or direct. *See Lay v. Burley Stabilization Corp.*, 312 Fed. Appx. 752, 756, 2009 WL 439987, *4 (6th Cir. Feb. 12, 2009) (*citing McCarthy v. Middle Tenn. Elec. Membership Corp.*, 466 F.3d 399, 407-10 (6th Cir. 2006)). In Tennessee, stockholders may bring an individual action for an injury done to them that is separate and distinct from any injury incurred by the corporation or other shareholders. *Hadden v. City of Gatlinburg*, 746 S.W.2d 687, 689 (Tenn. 1988); *see also McCarthy*, 466 F.3d at 408. Thus, a direct action will lie where a shareholder has suffered individual injury, such as where the shareholder has been denied voting rights or has been denied the right to inspect the corporate books. *Id.* at 560. It is imperative, however, that the shareholder be injured in a manner different

9

from the manner in which other shareholders were injured in order to have standing to assert a direct action. *See Cato v. Mid-America Distribution Centers, Inc.*, 1996 WL 502500, *5 (Tenn. Ct. App. Sept. 6, 1996).

"[C]laims such as mismanagement, <u>self-dealing</u>, and breach of fiduciary duty must generally be brought as derivative actions because breaches of fiduciary duty are deemed to injure only the corporation." *Cato*, 1996 WL 502500, at *6 (*citing Bayberry Assoc. v. Jones*, 783 S.W.2d 553 (Tenn. 1990)) (emphasis added); *see also McCarthy*, 466 F.3d at 410.

Here, Plaintiffs' claim that Canterbury POA's contract with Crystal Clear should be declared void because of the alleged self-dealing of Hood, which Plaintiffs allege controlled the Canterbury POA at the time it executed the Canterbury Communications Agreement. (Compl., ECF No. 1, ¶¶ 27, 69-73.) The individual residents have no direct cause of action against Hood because none of them has suffered an injury that is separate and distinct from any injury to the association or other residents. The injury, if any, is to the Canterbury POA. Plaintiffs' claim, therefore, is a classic derivative claim, as demonstrated by the case law above. In fact, Plaintiffs essentially admit as much in Paragraph 72 of their Complaint, wherein they allege, "[t]hese transactions are unfair to the … **Canterbury POA** and its resident members and homeowners and they have damaged the Plaintiffs and the Class." (*Id.* at ¶ 72) (emphasis added). Accordingly, Plaintiffs' claims that the Canterbury Communications Agreement should be declared void due to self-dealing are derivative claims of the Canterbury POA, and not individual claims of the members of the Canterbury POA.

> 2. <u>Plaintiffs' Complaint Fails To Meet The Requirements Of Tenn. Code Ann. § 48-56-401 and Fed. R. Civ. P. 23.1, And Should, Therefore, Be Dismissed.</u>

Tennessee's Nonprofit Corporations Act provides that in order to bring a derivative action on behalf of a Tennessee nonprofit corporation:

10

> [a] complaint in a proceeding brought in the right of a corporation must be verified and allege with particularity the demand made, if any, to obtain action by the directors and either why the plaintiffs could not obtain the action or why they did not make the demand. If a demand for action was made and the corporation's investigation of the demand is in progress when the proceeding is filed, the court may stay the suit until the investigation is completed.

Tenn. Code Ann. § 48-56-401(c). Additionally, Fed. R. Civ. P. 23.1 sets forth the pleading requirements for a derivative action. Pursuant to Fed. R. Civ. P. 23.1(b), the "complaint must be verified and must:"

(1) Allege that the plaintiff was a shareholder or member at the time of the transaction complained of, or that the plaintiff's share or membership later devolved on it by operation of law;

(2) Allege that the action is not a collusive one to confer jurisdiction that the court would otherwise lack; and

(3) State with particularity:

   a. Any effort by the plaintiff to obtain the desired action from the directors or comparable authority and, if necessary, from the shareholders or members; and

   b. The reasons for not obtaining the action or not making the effort.

Here, Plaintiffs' Complaint fails to meet the pleading requirements of both Tenn. Code Ann. § 48-56-401(c) and Fed. R. Civ. P. 23.1. Plaintiffs' Complaint is not verified, as required by both the Act and Rule 23.1. The Complaint does not allege with particularity the demand made or why they did not make demand of the directors of the Canterbury POA, as required by both. Additionally, Plaintiffs' Complaint lacks any required allegations under subsections (1) and (2) of Rule 23.1 regarding the member status of the named Plaintiffs or the putative class members or that the action is not a collusive one to confer jurisdiction on this Court.

