UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE

| | | |
|---|---|---|
| COURTNEY CATES, and others, | ) | |
| | ) | |
|     Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 3:16-cv-00008 |
| | ) | |
| CRYSTAL CLEAR TECHNOLOGIES, LLC, | ) | Judge Trauger |
| and others, | ) | |
| | ) | |
|     Defendants. | ) | |

### MEMORANDUM IN SUPPORT OF THE MOTION TO DISMISS
### BY CRYSTAL CLEAR TECHNOLOGIES, LLC AND CARBINE & ASSOCIATES, LLC

Each named plaintiff lives in one of three planned unit developments within the town of Thompson's Station, Tennessee. Plaintiffs' homeowners' associations require that all unit owners pay a monthly assessment for basic internet and television services that the associations contract for and that are provided to all units. Unit owners must pay the assessment whether they use the services or not. This is known as "bulk billing" – a type of arrangement that, as shown below, the Federal Communications Commission ("FCC") has reviewed and ruled permissible.

The three plaintiffs – who presume to speak on behalf of everyone who lives in the three communities – have decided that they do not like this arrangement. Plaintiffs, however, have not stated a claim upon which relief can be granted. Indeed, plaintiffs' First Amended Class Action Complaint, like its predecessor, is riddled with fatal deficiencies. Plaintiffs fail to assert allegations that are fundamental to their purported claims; repeatedly contradict both themselves and the content of the documents they attach to their pleading; and ignore the FCC's 2010 Order permitting bulk billing. Crystal Clear Technologies, LLC ("Crystal Clear") and Carbine & Associates, LLC ("Carbine & Associates") request dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6).

## RELEVANT FACTUAL ALLEGATIONS OF THE FIRST AMENDED COMPLAINT[1]

Each plaintiff lives in one of three developments in Thompson's Station, Tennessee: Bridgemore, Tollgate, and Canterbury (Dkt. 31 ("FAC") ¶¶ 2, 9-11). In 2006, Tollgate's homeowners' association ("HOA") entered into a Communications Services Agreement ("CSA") with Crystal Clear (FAC ¶ 42 & Ex. B). In 2007, Bridgemore's HOA entered into a nearly identical CSA with Crystal Clear (FAC ¶ 45 & Ex. C). In or around 2007, Canterbury's HOA "upon information and belief" entered into a similar CSA with Crystal Clear (FAC ¶ 48).

Each CSA:

- requires that Crystal Clear provide certain internet and television services to every home in the relevant development (FAC Ex. B at §2.1(d), Ex. C at §2.1(d));

- specifies the service quality standards Crystal Clear must meet, at risk of termination (FAC Ex. B at §§ 2.2 & 9.9, Ex. C at §§ 2.2 & 9.9);

- refers to an easement granted to Crystal Clear to be able to provide these services (FAC ¶ 63, Ex. B at Recital D, Ex. C at Recital D);

---

[1] This Court and defendants generally must assume for purposes of this motion that plaintiffs' factual allegations are true. In re Omnicare, Inc. Sec. Litig., 769 F.3d 455, 469 (6th Cir. 2014). But plaintiffs do *not* get the benefit of this assumption when those allegations contradict the content of documents plaintiffs attach to, or refer to in, their Complaint. Id. at 466 ("Generally, at the motion-to-dismiss stage, a federal court may consider only the plaintiff's complaint. However, we have recognized that if a plaintiff references or quotes certain documents, or if public records refute a plaintiff's claim, a defendant may attach those documents to its motion to dismiss, and a court can then consider them in resolving the Rule 12(b)(6) motion without converting the motion to dismiss into a Rule 56 motion for summary judgment. Fairness and efficiency require this practice. As the Second Circuit explained in Kramer, '[w]ere courts to refrain from considering such documents, complaints that quoted only selected and misleading portions of such documents could not be dismissed under Rule 12(b)(6) even though they would be doomed to failure. Foreclosing resort to such documents might lead to complaints filed solely to extract nuisance settlements.'" (citations omitted)). See also Williams v. CitiMortgage, Inc., 498 F. App'x 532, 536 (6th Cir. 2012) ("[W]hen a written instrument contradicts allegations in the complaint to which it is attached, the exhibit trumps the allegations.") (citation omitted) (copy at Dkt. 8 Attachment 1); Ford v. New Century Mortgage Corp., 797 F. Supp. 2d 862, 868 (N.D. Ohio 2011) (same).

