UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE

| | |
|---|---|
| COURTNEY CATES, BRIAN STOVER, ) <br> JASON MILLER, on behalf of themselves ) <br> and all others similarly situated, ) <br> ) <br>     **Plaintiffs,** ) <br> ) <br> v. ) <br> ) <br> CRYSTAL CLEAR TECHNOLOGIES, LLC, ) <br> CARBINE & ASSOCIATES LLC; HOOD ) <br> DEVELOPMENT, LLC; TOLLGATE ) <br> VILLAGE ASSOCIATION INC.; ) <br> CANTERBURY HOMEOWNERS ) <br> ASSOCIATION INC.; and DIRECTV, LLC, ) <br> ) <br>     **Defendants.** ) | Case No. 3:16-cv-00008 <br><br> Judge Aleta A. Trauger <br><br> **ORAL ARGUMENT <br> REQUESTED** |

**DIRECTV, LLC'S MEMORANDUM IN SUPPORT OF ITS
MOTION TO COMPEL ARBITRATION AND STAY LITIGATION**

    The claims against defendant DIRECTV belong in arbitration. Under federal antitrust laws, plaintiffs Courtney Cates, Jason Miller, and Brian Stover have sued DIRECTV (and others) based on the contracts under which their households receive DIRECTV service. But when they obtained or used DIRECTV's satellite-television service, plaintiffs agreed to arbitrate, on an individual basis, disputes that relate to their DIRECTV contract or service. The Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1-16, requires plaintiffs to honor that obligation.

    DIRECTV's records establish that the households of plaintiffs Courtney Cates and Jason Miller were sent copies of DIRECTV's Customer Agreement containing the arbitration provision when they ordered DIRECTV service. As federal courts across the country have held, customers like these plaintiffs are deemed to accept the terms of the Customer Agreement—including the arbitration provision—by continuing to pay for and use DIRECTV's services after they receive

1

notice of the relevant terms and conditions. While DIRECTV's records do not similarly establish that plaintiff Brian Stover's household received a copy of DIRECTV's Customer Agreement when he ordered service, they establish that his household continued to pay for and use that service after receiving repeated notifications that the Customer Agreement governs their use of the service and directing them to its terms. So, Brian Stover's household should also be deemed to have accepted the Customer Agreement.

As the U.S. Supreme Court has explained, "[t]he overarching purpose of the FAA . . . is to ensure the enforcement of arbitration agreements according to their terms so as to facilitate streamlined proceedings." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 344 (2011). Here, plaintiffs' disputes plainly fall within the scope of their DIRECTV arbitration agreements. And their antitrust claims are fully arbitrable, as the Supreme Court recently reiterated in *American Express Co. v. Italian Colors Restaurant*, 133 S. Ct. 2304, 2309-12 (2013). DIRECTV therefore respectfully requests that this Court (1) compel plaintiffs to arbitrate their claims against DIRECTV on an individual basis and (2) stay further proceedings against DIRECTV pending the arbitrations' outcome.

## BACKGROUND

### A. Plaintiffs Agreed to Arbitrate Disputes with DIRECTV.

According to DIRECTV's records, Jason Miller's household has subscribed to DIRECTV satellite television service since October 2013; Courtney Cates's household has done so since April 2014 (and since November 2014 at the address listed in the Amended Complaint (at ¶ 9)); and Brian Stover's household has done so since August 2014. Decl. of Katherine

2

Bradley ("Bradley Decl.") ¶¶ 7, 9, 13.[1] DIRECTV's Customer Agreement sets forth the terms and conditions under which customers receive DIRECTV's satellite-television service, and those terms contain an arbitration provision. When customers sign up for DIRECTV service or order certain kinds of new equipment, they receive a copy of their Customer Agreement as a matter of routine custom and practice. Bradley Decl. ¶¶ 4-5. The Customer Agreement is also available on DIRECTV's primary and mobile websites. *Id.* ¶ 3.

DIRECTV's records establish that the Miller and Cates households were sent copies of their Customer Agreements shortly after placing their orders; the Stover household continued to use the service after receiving repeated notice that the Customer Agreement governs such use and being directed to its terms.