Accordingly, because Plaintiffs' claims to declare void the Canterbury Communications Agreement are derivative and because Plaintiffs have failed to follow the requisite procedures for filing a derivative action on behalf of the Canterbury POA, the Court should dismiss these claims.

**D. PLAINTIFFS' CLAIM FOR DECLARATORY JUDGMENT THAT THE CANTERBURY COMMUNICATIONS AGREEMENT VIOLATES FCC EXCLUSIVITY ORDER, 47 U.S.C. § 458 (COUNT IV) FAILS TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED.**

In support of its argument that Plaintiffs' claim for declaratory judgment that the Canterbury Communications Agreement violates the FCC Exclusive Access Order, 47 U.S.C. § 458 (Count IV) should be dismissed as a matter of law, Defendant Hood hereby relies upon and adopts the substantive legal argument set forth by Crystal Clear and Carbine in support of their Motion to Dismiss. (*See* Mem. In Supp. Of Mot. To Dismiss, ECF No. 8, pp. 12-14.) In addition to these arguments, Defendant Hood states the following.

In Count IV of their Complaint, Plaintiffs seek a declaratory judgment that the Canterbury Communications Agreement violates the FCC's Exclusive Access Order, 47 U.S.C. § 458.[2] (Compl., ECF No. 1 ¶¶ 74-78.) The FCC Exclusive Access Order prohibits "cable operators and other entities (LECs and open video systems) that are subject to Section 628 [of the Cable Act] from enforcing exclusivity clauses and executing contracts containing new ones." FCC 07-189, ECF No. 1-3 at ¶ 30, p. 17. The FCC Exclusive Access Order does not apply to providers of Direct Broadcast Satellite ("DBS") services, such as DirecTV, which are not "cable operators" subject to Section 628. Exclusive Access Order, 22 FCC Rcd. 21828 at ¶¶ 2, 8, 61. The FCC has expressly held that DirecTV is a DBS service provider. FCC Notice of Proposed Rulemaking, Report and Order, and Order, Dated May 20, 2015, FCC 15-59 (copy attached as **Attachment 1**), ¶¶ 28, 34. Accordingly, because the FCC Exclusive Access Order, by its express terms, does not apply to the parties or the facts of this case, Plaintiffs' claim that the "Defendants" violated the order fail.

---

[2] The statutory basis for the FCC Exclusive Access Order is 47 U.S.C. § 548(b), which provides: "[i]t shall be unlawful for a **cable operator** … to engage in unfair methods of competition or unfair or deceptive acts or practices, the purpose or effect of which is to hinder significantly or to prevent any multichannel video programming distributor from providing satellite cable programming or satellite broadcast programming to subscribers or consumers." (emphasis added).

12

Moreover, even if the FCC Exclusive Access Order applied in any context here – which it does not – the Order expressly does not apply to developers, such as Hood, who are not cable operators. Hood was the developer of Canterbury and the original property owner of the development. The FCC Exclusive Access Order, by its own terms, does not apply to real estate owners and developers like Hood:

> Finally, we note that the rule we adopt today does not require that any new entrant be given access to any MDU. A [real estate] owner still retains the rights it has under relevant state law to deny a particular provider the right to provide service to its property. [FN111].[3] We merely prohibit the enforcement of existing exclusivity clauses and the execution of new ones **by cable operators**.

Exclusive Access Order, 22 FCC Rcd. 21828 at ¶ 37 (emphasis added). Therefore, by its express terms, the Exclusive Access Order merely prohibits **cable operators** from enforcing exclusivity clauses in its agreements. The Exclusive Access Order does not apply to, nor does the FCC have jurisdiction over, developers such as Hood.

Finally, because the Exclusive Access Order merely prohibits cable operators from enforcing exclusivity provisions, it does not provide Plaintiffs, individual property owners, an avenue for redress of alleged harm. To the extent Crystal Clear and/or DirecTV, LLC are subject to Section 628 of the Cable Act –which they are not – then they may be prohibited from enforcing exclusivity clauses, as defined by the FCC Exclusive Access Order. But such hypotheticals are not before the Court presently and would not involve Plaintiffs.

Accordingly, for the reasons set forth in Crystal Clear and Carbine's arguments, as well as the arguments set forth herein, Plaintiffs' claim for declaratory judgment under the FCC's Exclusive Access Order should be dismissed.