- provides that each homeowner will pay for the basic level of services as an assessment, even if they choose not to use the services or choose to buy the same services from another provider (FAC ¶¶ 61, 68, 113, Ex. B at §§ 3.5 & 5.5, Ex. C at §§ 3.5 & 5.5); and

- arranges for alternate providers to be able to provide the same services within the development (FAC Ex. B at Article 4, Ex. C at Article 4), mandating that "no resident within [the development], whether tenant or owner, shall be denied access to an available franchised or licensed cable television service, nor shall such resident or cable television service be required to pay anything of value in order to obtain or provide such service except those charges normally paid for like services by residents of, or providers of such services to, single-family homes within the same franchised or licensed area and except for installation charges as such charges may be agreed to between such resident and the provider of such services" (FAC Ex. B at § 3.5, Ex. C at § 3.5).[2]

The buyers of lots in the developments paid $1,500 per-lot toward the cost of installing the telecommunications networks Crystal Clear uses to provide the services (FAC ¶ 67).

Crystal Clear does not provide telecommunications services other than within Tollgate, Bridgemore, and Canterbury (FAC ¶¶ 57, 73). Crystal Clear sub-contracts with DIRECTV to provide television service (FAC ¶¶ 58, 65-66, 96). Plaintiffs miss out on DIRECTV's promotions (FAC ¶ 71). Plaintiffs think the services they get are "terrible" (FAC ¶¶ 71-73). Plaintiffs believe that, but for the arrangement reflected in the CSAs, AT&T would provide television and internet services in "at least one" of the developments (FAC ¶ 74).

---

[2] Plaintiffs repeatedly allege that the CSAs bar homeowners from buying television and internet services from satellite and landline providers other than Crystal Clear (FAC ¶¶ 61, 66, 110). Because the CSAs themselves show that this allegation is false, this Court need not accept the allegation as true. See Footnote 1.

3

Defendant Tollgate Farms, LLC is "nominally" the developer of Tollgate (FAC ¶ 22). Defendant Bridgemore Development Group, LLC is "nominally" the developer of Bridgemore (FAC ¶ 23). Defendant Carbine & Associates advertises for sale on its website homes that it has built in Tollgate and Bridgemore (FAC ¶¶ 22-23).

> Upon information and belief, Carbine & Associates controls, directly or indirectly, the operations of its related family of companies, including but not limited to Tollgate Farms, Bridgemore Development, and Crystal Clear. In the alternative, upon information and belief, Carbine & Associates and other companies in the Carbine corporate family operate under common direction and control. In either case, all of the Carbine entities act as *alter egos* of each other, irrespective of any corporate formalities that separate them. In the alternative, upon information and belief, Carbine & Associates allowed Tollgate Farms and Bridgemore Development to act as its apparent agents, or vice versa.[3]

(FAC ¶¶ 25-26). "Upon information and belief, [Defendant] Hood [Development] developed the Canterbury neighborhood either exclusively or along with a Carbine entity" (FAC ¶ 49).[4]

---

[3] An "apparent agent" is "[a] person who reasonably appears to have authority to act for another, regardless of whether actual authority has been conferred." Black's Law Dictionary (8th ed. 2004). This concept from the law of agency has no apparent relevance to this lawsuit.

[4] There are *26* allegations "upon information and belief" in the "Factual Background" section of plaintiffs' First Amended Complaint (FAC ¶¶ 21-77) – more than double the number of such allegations that were in plaintiffs' original Complaint (see Dkt. 1 ¶¶ 18-42). For example, plaintiffs alleged in their original Complaint that Carbine & Associates was the developer of the Tollgate and Bridgemore communities (Dkt. 1 ¶¶ 24, 26). After Carbine & Associates showed in its original motion to dismiss that public records readily available to plaintiffs plainly show that the developers of Tollgate and Bridgemore were Tollgate Farms, LLC and Bridgemore Development Group, LLC and therefore not Carbine & Associates (see Dkt. 8 p. 2 at n. 2 & n. 3), plaintiffs simply changed their pleading to assert "upon information and belief" that Tollgate Farms, LLC and Bridgemore Development, LLC are "*alter egos*" or, in the alternative, "apparent agents" of Carbine & Associates. Plaintiffs appear to be under the impression that they can allege anything that meets their needs-of-the-moment as litigants, as long as they begin with the words "upon information and belief." That is not so. See 16630 Southfield L.P. v. Flagstar Bank, 727 F.3d 502, 506 (6th Cir. 2013) ("Upon information and belief" assertions "are precisely the kinds of conclusory allegations that Iqbal and Twombly condemned and thus told us to ignore when evaluating a complaint's sufficiency."). Plaintiffs' "upon information and belief" assertion that Carbine & Associates, Crystal Clear, Tollgate Farms, and Bridgemore Development are "functionally the same" (FAC ¶ 21) is wrong; but, as shown below, plaintiffs would not have stated a claim even if their "*alter ego*" assertions were true.