**Miller's Customer Agreements**

For example, DIRECTV's records show that when Mr. Miller placed his order for new service on October 11, 2013, DIRECTV sent him an order confirmation letter along with a copy of his Customer Agreement. *Id.* ¶ 7 & Exs. 1-2. DIRECTV's records further show that when Mr. Miller ordered additional equipment a week later, DIRECTV sent him another order confirmation letter and another copy of his Customer Agreement. *Id.* ¶ 8 & Exs. 2-3.

**Cates's Customer Agreements**

Similarly, DIRECTV's records show that when Chad Cates placed an order for DIRECTV service on April 23, 2014, DIRECTV emailed him an order confirmation and a copy of the Customer Agreement. *Id.* ¶¶ 9-10 & Exs. 4-5. And when Mr. Cates moved to the address listed in the Amended Complaint in November 2014, DIRECTV emailed Mr. Cates an order

---

[1] DIRECTV's records show that the accountholder for the address listed by Cates in the Amended Complaint (at ¶ 9) is "Chad Cates." Bradley Decl. ¶ 9. DIRECTV's records show that the accountholder for the address listed by Brian Stover in the Amended Complaint (at ¶ 11) is "Jessica Tarpley." Bradley Decl. ¶ 13.

3

confirmation for that move and service at the new address. *Id.* ¶ 11 & Ex. 6. That order-confirmation email contained a button to "View Terms & Conditions." *Id.* Ex. 6. That button, when clicked, displays a page reminding the reader that "Receipt of DIRECTV programming is subject to the terms of the DIRECTV Customer Agreement; a copy is provided at directv.com/legal and in your order confirmation." *Id.* ¶ 12 & Ex. 7; *see also id.* Ex. 8 (online version of DIRECTV's Customer Agreement that was in place at the time).

**Stover's Receipt of Notices of Customer Agreement**

DIRECTV's records also show that Mr. Stover's household received multiple notifications that the Customer Agreement governed its DIRECTV service. *Every one of the bills* sent to his household since January 2015—about one year before he filed suit—has provided, under the heading "**Our Agreement**," that using the service is subject to the Customer Agreement:

> Your Customer Agreement describes the terms and conditions upon which you accept our service. Please consult your Customer Agreement, which is also available at directv.com/agreement, for complete information about billing and payment on your account.

*Id.* ¶ 14 & Exs. 9-21. Mr. Stover's household has continued to "accept [DIRECTV's] service" and pay for it on a monthly basis.

**The Arbitration Provision in DIRECTV's Customer Agreement**

The very first paragraph of DIRECTV's Customer Agreement highlights that the contract includes an arbitration provision:

> **THIS DESCRIBES THE TERMS AND CONDITIONS OF YOUR RECEIPT AND PAYMENT OF DIRECTV® SERVICE AND IS SUBJECT TO ARBITRATION (SECTION 9) AND DISCLAIMER OF WARRANTIES (SECTION 8). IF YOU DO NOT ACCEPT THESE TERMS, PLEASE NOTIFY US IMMEDIATELY AND WE WILL CANCEL YOUR ORDER OR SERVICE. IF YOU INSTEAD DECIDE TO RECEIVE OUR SERVICE, IT WILL MEAN**

4

## THAT YOU ACCEPT THESE TERMS AND THEY WILL BE LEGALLY BINDING.

Bradley Decl. Ex. 2 at 1 (capitalization and boldface in original); *accord id.* Exs. 8, 22 (same).[2]

Plaintiffs also received additional notifications that their Customer Agreements include an arbitration provision. Mr. Miller's order confirmation letters, for instance, reminded him that

> You and DIRECTV agree that any dispute arising under or relating to your agreements or service with DIRECTV, which cannot be resolved informally, will be resolved through binding arbitration as fully set forth in your DIRECTV Customer Agreement (copy enclosed and also may be viewed at directv.com/legal). Arbitration means you waive your right to a jury trial.

*Id.* Ex. 1 at 2; *id.* Ex. 3 at 2. And the terms and conditions linked to the order confirmation email sent to the Cates household when they moved in November 2014 similarly provided that

> You and DIRECTV agree that any dispute arising under or relating to your agreements or service with DIRECTV, which cannot be resolved informally, will be resolved through binding arbitration as fully set forth in your DIRECTV Customer Agreement (may be viewed at directv.com/legal). Arbitration means you waive your right to a jury trial.

*Id.* Ex. 7 at 2.