---

[3] Footnote 111 in the FCC Exclusivity Order cites the following comment: "the Communications Act does not authorize the Commission to regulate the real estate industry." Exclusive Access Order, 22 FCC Rcd. 21828 at ¶ 37, n. 111.

13

Case 3:16-cv-00008   Document 21   Filed 01/28/16   Page 13 of 18 PageID #: 394

### E. PLAINTIFFS' UNJUST ENRICHMENT CLAIM (COUNT V) FAILS TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED.

In support of its argument that Plaintiffs' unjust enrichment claim should be dismissed as a matter of law, Defendant Hood hereby relies upon and adopts the substantive legal argument set forth by Crystal Clear and Carbine in support of their Motion to Dismiss. (*See* Mem. In Supp. Of Mot. To Dismiss, ECF No. 8, pp. 15-16.) In addition to these arguments, Defendant Hood states the following.

As an initial matter, the Complaint does not appear to state an unjust enrichment claim against Hood. In Paragraph 83 of their Complaint, Plaintiffs allege that they "conferred an economic benefit on the Defendants by their **payments to Crystal Clear** for television and payment of the $1,500 fee to allegedly cover **Crystal Clear's** communications network infrastructure." (Compl., ECF No. 1, ¶ 83) (emphasis added). The next paragraph simply concludes without any support that "**Defendants**, including but not limited to Crystal Clear, appreciated, accepted, and retained **this economic benefit** to the detriment of Plaintiffs and members of the Class." (*Id.* at ¶ 84) (emphasis added). The next paragraph concludes that "[a]llowing **Defendants** to retain the economic benefit **it** received from telecommunications or the $1,500 fee would be inequitable …." (*Id.* at ¶ 85) (emphasis added). Therefore, the only benefits Plaintiffs complain were unjustly conferred were payments they made **to Crystal Clear** "for television and payment of the $1,500 fee." (*Id.* at ¶ 83.) Accordingly, Plaintiffs' Complaint fails to state a cause of action against Hood for unjust enrichment.

Second, even if the Court could construe the Complaint as asserting an unjust enrichment claim against Hood, any such claim would be barred due to Plaintiffs' allegations of the existence of an enforceable contract. *See Doe v. HCA Health Services of Tennessee, Inc.*, 46 S.W.3d 191, 197-98 (Tenn. 2001) (the first element to an unjust enrichment claim is that there is "no existing,

enforceable contract between the parties covering the same subject matter"). Here, Plaintiffs allege that the Canterbury POA entered the Canterbury Communications Agreement with Crystal Clear and that, pursuant to that agreement, Plaintiffs are required to purchase television from Crystal Clear. (Compl., ECF No. 1 ¶¶ 23, 33.) Accordingly, because there is an enforceable contract governing the provision of services to the Canterbury development, Plaintiffs cannot maintain an unjust enrichment claim arising out of that same transaction.

Third, in the alternative, to the extent the Court were to find that Plaintiffs, as opposed to the Canterbury POA, were in privity with Crystal Clear, the Complaint fails to establish that Plaintiffs have exhausted their remedies against Crystal Clear, which is a prerequisite to bringing an unjust enrichment claim under Tennessee law. *See Freeman Industries, LLC v. Eastman Chemical Co.*, 172 S.W.3d 512, 525 (Tenn. 2005) (to maintain an unjust enrichment claim, "[t]he plaintiff must further demonstrate that he or she has exhausted all remedies against the person with whom the plaintiff enjoyed privity of contract"). Here, Plaintiffs allege that the Canterbury Communications Agreement "requires homeowners to purchase television from Crystal Clear regardless of whether a homeowner actually uses the service." Based on these allegations, if the Court were to find that Plaintiffs were in privity of contract with Crystal Clear, Plaintiffs have not alleged that they have exhausted their remedies against Crystal Clear. Accordingly, because Plaintiffs have not, and cannot, allege that they have exhausted their remedies, if any, against Crystal Clear, their unjust enrichment claims against Hood, if they had any, are premature.