**ARGUMENT**

Plaintiffs' First Amended Complaint contains six counts: unlawful tying under Section 1 of the Sherman Act; unlawful horizontal market allocation under Section 1 of the Sherman Act; "void for self-dealing"; violation of the FCC's "2007 Exclusivity Order"; unjust enrichment; and unconscionability. Plaintiffs, however, have not plausibly stated a claim under any of these theories. See Ashcroft v. Iqbal, 129 S. Ct. 1937, 1950 (2009) (complaint that suggests "the mere possibility of misconduct" not sufficient; complaint must state "a plausible claim for relief").

**COUNT I: PLAINITFFS HAVE NOT STATED A CLAIM FOR UNLAWFUL TYING.**

A "tying arrangement" is "an agreement by a party to sell one product [the "tying product"]…only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier." Michigan Division-Monument Builders of North America v. Michigan Cemetery Ass'n, 524 F.3d 726, 732 (6th Cir. 2008) (cited below as "Michigan Monuments") (quoting N. Pac. Ry. Co. v. United States, 356 U.S. 1, 5-6 (1958)). "The purpose of the rule against certain tying arrangements is to stop the extension of market power from one product to another….[That extension of power is] impossible unless the seller has substantial market power [in the tying product market]." Will v. Comprehensive Accounting Corp., 776 F.2d 665, 671 (7th Cir. 1985), cert. denied, 475 U.S. 1129 (1986). Tying therefore is a violation of Section 1 of the Sherman Act only if (1) the seller has sufficient market power in the tying product market to force the sale of the tied product on a buyer; and (2) the arrangement affects a substantial volume of commerce in the tied market. Michigan Monuments, 524 F.3d at 732; PSI Repair Serv., Inc. v. Honeywell, Inc., 104 F.3d 811, 817-18 (6th Cir.), cert. denied, 520 U.S. 1265 (1997).

Plaintiffs assert that "defendants" have sufficient market power in the sale of lots in Tollgate and Bridgemore (the tying product) to force potential buyers of those lots to also buy telecommunications services from Crystal Clear (the tied product) and that "defendants" have used that market power in violation of Section 1 of the Sherman Act (FAC Count I).[5] Plaintiffs have failed to state a viable unlawful tying claim because, among other things, plaintiffs have failed to even properly allege a relevant market.[6]

### *Plaintiffs May Not Artificially Define the Market at Issue to Exclude All Competition*

"[A]ny inquiry into the validity of a tying arrangement must focus on the market or markets in which the two products are sold, for that is where the anticompetitive forcing has its impact." Michigan Monuments, 524 F.3d at 732 (quoting Jefferson Parish Hosp. Dist. No. 2 v. Hyde, 466 U.S. 2, 18 (1984)). A plaintiff asserting an unlawful tying claim must sufficiently define both the relevant product market *and* the relevant geographic market. Id. at 733. The geographic market "includes the geographic area in which consumers can practically seek alternative sources of the product, and it can be defined as 'the market area in which the seller operates.'" Id. (quoting Double D Spotting Serv., Inc. v. Supervalu, Inc., 136 F.3d 554, 560 (8th Cir. 1998)). Courts dismiss tying claims under Rule 12(b)(6) "on the basis of an insufficiently pled or totally unsupportable proposed market." Id.

---

[5] Plaintiffs in their six counts do not bother to distinguish among the nine entities they have sued, but instead just make blanket assertions of the supposed liability of "defendants."

[6] Because plaintiffs' failure to properly allege a relevant market mandates dismissal of Count I without even reaching the separate issue of whether plaintiffs have properly alleged that Carbine & Associates or Crystal Clear have "sufficient market power" within that market, Carbine & Associates and Crystal Clear will not here challenge the deficient chain of "upon information and belief" allegations by which plaintiffs seek to suggest that either of them had *any* market power at all in the original sales of Tollgate and Bridgemore lots, let alone the level of market power that is required for a tying claim (see p. 4 above). PSI Repair, 104 F.3d at 818 ("The market power requirement is important because, without market power, a seller cannot engage in the forcing necessary to establish a § 1 violation.").