The arbitration provision itself, in Section 9 of the Customer Agreement, entitled "**RESOLVING DISPUTES**," states that "you and we agree that any legal or equitable claim relating to this Agreement, any addendum, or your Service . . . will be resolved only by binding arbitration" before JAMS "if we cannot resolve [it] informally." Bradley Decl. Ex. 5, § 9. The provision further states that "[n]either you nor we shall be entitled to . . . arbitrate any claim as a representative member of a class or in a private attorney general capacity." *Id.* § 9(c).

---

[2]     The full text of the Customer Agreement that was emailed to Mr. Cates in April 2014 also contains the same language in all caps, without the bold font. *See id.* Ex. 5 at 1.

5

### B. DIRECTV's Arbitration Provision Includes Features Designed to Make Arbitration Convenient for Consumers.

DIRECTV's arbitration procedures are tailored for the needs of consumers (Bradley Decl. Ex. 5, §§ 9(b)-(d)):

- **Cost-free arbitration**: "If you decide to initiate arbitration, [DIRECTV] agree[s] to pay the arbitration initiation fee and any additional deposit required by JAMS to initiate your arbitration. We also agree to pay the costs of the arbitration proceeding";

- **Small-claims-court option**: Consumers may "assert an individual action in small claims court in lieu of arbitration";

- **Full individual remedies available**: The consumer "may, in arbitration, seek any and all remedies otherwise available to you pursuant to your state's law," including (when applicable) statutory damages, punitive damages, attorneys' fees, and injunctive relief;

- **Flexible consumer procedures**: Arbitration will be conducted under the JAMS rules and Consumer Minimum Standards, which JAMS designed with consumers in mind;[3]

- **Choice of local in-person hearing or telephonic hearing**: "The arbitration will be held at a location in" the consumer's "hometown area unless you and we both agree to another location or telephonic arbitration"; and

- **No confidentiality requirement**: Either party may publicly disclose the arbitration and its result.

### C. Plaintiffs Sue DIRECTV.

Notwithstanding their agreements to arbitrate their claims with DIRECTV on an individual basis, plaintiffs filed this putative class action lawsuit in January 2016 (Dkt. No. 1), and filed their First Amended Complaint on February 15, 2016 (Dkt. No. 31). In the Amended Complaint, plaintiffs allege that defendant Crystal Clear Technologies, LLC ("Crystal Clear") received the right from Thompson's Station, Tennessee to build a telecommunications cable

---

[3] The arbitration provision references the "rules of JAMS that are in effect at the time the arbitration is initiated." Bradley Decl. Ex. 5, § 9(b); *accord id.* Exs. 2, 8, 22 (same). JAMS applies its Streamlined Arbitration Rules and Procedures and Consumer Minimum Standards to arbitrations of consumer disputes seeking less than $250,000. Declaration of Clark Milner ¶¶ 3-4 & Exs. 1-2.

6

system in the three residential developments where plaintiffs reside (which they call the "Neighborhoods"). Am. Compl. ¶¶ 2, 28. In 2006 and 2007, Crystal Clear entered agreements with homeowners' associations ("POAs") in the Neighborhoods. *Id.* ¶¶ 42-46, 48-49; *see also id.* Exs. B-C. The plaintiffs allege that these agreements "bind the POAs (and, by extension, the homeowners) to utilize Crystal Clear for over twenty-five years." *Id.* ¶ 61. Crystal Clear then allegedly "contracted with DirecTV to allow it to provide television and internet to the residences in the Neighborhoods." *Id.* ¶ 66. The "net effect" of these arrangements, plaintiffs allege, "was to allow Crystal Clear a monopoly on providing television and home internet to the Neighborhoods and to allow DirecTV to be the exclusive provider of telecommunications to Crystal Clear." *Id.* ¶ 68.

Relying on these allegations, plaintiffs have brought claims under the Sherman Act for unlawful tying and market allocation, claims seeking declaratory relief, and a claim for unjust enrichment. *See id.* ¶¶ 87-126.[4] Plaintiffs seek to represent a class of all of the homeowners in the Neighborhoods (*id.* ¶ 78), and request, among other things, compensatory and treble damages under the antitrust laws, declaratory and injunctive relief, and attorneys' fees and costs. *Id.* ¶ 127 (Prayer for Relief).