Finally, even if Plaintiffs' Complaint were to survive these deficiencies, it nevertheless fails to establish that it would be unjust for Hood to retain any benefits under the bulk billing arrangements at issue in the Complaint. The FCC has carefully analyzed the exact types of bulk billing arrangements Plaintiffs complain about in their Complaint and concluded that the benefits

15

of such arrangements outweigh any concerns. *See* 25 FCC Rcd. 2460, 2471 (2010) (the "2010 Bulk Billing Order"), ECF No. 8-6. In analyzing these arrangements, the FCC sought and received filings from major cable operators, their trade association, local exchange carriers ("LECs"), the two major Direct Broadcast Satellite ("DBS") providers (DirecTV and DISH Network), private cable operators, their trade association, real estate interests (MDU developers, builders, owners, and managers and their trade associations), homeowners' associations, municipal governments, the National Governors Association, hundreds of individual consumers, and others. 25 FCC Rcd at 2463. The FCC, in analyzing these bulk billing arrangements and the input it received from the above-identified sources concluded:

> Finally, it would be a disservice to the public interest if, in order to benefit a few residents, the Commission prohibited bulk billing, because so doing would result in higher MVPD (multichannel video programming distributors like DirecTV) service charges for the vast majority of MDU residents who are content with such arrangements. Based on the evidence in the record before us, we choose not to take action that would raise prices for most MDU residents who are subject to bulk billing. Accordingly, we will allow bulk billing by all MVPDs to continue because, under current marketplace conditions, it is clear that it has significant pro-consumer effects.

*Id.* at 2471.

In reaching this conclusion, the FCC considered all of the same issues raised by Plaintiffs in their Complaint here, including: frustrating the ability of residents of an MDU to receive the service of a second MVPD by forcing such residents to pay for two MVPDs' services; developers receiving revenue they would not otherwise receive by entering bulk billing arrangements with MVPDs; and claims of inferior service. *Id.* at 2469-70. The FCC, however, weighed these concerns against the benefits of bulk billing arrangements, including: increasing competition by helping new cable operators to continue to grow; increasing efficiencies and lower costs to consumers because the MVPD provider is spared the significant expenses of selling to each resident, making credit checks and collecting deposits, managing bad debt and theft of service, and

16

frequently sending personnel and vehicles to residences to place and remove boxes and turn service on and off in different units; often ensuring prices for services below ordinary retail rates; specialized services for residents; and services provided to areas that would not otherwise receive services. *Id.* at 2465-68. In weighing these considerations, the FCC found the benefits of bulk billing arrangements outweighed the concerns, and found that they have "significant pro-consumer effects." *Id.* at 2471.

One final interesting point raised by the FCC that puts the bulk billing concerns raised by Plaintiffs into perspective is that the residential real estate market is very competitive. *Id.* at 2468. Given that competitiveness, providing MVPD services is "just another amenity of an MDU … that the owner can provide, such as a swimming pool, a fitness center, or valet services; with those amenities, some benefit from them, some do not, but all pay for them whether the assessment is itemized or not." *Id.*

If the FCC, having the benefit of input from all of the stakeholders in bulk billing arrangements, including hundreds of consumers like Plaintiffs, concludes that such arrangements are not unjust, then Plaintiffs' conclusory allegations set forth in their Complaint fail to establish that they are unjust.

## **CONCLUSION**

Plaintiffs' Class Action Complaint does not state a plausible claim for relief against Hood Development, LLC. Defendant Hood Development, LLC, therefore, respectfully requests that this Court dismiss that Complaint under Rule 12(b)(6), and submits that, under the circumstances, the dismissal should be with prejudice as to at least the three named plaintiffs. Defendant Hood Development, LLC further requests any additional relief the Court deems just and appropriate.

17

Respectfully submitted,

*s/ Christopher E. Thorsen*
Christopher E. Thorsen (TN Bar No. 21049)
Bradley Arant Boult Cummings LLP
1600 Division Street, Suite 700
Nashville, TN 37203
Tel: (615) 244-2582
cthorsen@babc.com

*Counsel for Hood Development, LLC*

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of this filing has been served upon the following Filing Users through the Court's Electronic Filing System:

J. Gerard Stranch, IV (gerards@BSJFirm.com)
Benjamin A. Gastel (beng@BSJFirm.com)
Branstetter, Stranch & Jennings PLLC
227 Second Avenue North, Fourth Floor
Nashville, TN  37201-1631


Craig V. Gabbert, Jr.
D. Alexander Fardon
Harwell Howard Hyne Gabbert & Manner, P.C.
333 Commerce Street, Suite 1500
Nashville, TN 37201


this the 28th day of January, 2016.


s/ *Christopher E. Thorsen*

18

Case 3:16-cv-00008   Document 21   Filed 01/28/16   Page 18 of 18 PageID #: 399