Plaintiffs here allege a tying market that consists of those residential lots located within each of the three developments at issue. Such a proposed market automatically gives the developer (that is, the original seller of lots within the relevant development) 100% market power by artificially defining the geographic market to include only those lots owned by that particular developer. Such a proposed market has already been rejected by the Sixth Circuit Court of Appeals as "totally unsupportable." See Michigan Monuments, 524 F.3d at 732-37.

The plaintiffs in Michigan Monuments accused certain cemetery owners of unlawfully tying the sale of burial lots to the sale of monuments – that is, each defendant was requiring everyone who bought a burial lot in that defendant's cemetery to also buy the monument for that lot from the defendant. Id. at 732. The plaintiffs alleged that "each individual cemetery in the State of Michigan" was its own geographic market. Id. at 730. The Court of Appeals held that this market definition was "too narrow as a matter of law" and affirmed the district court's Rule 12(b)(6) dismissal. Id. at 732-37. The Court of Appeals found that:

- The plaintiffs had improperly tried to define each market to include just one seller. As a result, "the acceptance of [plaintiffs'] proposed geographic market would make any proof of market power unnecessary. *There can be no competition for the sale of burial lots within a market that contains only one provider of burial lots. Market power under these circumstances would be unavoidable*….[Plaintiffs] in essence are urging us to merge the geographic-market analysis and the tying-product market analysis into one determination, rendering one or the other unnecessary." Id. at 735 (emphasis added). See also, e.g., Apani S.W., Inc. v. Coca-Cola Enter., Inc., 300 F.3d 620, 628-33 (5th Cir. 2002) (rejecting plaintiff's effort to define market to consist of only those facilities owned by one particular entity; "Such pleading maneuvers may not be used for the purpose of

7

creating a fictitious market."); Tanaka v. Univ. of Southern Cal., 252 F.3d 1059, 1065 (9th Cir. 2001) ("By attempting to restrict the relevant market to a single athletic program in Los Angeles based solely on her own preferences, [plaintiff] has failed to identify a relevant market for antitrust purposes."); Double D, 136 F.3d at 560-61 (plaintiff could not define the relevant market as defendant's warehouse in a subdivision of Des Moines; "Supervalu's one warehouse in Urbandale does not amount to a relevant market for unloading services of this type. Rather, the market for unloading services would seem to be more properly defined as including all warehouses within, at least, the entire Des Moines, Iowa, metropolitan area if not an even larger area."); TV Comm'n Network, Inc. v. Turner Network Telev., Inc., 964 F.2d 1022, 1025 (10th Cir.), cert. denied, 506 U.S. 999 (1992) (affirming dismissal where plaintiff had proposed market consisting of one television channel; "[A] company does not violate the Sherman Act by virtue of the natural monopoly it holds over its own product."); Lansdowne on the Potomac Homeowners Ass'n, Inc. v. Openband at Lansdowne LLC, 2011 WL 5872885, No. 1:11-cv-872, slip op. at 3-6 (E.D. Va. Nov. 22, 2011) (dismissing antitrust claims against cable operator after rejecting plaintiffs' effort to define a single subdivision as the relevant geographic market) (copy at Dkt. 8 Attachment 4).

- The plaintiffs had "ignore[d] the fact that each individual cemetery has nothing close to exclusive control over burial lots outside of the four corners of its own land." Michigan Monuments, 524 F.3d at 734. In short, plaintiffs had ignored the "alternative sources of the product" that were available in all the other Michigan cemeteries. Id. at 733 (a geographic market includes the area in which consumers can practically seek alternative sources of the product). See also E.I. Du Pont De Nemours and Co. v. Kolon Industs.,

8

Inc., 637 F.3d 435, 441 (4th Cir. 2011) ("The relevant geographic market inquiry focuses on that geographic area within which the defendant's customers can practically turn to alternative supplies if defendant were to raise its prices or restrict its output."); JES Properties, Inc. v. USA Equestrian, Inc., 253 F. Supp. 2d 1273, 1282-84 (M.D. Fla. 2003) ("The relevant market is the "area of effective competition" in which competitors generally are willing to compete for the consumer potential and not the market area of a single company."; plaintiff's proposed market "clearly does not encompass all interchangeable substitute products") (citation omitted).

Plaintiffs in this case have similarly alleged a market that is "too narrow as a matter of law" by trying to define the geographic market in such a way that market power is "unavoidable" and by failing to allege plausible reasons (or any reason at all) why all the other residential lots and homes in and near Thompson's Station (if not Williamson County, or the greater Nashville area) were not "alternative sources of the product." Plaintiffs' failure to properly allege a relevant market mandates dismissal of their unlawful tying claim.