## ARGUMENT

### I. THE FAA REQUIRES THE ENFORCEMENT OF PLAINTIFFS' ARBITRATION AGREEMENTS.

Plaintiffs' claims must be arbitrated in accordance with their arbitration agreements with DIRECTV. The FAA requires courts to compel arbitration when a "suit or proceeding" involves

---

[4] Only Counts II and V, for horizontal market allocation and unjust enrichment, respectively, are against DIRECTV.

7

"any issue referable to arbitration under an agreement in writing for such arbitration[.]" 9 U.S.C. § 3; *see also id.* § 4. That mandate applies to this action.

The FAA governs any arbitration agreement that is "written" and in a contract "evidencing a transaction involving commerce." 9 U.S.C. § 2. Both criteria are met here: (i) DIRECTV's arbitration provision is in writing (*see* pages 2-5, *supra*), and (ii) contracts for satellite television service involve interstate commerce because it is "inherent in its very nature" that "television broadcasting is in interstate commerce." *Allen B. Dumont Labs., Inc. v. Carroll*, 184 F.2d 153, 154 (3d Cir. 1950); *see also United States v. One Macom Video Cipher II*, 985 F.2d 258, 260-61 (6th Cir. 1993) (observing that "satellite television transmissions" are regulated by multiple federal statutes). Moreover, DIRECTV's arbitration provision specifies that it "shall be governed by the Federal Arbitration Act." Bradley Decl. Ex. 5, § 10(b). The U.S. Supreme Court noted as much in its recent opinion in *DIRECTV, Inc. v. Imburgia*, 136 S. Ct. 463, 466 (2015), which addressed a prior version of DIRECTV's arbitration agreement.

Under the FAA, plaintiffs' arbitration agreements are "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. As the Supreme Court has explained, "[t]he overarching purpose of the FAA . . . is to ensure the enforcement of arbitration agreements according to their terms so as to facilitate streamlined proceedings." *Concepcion*, 563 U.S. at 344. And this "'liberal federal policy favoring arbitration agreements'" applies "'notwithstanding any state substantive or procedural policies to the contrary.'" *Id.* at 346 (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983)).

Here, no grounds "exist at law or in equity for the revocation of" (9 U.S.C. § 2) plaintiffs' arbitration agreements. Plaintiffs accepted those agreements, and the arbitration provision's terms are both enforceable as a matter of federal law and cover plaintiffs' claims in this lawsuit.

### A. Plaintiffs Agreed to Arbitrate Their Disputes with DIRECTV.

As noted above, DIRECTV sent the Miller and Cates households copies of the Customer Agreement shortly after Mr. Miller and Mr. Cates placed their orders for DIRECTV satellite television service and new equipment. Bradley Decl. ¶¶ 7-10 & Exs. 1-5. DIRECTV again reminded the Cates household of their Customer Agreement when the Cates moved in November 2014. *Id.* ¶¶ 11-12 & Exs. 6-7.

The first paragraph of that Customer Agreement contains "**THE TERMS AND CONDITIONS OF YOUR RECEIPT OF AND PAYMENT FOR DIRECTV® SERVICE**"—including "**SECTION 9**" of the Agreement regarding "**ARBITRATION**"—and informed each plaintiff that if he or she "**DECIDE[S] TO RECEIVE OUR SERVICE, IT WILL MEAN THAT YOU ACCEPT THESE TERMS AND THEY WILL BE LEGALLY BINDING.**" *E.g.*, *id.* Ex. 2 at 1 (capitalization and boldface in original); *id.* Ex. 8 at 1 (same); *id.* Ex. 22 at 1 (same); *see also id.* Ex. 5 at 1 (same without the boldface). Mr. Miller's and Ms. Cates's households never cancelled their orders or service.

Settled case law confirms that these plaintiffs repeatedly formed a binding agreement to arbitrate by using their service after receiving multiple notices of their Customer Agreement. *See*, *e.g.*, *Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585, 593-95 (1991) (enforcing terms on back of cruise ship ticket after passenger chose to board cruise after receiving ticket); *Schwartz v. Comcast Corp.*, 256 F. App'x 515, 518-20 (3d Cir. 2007) (enforcing arbitration provision contained in subscription agreement that was sent to all new customers and available on the defendant's website); *Hill v. Gateway 2000, Inc.*, 105 F.3d 1147, 1148-50 (7th Cir. 1997)