**COUNT II: PLAINTIFFS HAVE NOT STATED A CLAIM FOR UNLAWFUL MARKET ALLOCATION.**

A horizontal market allocation is "an agreement between competitors at the same level of the market structure to allocate territories in order to minimize competition." United States v. Topco Assoc., Inc., 405 U.S. 596, 608 (1972). Coca-Cola, for example, may not strike this deal with Pepsi: "You take east of the Mississippi, and I'll take west." Such agreements violate Section 1 of the Sherman Act. Id.

Plaintiffs assert that Crystal Clear's contract with DIRECTV to provide satellite television service in Tollgate, Bridgemore, and Canterbury, is an unlawful horizontal market allocation of "territories for the marketing of competing telecommunications services" (FAC ¶¶

9

96-99). Plaintiffs have failed to state a viable horizontal market allocation claim for at least two distinct reasons.

### *The Agreement Plaintiffs Describe Does Not Involve Market Allocation*

Market allocation involves competitors agreeing to divide territories. What plaintiffs describe is the *opposite* of dividing territories. According to plaintiffs, Crystal Clear does business in only three "territories" – Tollgate, Bridgemore, and Canterbury – and Crystal Clear has contracted with DIRECTV for DIRECTV *to come into those territories* (FAC ¶¶ 56-58, 65-66, 68, 96). Cf. Noteholders Secs. Litig., 151 F. Supp. 2d 371, 405-06 (S.D.N.Y. 2001) ("[A] court need not feel constrained to accept as truth conflicting pleadings that make no sense, or that would render a claim incoherent, or that are contradicted…by statements in the complaint itself…").

### *The Relationship Plaintiffs Describe is Not Horizontal*

Horizontal restraints "involve direct competitors at a given level of the market." Expert Masonry, Inc. v. Boone Co., Ky., 440 F.3d 336, 344 (6th Cir. 2006). By contrast, vertical restraints "typically involve entities that are upstream or downstream of one another," such as is the case with manufacturers and distributors. Id. See also Topco Assoc., 405 U.S. at 608. By plaintiffs' own allegations, the relationship between Crystal Clear and DIRECTV is vertical, not horizontal (see FAC ¶¶ 55-58, 68 (alleging Crystal Clear is unable to provide television content itself, therefore must buy that content from DIRECTV, and is a "reseller" of DIRECTV's services)). See also AT&T Corp. v. JMC Telecom, LLC, 470 F.3d 525, 531 (3rd Cir. 2006), cert. denied, 551 U.S. 1103 (2007) (vertical relationship existed when AT&T supplied telecommunications service to JMC for resale). Crystal Clear, according to plaintiffs, had to buy television content because it had none of its own. Crystal Clear's choice of the supplier from

10

whom to buy that content did not, as a matter of law, violate the Sherman Act. See Expert Masonry, 440 F.3d at 347 ("[T]here is no economic rationale to restrict, as a violation of Section 1, a buyer's latitude in selecting the entity from whom it will purchase products or services.").

**COUNT III: PLAINTIFFS HAVE NOT STATED A CLAIM FOR "SELF-DEALING."**

Plaintiffs assert that the CSAs between Crystal Clear and the Tollgate and Bridgemore HOAs are "void for self-dealing" because (1) the Tollgate and Bridgemore HOAs were "under the exclusive control of Carbine [& Associates]" (FAC ¶¶ 101-02); and (2) Crystal Clear and Carbine & Associates are, "[u]pon information and belief…functionally the same" (FAC ¶ 21). Plaintiffs assert "[o]n information and belief" that the alleged CSA between Crystal Clear and Canterbury also "involves a self-dealing transaction between Carbine [& Associates], Hood [Development], and Crystal Clear" (FAC ¶ 104). Plaintiffs contend all "this self-dealing" is "unfair" and ask this Court to declare the CSAs "null and void" (FAC ¶¶ 106-08). Assuming plaintiffs even have standing to challenge contracts (that is, the CSAs) to which they are not parties, plaintiffs have failed to state a viable claim.