9

(enforcing arbitration provision contained in package mailed to consumer after telephonic purchase; "[b]y keeping the computer . . ., the Hills accepted Gateway's offer, including the arbitration clause"). As this Court has recognized in a different context, "'continued employment can constitute acceptance' of an arbitration agreement under Tennessee law." *Wynn v. Five Star Quality Care Trust*, 2014 WL 2560603, at *6 (M.D. Tenn. June 5, 2014) (Trauger, J.) (quoting *Seawright v. Am. Gen. Fin. Servs., Inc.*, 507 F.3d 967, 972-73 (6th Cir. 2007)).[5] Indeed, it is well established that "Tennessee law recognizes the validity of unilateral contracts, in which acceptance is indicated by action under the contract." *Seawright*, 507 F.3d at 972 (quoting *Fisher v. GE Med. Sys.*, 276 F. Supp. 2d 891, 895 (M.D. Tenn. 2003) (Trauger, J.) (citing in turn *Central Adjustment Bureau v. Ingram*, 678 S.W.2d 28, 35 (Tenn. 1984))). Here, not only did these plaintiffs accept their contracts' benefits by choosing to maintain service, they affirmatively and repeatedly chose to continue paying for service after they were informed that use of the service was governed by DIRECTV's Customer Agreement, including the arbitration provision.

Unsurprisingly, courts across the country have held that DIRECTV customers validly accept their Customer Agreements under similar procedures. *See*, *e.g.*, *Clements v. DIRECTV, LLC*, 2014 WL 1266834, at *3 (W.D. Ark. Mar. 26, 2014); *Brown v. DIRECTV, LLC*, 2013 WL 3273811, at *4 (C.D. Cal. June 26, 2013); *Murphy v. DIRECTV, Inc.*, 2011 WL 3319574, at *2 (C.D. Cal. Aug. 2, 2011), *aff'd*, 724 F.3d 1218 (9th Cir. 2013); *Stachurski v. DIRECTV, Inc.*, 642 F. Supp. 2d 758, 766 (N.D. Ohio 2009); *Truitt v. DIRECTV, Inc.*, 2008 WL 5054570, at *3 (E.D. La. Nov. 21, 2008); *Bischoff v. DIRECTV, Inc.*, 180 F. Supp. 2d 1097, 1103-06 (C.D. Cal. 2002).

---

[5] Pursuant to Local Rule 7.01(e), copies of unpublished decisions are attached in an appendix as Exhibit 1.

Moreover, in Tennessee, as elsewhere, "it is immaterial whether Plaintiff actually read the agreement." *Dillard v. Signature Healthcare Fentress Cnty.*, 2015 WL 5320544, at *6 & n.3 (M.D. Tenn. Sept. 11, 2015) (citing *Giles v. Allstate Ins. Co.*, 871 S.W.2d 154, 157 (Tenn. Ct. App. 1993)). As the court in *Giles* explained, "contracts would not be worth the paper on which they are written" if a party could avoid his obligations under a contract by "say[ing] that he did not read it . . . or did not know what it contained." 871 S.W.2d at 157 (quotation marks omitted). Instead, Tennessee courts evaluate contract formation under "an objective standard based on the manifestations of the parties." *T.R. Mills Contractors, Inc. v. WRH Enters., LLC*, 93 S.W.3d 861, 866 (Tenn. Ct. App. 2002). These rules make clear that plaintiffs Mr. Miller and Ms. Cates validly agreed to the arbitration provision in their Customer Agreements.

While DIRECTV's records do not establish that Mr. Stover's household received a copy of DIRECTV's Customer Agreement when they ordered service, the same principles lead to the result that Mr. Stover also agreed to DIRECTV's arbitration provision. In every monthly bill for nearly a year before this lawsuit, DIRECTV repeatedly referred Mr. Stover's household to the Customer Agreement and informed them that it applies to their use of DIRECTV's service. *See* Bradley Decl. ¶ 14 & Exs. 9-21. DIRECTV also informed Mr. Stover's household that the Customer Agreement can be found online "at directv.com/agreement." *Id.* After receiving these multiple and repeated notifications, Mr. Stover's household accepted DIRECTV's terms by continuing to use and pay for DIRECTV's service. *See* pp. 9-10, *supra*; *see also, e.g.*, *Rasschaert v. Frontier Commc'ns Corp.*, 2013 WL 1149549, at *6-8 (D. Minn. Mar. 19, 2013) (finding valid assent to arbitration provision where plaintiffs continued to subscribe to defendant's services after being "made aware on a monthly basis" through notices on their bills

11

"that [defendant]'s services were governed by [its] Terms and Conditions, available on a particular webpage").