"Self-dealing" is not a cause of action. "Self-dealing" is a label used to describe one way in which a fiduciary breaches his or her fiduciary duty. See, e.g., Bullock v. Bankchampaign, N.A., 133 S. Ct. 1754, 1757 (2013) (Chapter 7 debtor breached his fiduciary duty by self-dealing while serving as a trustee); McRedmond v. Marianelli, 1996 WL 697944, slip op. at 1 (Tenn. Ct. App. Dec. 6, 1996) (plaintiffs claimed defendants "breached their fiduciary duties by self-dealing") (copy at Dkt. 8 Attachment 5). See also Black's Law Dictionary (8th ed. 2004) (defining "self-dealing" as "Participation in a transaction that benefits oneself instead of another who is owed a fiduciary duty."). A fiduciary duty is the duty to act primarily for another's

11

benefit. McRedmond v. Estate of Marianelli, 46 S.W.3d 730, 738 (Tenn. Ct. App. 2000). Here, plaintiffs do not allege even the existence of a fiduciary duty, let alone a breach of such a duty.[7]

**COUNT IV: PLAINTIFFS HAVE NOT STATED A CLAIM UNDER THE FCC'S 2007 EXCLUSIVITY ORDER.**

In 2007, the FCC determined that exclusive contracts between cable television providers and developers of multiple dwelling units ("MDUs") and other real estate developments harm competition and inhibit broadband deployment. The FCC as result issued an Order banning the execution and enforcement of such "exclusivity" contracts – that is, "contracts that specify that, for a designated term, only a particular [cable television provider] and no other provider may provide video programming and related services to residents of an MDU." 22 FCC Rcd. 20235 (2007) ("2007 Exclusivity Order") at 20236 n. 2 (citation omitted).[8]

Plaintiffs assert that the CSAs between Crystal Clear and the Tollgate, Bridgemore, and Canterbury HOAs violate the 2007 Exclusivity Order "by providing Crystal Clear with the exclusive rights to serve the Neighborhoods" (FAC ¶ 115). Plaintiffs ask that this Court declare the CSAs unenforceable under the 2007 Exclusivity Order (FAC Count IV).

Plaintiffs' "2007 Exclusivity Order" theory turns on plaintiffs' assertion that the CSAs state that Crystal Clear will be the only provider of video programming and related services to the homes in Tollgate, Bridgemore, and Canterbury and bar plaintiffs from getting those services from alternate providers (see FAC ¶¶ 61, 66, 110, 115). But the CSAs themselves refute that assertion. In fact, not only do the CSAs *not* prohibit homeowners from obtaining services from

---

[7] Incidentally, as Carbine & Associates and Crystal Clear have already shown in response to plaintiffs' previous (but apparently now abandoned) claim of ignorance about the "bulk billing" arrangement at issue, that arrangement was disclosed to all potential homebuyers through, among other means, publically-recorded instruments concerning the property (see Dkt. 8 p. 12 at n. 8).

[8] The 2007 Exclusivity Order is attached to the First Amended Complaint as Exhibit D.

12

other providers, they *mandate* that other providers have access to the developments so that they may provide those services (see, e.g., FAC Ex. B at § 3.5 & Article 4, Ex. C at § 3.5 & Article 4). The CSAs therefore are not exclusivity contracts; the 2007 FCC Exclusivity Order does not apply.[9]

A careful review of their latest pleading reveals plaintiffs' real beef: the fact that they must pay for a basic level of services from Crystal Clear even if they do not want those services, and even if they buy the same or similar services from another provider (see, e.g., FAC ¶¶ 60-61, 113-14). This assertion *is* accurate: the CSAs provide that each homeowner will pay Crystal Clear for the basic level of services as an assessment, even if the homeowner elects not to use the services or to buy the same services from an alternate provider (FAC Ex. B at §§ 3.5 & 5.5, Ex. C at §§ 3.5 & 5.5). This, however, is not an "exclusivity" arrangement barred by the 2007 Exclusivity Order. It is instead a common arrangement known as "bulk billing." Bulk billing is the subject of a *separate* FCC Order – a 2010 Order plaintiffs do not mention in their First Amended Class Action Complaint – in which the FCC analyzes and decides *to permit* bulk billing. See 25 FCC Rcd. 2460, 2460-71 (2010) (the "2010 Bulk Billing Order") (copy at Dkt. 8 Attachment 6). See also Southern Walk at Broadlands Homeowner's Ass'n, Inc. v. Openband at Broadlands, LLC, 713 F.3d 175, 182 (4th Cir. 2013) (distinguishing between exclusivity contracts and bulk billing arrangements and stating that the latter are enforceable under the 2010 Bulk Billing Order).

The FCC explained bulk billing, and the rationale for it, in its 2010 Bulk Billing Order:

---

[9] The Tollgate and Bridgemore CSAs do give Crystal Clear the exclusive right to *market* the services within those developments (see FAC Ex. B at § 3.1, Ex. C at § 3.1), but the FCC has found that such exclusive marketing agreements are permitted. See 25 FCC Rcd. 2460, 2471-73 (2010) (copy at Dkt. 8 Attachment 6).