### B. The Terms of DIRECTV's Arbitration Provision are Enforceable.

Under the FAA, DIRECTV's arbitration provision is fully enforceable as a matter of federal law. Plaintiffs may not protest, for instance, that consumer arbitration agreements (like DIRECTV's arbitration provision) barring classwide proceedings are unconscionable under Tennessee law. The U.S. Supreme Court has held that any state-law rule "[r]equiring the availability of classwide arbitration interferes with fundamental attributes of arbitration and thus creates a scheme inconsistent with the FAA." *Concepcion*, 563 U.S. at 344. "States," the Supreme Court added, "cannot require a procedure that is inconsistent with the FAA, even if it is desirable for unrelated reasons," such as the goal of ensuring that "small-dollar claims" do not "slip through the legal system." *Id.* at 351. In all events, Tennessee recognized a decade before *Concepcion* that the "Supremacy Clause . . . preclude[s] [a court] from invalidating an arbitration agreement otherwise enforceable under the FAA simply because a plaintiff cannot maintain a class action." *Pyburn v. Bill Heard Chevrolet*, 63 S.W.3d 351, 365 (Tenn. Ct. App. 2001).

Nor can plaintiffs show that the Sherman and Clayton Acts relieve them of the obligation to arbitrate their claims under those statutes. The U.S. Supreme Court has made clear that "even when the claims at issue are federal statutory claims," the FAA "requires courts to enforce agreements to arbitrate according to their terms[,] . . . unless the FAA's mandate has been 'overridden by a contrary congressional command.'" *CompuCredit Corp. v. Greenwood*, 132 S. Ct. 665, 669 (2012) (quoting *Shearson/Am. Express, Inc. v. McMahon*, 482 U.S. 220, 226 (1987)). And the Supreme Court has made equally clear that the federal antitrust laws contain "[n]o contrary congressional command," nor do they "'evinc[e] an intention to preclude a

12

waiver' of class-action procedure." *Am. Express Co.*, 133 S. Ct. at 2309 (quoting *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 628 (1985)).

### C. Plaintiffs' Claims Fall within the Scope of Their Arbitration Agreements.

In addition, DIRECTV's arbitration provision undoubtedly covers the claims that plaintiffs have asserted in this lawsuit. The provision requires arbitration of a sweeping range of claims, including "***any*** legal or equitable claim ***relating to*** this Agreement, any addendum, or [the customer's] Service." Bradley Decl. Ex. 5, § 9 (emphasis added). DIRECTV's provision, as other courts have observed, "is worded very broadly." *Hodsdon v. DIRECTV, LLC*, 2012 WL 5464615, at *4 (N.D. Cal. Nov. 8, 2012); *see also Brown*, 2013 WL 3273811, at *5 (provision "is relatively broad").[6] Here, plaintiffs' claims challenge the manner in which DIRECTV services are provided to their households and the price that they pay for those services. *See* pp. 6-7, *supra*. Those allegations plainly amount to a "legal or equitable claim relating to" the "Agreement" and plaintiffs' "Service." Bradley Decl. Ex. 5, § 9.

In any event, even if there was any uncertainty about whether DIRECTV's arbitration provision extends to plaintiffs' claims—and there is none—the U.S. Supreme Court has held that, "as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone*, 460 U.S. at 24-25. As the Sixth Circuit has similarly put it, courts must "examine[] 'arbitration language in a contract in light of the strong federal policy in favor of arbitration, resolving *any doubts as to the parties' intentions in favor of arbitration.*'" *Huffman*, 747 F.3d at 395 (quoting *Nestle Waters N. Am., Inc. v. Bollman*, 505 F.3d 498, 503 (6th Cir. 2007)). Or, put still another way, "'[i]n the absence of any express

---

[6] The Sixth Circuit has reiterated that agreements to arbitrate all disputes "arising out of or relating to" a contract are "'broad.'" *Huffman v. Hilltop Cos.* 747 F.3d 391, 395 (6th Cir. 2014) (some internal quotation marks omitted) (quoting *Masco Corp. v. Zurich Am. Ins. Co.*, 382 F.3d 624, 625 (6th Cir. 2004)).