> In a typical bulk billing arrangement, the MDU building subscribes to the [cable television provider's] service, agreeing to pay the [provider] a monthly fee. The [provider] then connects its service to every unit in the MDU. The [provider] typically bills its fee every month to the MDU building, which factors each unit's pro rata charge into the unit's rent, condominium fee, or homeowners' association dues….[Bulk billing arrangements] usually provide each MDU with the chosen [provider's] Basic or Expanded Basic video service, and sometimes also with voice, Internet access, and/or alarm service. In most bulk billing arrangements, the MDU's residents receive a significant discount from the bulk billing [provider's] standard retail rate. Residents may also purchase additional services, such as premium channels, directly from the [provider] at the regular retail rate. *The record indicates that bulk billing arrangements occur in a significant number of MDUs*, but not in most….A bulk billing agreement does not prevent MDU residents from obtaining services from another [provider], assuming that another has wired or will wire the MDU, if necessary. Some residents may also place satellite dishes on their premises, depending on the physical configuration of their units. *Any such residents, however, must pay for both the bulk billing [provider] and the services of the other [provider].* As already noted, bulk billing does not physically or legally prevent a second [provider] from providing service to an MDU resident and does not prevent such [a provider] from wiring an MDU for its service, subject to the permission of the MDU owner. *The arrangement may deter a second [provider] in some cases, however, because it limits the entrant's patronage to residents in the MDU who are willing to pay for the services of two [providers] or who simply insist on receiving the services of the second [provider] for the characteristics of that service (e.g., high-speed broadband for a home business).*

25 FCC Rcd. at 2464-65 (emphasis added).

The FCC concluded:

> The record before us shows that bulk billing arrangements predominantly benefit consumers, through reduced rates and operational efficiencies, and by enhancing deployment of broadband. Based on the evidence of all the effects of bulk billing on consumers, we do not prohibit any [provider] from using bulk billing arrangements….*[I]t would be a disservice to the public interest if, in order to benefit a few residents, we prohibited bulk billing, because so doing would result in higher [provider] charges for the vast majority of MDU residents with such arrangements.*

Id. at 2461, 2471 (emphasis added).[10]

---

[10] The FCC reached this conclusion only after a long, thorough analysis, relying on input from multiple sources, and considering both the pros and cons of bulk billing, including the "cons" plaintiffs seek to argue here. See id. at 2463-71.

14

In short, the FCC has *not* prohibited – but rather has ruled permissible – the type of telecommunications services arrangement plaintiffs seek to challenge in this lawsuit.

**COUNT V: PLAINTIFFS HAVE NOT STATED A CLAIM FOR UNJUST ENRICHMENT.**

Unjust enrichment is an "equitable doctrine [that] allows the Court to infer a promise to pay for the reasonable value of the services rendered, where one party has conferred a benefit upon another." Wolff Ardis, P.C. v. Kimball Products, Inc., 289 F.Supp.2d 937, 943 (W.D. Tenn. 2003). A plaintiff asserting an unjust enrichment claim must show: "(1) that valuable services were rendered, (2) to the person to be charged, (3) that the person to be charged reasonably understood that the provider expected to be paid, and (4) that it would be unjust for the benefitted party to obtain the benefit without paying for it." Id. See also City of Rockwood, Tenn. v. Imco Recycling, Inc., 415 F.Supp.2d 853, 857 (E.D. Tenn. 2006) (similar statement of elements, but adding that "there must be no existing, enforceable contract between the parties covering the same subject matter").

Plaintiffs assert that homeowners in Tollgate, Bridgemore, and Canterbury "conferred an economic benefit on the Defendants" by paying a $1,500 fee toward the cost of the telecommunications infrastructure from which each home benefits and by paying Crystal Clear for the services Crystal Clear has provided under the CSAs (FAC ¶ 118).[11] Plaintiffs contend that these payments were "unjust" and that the Court should make "defendants" pay this money back (FAC Count V).

Like their "horizontal market allocation" theory, plaintiffs' unjust enrichment theory makes no sense. Indeed, plaintiffs seek to turn unjust enrichment theory on its head. Here,

---

[11] Plaintiffs' complaint about the $1,500 fee toward the cost of the telecommunications infrastructure seems to be that homebuilders broke-out that fee as a line-item when they sold homes, rather than just including it in a lump-sum price (see FAC ¶ 67).