13

provision excluding a particular grievance from arbitration . . . only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail.'" *Nestle*, 505 F.3d at 503-04 (quoting *AT&T Techs, Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 650 (1986)). There is no such evidence here. Thus, any assertion by plaintiffs that they have not agreed to arbitrate their claims would be baseless.

## II. THIS ACTION SHOULD BE STAYED PENDING ARBITRATION OF PLAINTIFFS' CLAIMS.

When, as here, the FAA governs an arbitration provision that covers a plaintiff's claims, Section 3 of the FAA directs the district court to compel arbitration and stay the lawsuit. *See* 9 U.S.C. § 3 (providing for a stay of court proceedings pending the resolution of arbitration); *see also*, *e.g.*, *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 25 (1991) (FAA "provides for stays of proceedings in federal district courts when an issue in the proceeding is referable to arbitration, § 3").

## CONCLUSION

The Court should enter an order (i) compelling each plaintiff to arbitrate his or her claims individually against DIRECTV in accordance with his or her arbitration agreement and (ii) staying this action pending the resolution of those arbitrations.

Dated: March 14, 2016

                                            Respectfully submitted,

                                            */s/ R. Dale Grimes*
                                            Robert Dale Grimes (#6223)
                                            Virginia M. Yetter (#31471)
                                            BASS, BERRY & SIMS PLC
                                            150 Third Avenue South, Suite 2800
                                            Nashville, TN 37201
                                            (615) 742-6200
                                            dgrimes@bassberry.com

14

Mark W. Ryan (*pro hac vice*)
Archis A. Parasharami (*pro hac vice*)
MAYER BROWN LLP
1999 K Street, N.W.
Washington, D.C. 20006
(202) 263-3338
mryan@mayerbrown.com
aparasharami@mayerbrown.com

*Attorneys for Defendant DIRECTV, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on this 14th day of March 2016, a true and exact copy of the foregoing has been served on the following via the Court's electronic filing system:

| **Counsel for Plaintiffs**<br><br>Benjamin A. Gastel (#28699)<br>J. Gerard Stranch, IV (#23045)<br>Branstetter, Stranch & Jennings, PLCC<br>227 Second Avenue North, Fourth Floor<br>Nashville, TN 37201-1631<br>Tel.: 615-254-8801<br>gerards@BSJFirm.com<br>beng@BSJFirm.com | **Counsel for Crystal Clear Technologies LLC and Carbine & Associates, LLC**<br><br>Craig V. Gabbert, Jr.<br>D. Alexander Fardon<br>Harwell Howard Hyne Gabbert & Manner, P.C.<br>333 Commerce Street, Suite 1500<br>Nashville, TN 37201<br>Tel.: 615-256-0500<br>cvg@h3gm.com<br>daf@h3gm.com |
|---|---|
| **Counsel for Canterbury Homeowners Association, Inc.**<br><br>Tricia T. Olson<br>Rocklan W. King III<br>Adams and Reese LLP<br>424 Church Street, Suite 2700<br>Nashville, TN 37219<br>Tel.: 615-259-1450<br>tricia.olson@arlaw.com<br>rocky.king@arlaw.com | **Counsel for Canterbury Homeowners Association, Inc.**<br><br>Cannon F. Allen, Sr.<br>Adams and Reese LLP<br>6075 Poplar Avenue, Suite 700<br>Memphis, TN 38119<br>Tel.: 901-525-3234<br>cannon.allen@arlaw.com |
| **Counsel for Hood Development, LLC**<br><br>Christopher E. Thorsen<br>Bradley Arant Boult Cummings LLP<br>1600 Division St., Suite 700<br>Nashville, TN 37203<br>Tel.: 615-244-2582<br>cthorsen@babc.com | **Counsel for Defendants Bridgemore Village and Tollgate Village Associations**<br><br>H. Rowan Leathers, III<br>Valerie D. Moore<br>Butler Snow LLP<br>Suite 1600 Pinnacle Bldg<br>150 Third Avenue South<br>Nashville, TN 37201<br>Tel.: 615-651-6700<br>rowan.leathers@butlersnow.com |

/s/ R. Dale Grimes
R. Dale Grimes