15

Crystal Clear is the provider of the service, and plaintiffs have already paid for that service, as required under the bulk billing arrangement established by each development's HOA. If plaintiffs had not paid for the services they had received, *Crystal Clear* might have an unjust enrichment claim against *plaintiffs*. But unjust enrichment is not a theory under which the person who received the services, and paid for them, may later demand reimbursement on the basis that they have now decided that it was somehow "unfair" for them to have paid for the services they received.

**COUNT VI: PLAINTIFFS HAVE NOT STATED A CLAIM FOR UNCONSIONABILITY.**

Finally, plaintiffs assert that the CSAs – which are now more than nine years old – should be declared void because they are, in plaintiffs' opinion[12], "unconscionable" (FAC Count VI). "Unconscionability may be thought of or defined as a violation of public policy." City of Loudon, Tenn. v. TVA, 585 F. Supp. 83, 88 (E.D. Tenn. 1984). "Public policy is to be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests." FDIC v. Aetna, 903 F.2d 1073, 1077 (quoting Muschany v. United States, 324 U.S. 49, 66 (1945)). Here, as shown above, the governmental agency with the expertise and authority to make the determination has concluded that bulk billing is permissible as opposed to "unconscionable."

Plaintiffs complain in Count VI that they "were denied any opportunity for meaningful choice and were stuck with these agreements once they purchased homes and/or lots in the three neighborhoods" (FAC ¶ 124). The FCC also addressed this argument in its 2010 Bulk Billing Order. Concluding "that the benefits of bulk billing outweigh its harms," the FCC noted in that Order the claim of supporters of the practice that (1) bulk billing of television services is "just

---

[12] Note that just three of "over a thousand homeowners" (FAC ¶ 79) filed this lawsuit.

another amenity of an MDU building that the owner can provide, such as a swimming pool, a fitness center, or valet services; with those amenities, some benefit from them, some do not, but all pay for them whether the assessment is itemized or not," and (2) residents of MDUs that have bulk billing "chose to live there and should not be heard to complain and seek to deprive the majority of residents who are satisfied with it." 25 FCC Rcd. at 2468-70. In any event – and again assuming plaintiffs even have standing to challenge contracts to which they are not parties – plaintiffs have failed to state a viable claim of unconscionability.

## CONCLUSION

Plaintiffs' First Amended Class Action Complaint does not state a plausible claim for relief. Crystal Clear and Carbine & Associates respectfully request that this Court dismiss that Complaint under Rule 12(b)(6), and submit that, under the circumstances, the dismissal should be with prejudice.

Respectfully submitted,

s/ D. Alexander Fardon
Craig V. Gabbert, Jr.
D. Alexander Fardon
Harwell Howard Hyne Gabbert & Manner, P.C.
333 Commerce Street, Suite 1500
Nashville, TN 37201
Tel: (615) 256-0500
cvg@h3gm.com
daf@h3gm.com

*Counsel for Crystal Clear Technologies, LLC and Carbine & Associates, LLC*

**CERTIFICATE OF SERVICE**

       I certify that a true and correct copy of this filing has been served upon the following Filing Users through the Court's Electronic Filing System on this 3rd day of March, 2016:

J. Gerard Stranch, IV (gerards@BSJFirm.com)
Benjamin A. Gastel (beng@BSJFirm.com)
Branstetter, Stranch & Jennings PLLC
227 Second Avenue North, Fourth Floor
Nashville, TN 37201-1631

Christopher E. Thorsen (cthorsen@babc.com)
Bradley Arant Boult Cummings LLP
1600 Division Street, Suite 700
Nashville, TN 37203-0025

H. Rowan Leathers, III
(rowan.leathers@butlersnow.com)
Valerie Leigh Diden Moore
(valerie.moore@butlersnow.com)
Butler Snow LLP
150 Third Avenue South, Suite 1600
Nashville, TN 37201

Tricia T. Olson (tricia.olson@arlaw.com)
Rocklan W. King, III (rocky.king@arlaw.com)
Adams and Reese LLP
424 Church Street, Suite 2700
Nashville, TN 37219-0058

Cannon F. Allen (cannon.allen@arlaw.com)
Adams and Reese LLP
6075 Poplar Avenue, Suite 700
Memphis, TN 38119

Archis A. Parasharami
(aparasharami@Mayerbrown.com)
Mark W. Ryan (mryan@mayerbrown.com)
Mayer Brown LLP
1999 K Street, NW
Washington, DC 20006

Robert Dale Grimes (dgrimes@bassberry.com)
Virginia M. Yetter (vyetter@bassberry.com)
Bass Berry & Sims
150 Third Avenue South, Suite 2800
Nashville, TN 37201

                                              s/ D. Alexander Fardon