**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | |
|---|---|
| **COURTNEY CATES, BRIAN STOVER, and** ) | |
| **JASON MILLER, on behalf of themselves and** ) | |
| **all others similarly situated,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | **Case No. 3:16-cv-08** |
| ) | **Judge Aleta A. Trauger** |
| **CRYSTAL CLEAR TECHNOLOGIES, LLC;** ) | |
| **CARBINE & ASSOCIATES, LLC; HOOD** ) | |
| **DEVELOPMENT, LLC; TOLLGATE** ) | |
| **VILLAGE ASSOCIATION, INC.;** ) | |
| **BRIDGEMORE VILLAGE OWNERS'** ) | |
| **ASSOCIATION, INC.; CANTERBURY** ) | |
| **HOMEOWNERS ASSOCIATION, INC.;** ) | |
| **TOLLGATE FARMS, LLC; BRIDGEMORE** ) | |
| **DEVELOPMENT GROUP, LLC; and** ) | |
| **DIRECTV, LLC,** ) | |
| ) | |
| **Defendants.** ) | |

## <u>MEMORANDUM</u>

Pending before the court are three Motions to Dismiss: 1) a Motion to Dismiss filed by

defendants Crystal Clear Technologies, LLC ("Crystal Clear") and Carbine & Associates, LLC

("Carbine") (Docket No. 52); 2) a Motion to Dismiss filed by defendants Tollgate Farms, LLC

("Tollgate Farms") and Bridgemore Development Group, LLC ("Bridgemore Development")

(Docket No. 55); and 3) a Motion to Dismiss filed by defendants Tollgate Village Association,

Inc. (the "Tollgate POA") and Bridgemore Village Owner's Association, Inc. (the "Bridgemore

POA") (Docket No. 56). The plaintiffs have filed an Omnibus Response in opposition to all of

the Motions to Dismiss (Docket No. 77), to which Crystal Clear and Carbine have filed a Reply

(Docket No. 83). Also pending before the court is a Motion to Compel Arbitration and Stay

Litigation ("Arbitration Motion") filed by defendant DIRECTV, LLC ("DIRECTV") (Docket

65), to which the plaintiffs have filed a response (Docket No. 85), and DIRECTV has filed a Reply (Docket No. 90). For the reasons discussed herein, the Motions to Dismiss will be granted and all claims in this action will be dismissed. As a result, DIRECTV's Arbitration Motion will be denied as moot.

## BACKGROUND[1]

Each of the three named plaintiffs – Courtney Cates, Brian Stover, and Jason Miller (collectively, the "Plaintiffs") – is a homeowner and resident in one of three planned neighborhoods in Thompson's Station, Tennessee: Canterbury, Bridgemore, and Tollgate (collectively, the "Neighborhoods"). Each of the Neighborhoods is comprised of hundreds of houses with common facilities. The Bridgemore neighborhood was developed by Bridgemore Development, which then established the Bridgemore POA (or property owners' association) to represent the interests of homeowners in the neighborhood. The Tollgate neighborhood was developed by Tollgate Farms, which similarly established the Tollgate POA. Finally, the Canterbury neighborhood was developed by defendant Hood Development, LLC ("Hood"), which, in turn, established the defendant Canterbury Homeowners Association, Inc. (the "Canterbury POA"). Bridgemore Development, Tollgate Farms, and Hood are referred to, collectively, throughout this opinion, as the developers or the developer defendants. The Bridgemore POA, the Tollgate POA, and the Canterbury POA are referred to, collectively, as the POAs or the POA defendants.[2]

---

[1] For the purposes of the currently pending Motions to Dismiss, the facts are drawn from the First Amended Class Action Complaint (Docket No. 31) and presumed to be true.

[2] As noted below, the Canterbury POA is no longer a party to this action. Nevertheless, factual allegations involving the Canterbury POA remain relevant, particularly with respect to claims against defendant Hood. While Hood has not filed a motion to dismiss, the court finds that the allegations against it are similar enough to the allegations against the other developer defendants

This action arises from allegations that the POA defendants, while under the control of the respective developer defendants (and not the homeowners and residents of the Neighborhoods), each entered into an agreement with defendant Crystal Clear for the provision of telecommunications services to the respective neighborhood (collectively, the "Agreements") and that the Agreements are improper, illegal, and counter to the interests of the homeowners in the Neighborhoods.[3]  According to the First Amended Class Action Complaint (Docket No. 31 (the "Complaint")), which is the current operative pleading, the Agreements, all of which are substantially the same, require all homeowners in the Neighborhoods to purchase basic telecommunications services – including telephone, internet, and cable – from Crystal Clear and to make one-time payments to Crystal Clear toward Crystal Clear's development of telecommunications infrastructure in the Neighborhoods.  Pursuant to the Agreements, the homeowners cannot opt out of purchasing these basic services from Crystal Clear, regardless of whether they want or actually use the services, or whether they also obtain telecommunications services from another provider.  The Agreements further authorize Crystal Clear to be an exclusive agent for the homeowners in procuring telecommunications services from any outside

that it is efficient to review the claims against them simultaneously.  Accordingly, the court will refer in this opinion to allegations that involve the Canterbury POA and Hood and will include the Canterbury POA in its reference to the "POA defendants," though at this time the Canterbury POA is no longer truly a defendant.

[3] According to the Complaint, it is typical for developers of newly planned neighborhoods to initially establish and control a neighborhood POA, which would eventually be turned over to the homeowners once a certain percentage of residential units are sold.  During the time that the developer controls the POA, the Complaint alleges, the developer is responsible to make decisions that will benefit the prospective homeowners and that will, in turn, increase the desirability of the neighborhood.  According to the Complaint, then, it is not the fact that the developer defendants controlled the POAs at the time the Agreements were entered that is problematic.  Instead, – as discussed below – the plaintiffs are challenging the Agreements on the basis that they were entered only because of the advantages they conferred on the developer defendants, while they are detrimental to the homeowners and, ultimately, to the Neighborhoods.

providers.  By the terms of the Agreements, the homeowners may not negotiate or contract directly with outside providers but must go through Crystal Clear, and they may be required to pay additional markups or premiums to Crystal Clear for its representation in procuring these services.  The Agreements are in effect for a term of 25 years, with an automatic renewal clause.  Only the POAs (which remain controlled by the developers and not the homeowners themselves) can terminate the Agreements.

According to the Complaint, the Agreements are not the product of arms-length transactions between independent entities, as they purport to be.  The POAs entered the Agreements under the control and direction of the developer defendants.  Meanwhile, Crystal Clear, the Complaint alleges, operates at the direction, and to the benefit, of the developer defendants as well.  Moreover, the Complaint alleges that Crystal Clear's services are not actually necessary or beneficial to the POAs or the homeowners.  Were it not for the Agreements, the POAs – or the individual homeowners themselves – would be able to contract directly with telecommunications providers such as DIRECTV or AT&T, and these companies could themselves create the necessary infrastructure to deliver services[4] and could provide better service at a more competitive rate than what the homeowners receive by being forced to purchase their services through Crystal Clear.  In sum, the Complaint alleges that Crystal Clear "operates only as a shill for the developers to soak the residents for more money than they would actually spend (if any) on telecommunications services provided by DIRECTV or another legitimate service provider."  (Docket No. 31 ¶ 1.)

---

[4] The Plaintiffs allege that, while the Agreements misleadingly refer to Crystal Clear's "easement" from the City of Thompson's Station to build telecommunications infrastructure in the Neighborhoods, in fact Crystal Clear obtained only a *nonexclusive* franchise agreement with the City to use streets and easements for the construction and maintenance of telecommunications infrastructure, and there is no barrier to other service providers obtaining the same access.

The Complaint specifically describes the relationship between Crystal Clear and the developer defendants as follows. Despite the fact that Bridgemore and Tollgate were developed by Bridgemore Development and Tollgate Farms, respectively, Carbine holds itself out publicly as the owner and developer of these neighborhoods, advertising new residential properties for sale. While there may be corporate formalities separating Carbine from Bridgemore Development and Tollgate Farms, these entities operate under common ownership, direction, and control. Crystal Clear, which purports to be an independent provider of telecommunications services, is actually under the same common ownership, direction, and control as Carbine, Bridgemore Development, and Tollgate Farms. All four of these entities (referred to, collectively, in the Complaint as the "Carbine family") have the same business address, the same registered agent, and overlapping boards of directors, officers, and shareholders.[5] Hood, which

---

[5] In their Motion to Dismiss, Carbine and Crystal Clear argue that the court cannot consider the Plaintiffs' allegations that Carbine, Crystal Clear, Bridgemore Development, and Tollgate Farms are all one entity, because these allegations are made "upon information and belief" and are, therefore, conclusory assertions not based in fact. (Docket No. 53 p.4, n.4.) To support this proposition, Carbine and Crystal Clear cite *Southfield L.P. v. Flagstar Bank*, 727 F.3d 502, 506 (6th Cir. 2013). (*Id.*) *Southfield*, however, simply states that "a plaintiff cannot overcome a Rule 12(b)(6) motion to dismiss simply by referring to *conclusory* allegations in the complaint that the defendant *violated the law*. Instead, the sufficiency of a complaint turns on its *factual content*, requiring the plaintiff to plead enough factual matter to raise a plausible *inference* of wrongdoing. The plausibility of an inference depends on a host of considerations, including common sense and the strength of competing explanations for the defendant's conduct." 727 F.3d at 504 (emphasis added) (internal citations omitted). *Southfield* held that a plaintiff's claim for national origin discrimination could not survive a motion to dismiss where the plaintiff alleged no specific facts to support an inference of discrimination other than the conclusory allegation that, on information and belief, others who did not share his national origin were treated differently, but the plaintiff made no specific allegations identifying any such individuals or any basis for the belief. The fact that the allegations in *Southfield* were made upon "information and belief" was not the problem, so much as the fact that the allegations were conclusory and unsupported by factual content. Here, to the contrary, the Plaintiffs make specific factual allegations to support the inference that the Carbine family is one entity: namely, that these entities are run by the same people, that they have the same address and business agent, that they publicly take credit for one another's work (e.g. Carbine's website taking credit for the development that is supposedly the work of the developers), and that they entered into

developed the Canterbury neighborhood, is not a part of the Carbine family of entities. Hood, however, entered into an independent contract with Crystal Clear prior to the Agreements, by which Hood agreed to force the Canterbury POA to enter into the same type of telecommunications agreement with Crystal Clear that the other POAs entered, in exchange for Crystal Clear's providing Hood with some of the generated revenue. While the Plaintiffs, and other homeowners in the Neighborhoods, were aware of the Agreements at the time they purchased their homes, they were not aware of the underlying self-dealing or of the relationships among the developer defendants and Crystal Clear.

The Complaint further alleges that Crystal Clear is not a legitimate telecommunications provider; has no previous experience building telecommunications infrastructure, operating a telecommunications network, or conducting any part of the business of providing telecommunications services; and, to the present day, does not provide telecommunications services to any customers outside of the Neighborhoods. Moreover, the Complaint alleges that Crystal Clear is unable, on its own, to actually deliver television content or high speed internet to the Neighborhoods and, therefore, in order to deliver the basic cable and internet services it is obligated to provide under the Agreements, Crystal Clear has contracted with DIRECTV. Rather than allowing the homeowners to enter into direct service contracts with DIRECTV, however, the services are sold through Crystal Clear, as per Crystal Clear's rights as exclusive agent to the

---

contracts with one another that do not benefit them as independent parties but make sense only if they are one and the same. Moreover, the allegation that the Carbine family is one entity is not even itself a conclusory allegation of wrongdoing, but is, instead, one piece of the factual content needed to support the ultimate inference that the defendants are guilty of self-dealing. Finally, factual allegations in any complaint are, as a rule, made upon information and belief and their veracity is assumed for purposes of a 12(b)(6) motion to dismiss but cannot be confirmed until discovery is completed. Here, the court finds that the allegations in the Complaint are more than sufficiently pled to support an inference – for purposes of the motions to dismiss – that the Carbine family is one entity, and the court will not overlook these allegations as conclusory assertions of wrongdoing.

Neighborhoods for any contracts with outside telecommunications providers. Crystal Clear has negotiated a bulk rate with DIRECTV, and it then resells DIRECTV's services to the homeowners pursuant to the terms of the Agreements that require homeowners to purchase basic services from Crystal Clear. The rate for these basic cable and internet services reflects the price Crystal Clear is paying DIRECTV *plus* a premium payable to Crystal Clear.[6] This price is significantly greater than the promotional prices offered by DIRECTV to customers outside of the Neighborhoods. DIRECTV has always been given the right to market to homeowners in the Neighborhoods for additional services it offers beyond the basic packages purchased by Crystal Clear (those services would also be purchased *through* Crystal Clear if homeowners wish to add them). DIRECTV is aware of the Agreements and the pricing arrangements between Crystal Clear and the homeowners.

In addition, because Crystal Clear delivers the homeowners' DIRECTV services through Crystal Clear's infrastructure – rather than contracting for DIRECTV to create its own infrastructure in the Neighborhoods – the homeowners receive services that are of significantly lower quality than the services received by DIRECTV customers outside of the Neighborhoods (or by customers of other outside providers). Specifically, homeowners in the Neighborhoods experience a higher rate of service disruptions than other DIRECTV users and must install satellite dishes on their homes, at their own expense. In addition, the homeowners cannot contact DIRECTV directly about their cable and internet service or the interruptions to service that they experience, but, instead, all communications with DIRECTV must go through Crystal Clear. The Agreements also govern the terms by which the homeowners may be reimbursed, if

---

[6] The homeowners may also purchase additional DIRECTV cable and internet services – beyond those provided by Crystal Clear through the basic services packages – but, again, homeowners must purchase any additional DIRECTV services through Crystal Clear at a price that reflects Crystal Clear's negotiations with DIRECTV plus a premium to Crystal Clear.

at all, for disruptions to service, terms which are less favorable than those offered to DIRECTV customers outside of the Neighborhoods or offered by other providers.

The Complaint alleges that the terms of the Agreements, as a practical matter, prevent them from obtaining basic telecommunications services from any providers other than Crystal Clear and DIRECTV (*through* Crystal Clear) because 1) they are already paying Crystal Clear for basic services from DIRECTV, so obtaining basic services from another outside provider would essentially mean paying for the same services twice, and 2) they would have to contract for these services through Crystal Clear at a premium.[7]

Finally, according to the Complaint, the POAs never have pursued, and never will pursue (so long as they are controlled by the developers), action against Crystal Clear for the poor quality and overpriced telecommunications services that breach the direct terms, and implied

---

[7] Significantly, however, the Complaint does not allege that the Agreements expressly provide for Crystal Clear to be the *exclusive* provider of telecommunications services to the Neighborhoods. Quite to the contrary, the Agreements – both as they appear in the record and as they are characterized by the Complaint – expressly lay out the terms by which outside providers can be engaged – namely, through negotiation with Crystal Clear as an exclusive agent. (Only two of the three Agreements are in the record – the agreement between Crystal Clear and the Tollgate POA and the agreement between Crystal Clear and the Bridgemore POA (Docket Nos. 31-4, 31-5 (Exhibits B and C to the Complaint) – but the Complaint alleges that all three Agreements are substantially the same). Moreover, the Complaint alleges that Crystal Clear is incapable of providing services directly and must, at a minimum, negotiate with an outside provider in order to provide the basic service packages obligated by the Agreements, as Crystal Clear has done in its negotiations with DIRECTV. Likewise, the Complaint does not allege that Crystal Clear's agreement with DIRECTV expressly provides DIRECTV with any *exclusive* rights to serve the Neighborhoods. Rather, Crystal Clear has chosen to contract with DIRECTV for all of the basic services it is obligated to provide in the Neighborhoods, but there is no indication in the Complaint that Crystal Clear may not switch providers for the basic services it provides, or engage with other outside providers to provide additional services to the Neighborhoods. All references in the Compliant to Crystal Clear and/or DIRECTV being "exclusive" providers of cable and internet services in the Neighborhoods are, therefore, understood to denote that the end result of the Agreements, plus Crystal Clear's contract with DIRECTV, is that it would be economically unsustainable for homeowners to purchase services through other outside providers, making DIRECTV (through Crystal Clear) the *de facto* sole provider of cable and internet services in the Neighborhoods.

warranties, of the Agreements.  Nor will the POAs terminate the Agreements or decline to renew them.  This is because, the Complaint alleges, doing so would go against the self interests of the developer defendants who control the POAs, since Bridgemore Development and Tollgate Farms are members of the same Carbine family of entities as Crystal Clear and, accordingly, share in Crystal Clear's profits, and Hood has an insider contract with Crystal Clear by which Hood reaps some of the profits from Crystal Clears' agreement with the Canterbury POA.

## **PROCEDURAL HISTORY**

This action was initially filed on January 5, 2016.  (Docket No. 1.)  The (Amended) Complaint was filed on February 15, 2016.  (Docket No. 31.)  The Complaint requests that this action be tried as a class action under Federal Rules of Civil Procedure 23(a) and 23(b)(1), (2), and (3), and the Plaintiffs' proposed class consist of all homeowners in the Neighborhoods, with three subclasses for each of the three individual neighborhoods.  According to the Complaint, the Plaintiffs are all residents of Tennessee and the defendants, with the exception of DIRECTV, are all Tennessee corporations.  DIRECTV is a California corporation.  The Complaint asserts that the basis for this court's subject matter jurisdiction arises from the federal statutes governing their federal law claims.  The Complaint contains the following six counts:

- Count I is a claim for unlawful tying, in violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.  This claim is based on allegations that the defendants illegally tied the sale of residential lots in the Neighborhoods to the sale of telecommunications services from Crystal Clear.  The Complaint alleges that the defendants "have sufficient market power in the sale of lots in the Neighborhoods and/or the sale of telecommunications in the Neighborhoods," and that "the amount of interstate commerce affected in the market for the sale of lots in the Neighborhoods and/or the sale of telecommunications in the Neighborhoods is substantial."  (Docket No. 31 ¶¶ 89, 90.)

- Count II is a claim for unlawful market allocation, also in violation of Section I of the Sherman Antitrust Act.  This claim is based on the allegation that Crystal Clear and DIRECTV are horizontal competitors for the provision of telecommunications services in the Neighborhoods and that the agreement between Crystal Clear and DIRECTV, combined with the Agreements, "eliminate a significant form of competition to allow

DIRECTV via Crystal Clear to be the exclusive provider of telecommunications within the Neighborhoods to the exclusion of other telecommunications providers or direct competition between Crystal Clear and DIRECTV."  (Docket No. 31 ¶ 96.)

- Count III is a claim for self-dealing that seeks a declaratory judgment voiding the Agreements as a product of self-dealing that was never disclosed to potential homeowners in the Neighborhoods.

- Count IV is a claim for violation of the following Federal Communications Commission Order: *In the Matter of Exclusive Service Contracts for Provision of Video Services in Multiple Dwelling Units and Other Real Estate Developments*, 22 FCC Rcd. 20235 (2007) (the "FCC Exclusivity Order").  This count seeks a declaratory judgment that the Agreements are void for violating the FCC Exclusivity Order, by creating sufficient barriers for outside providers to compete with Crystal Clear to provide telecommunications services in the Neighborhoods, effectively giving Crystal Clear "the exclusive rights to serve the Neighborhoods."  (Docket No. 31 ¶ 115.)

- Count V is a claim for unjust enrichment, based on allegations that the defendants are unjustly enriched by the Plaintiffs' monthly payments to Crystal Clear for telecommunications services and one-time payments to Crystal Clear for telecommunications infrastructure.

- Count VI is a claim for unconscionability, again seeking a declaratory judgment that the Agreements are void because they are unconscionable.

The Complaint seeks class action certification, an injunction preventing the enforcement of the Agreements, a declaration that the Agreements are void, monetary damages (including treble damages), and attorney's fees.

On March 3, 2016, Carbine and Crystal Clear filed a Motion to Dismiss, along with a Memorandum in support.  (Docket Nos. 52, 53.)

On March 7, 2016, Bridgemore Development and Tollgate Farms filed a Motion to Dismiss, incorporating by reference the Memorandum of law filed by Carbine and Crystal Clear. (Docket No. 55.)

On March 14, 2016, the Bridgemore POA and the Tollgate POA filed a Motion to Dismiss, along with an accompanying Memorandum, also incorporating by reference the

Memorandum filed by Carbine and Crystal Clear and adding additional arguments. (Docket Nos. 56, 57.)

Also on March 14, 2016, DIRECTV filed is Arbitration Motion, along with a Memorandum in support, the Declaration of Clark Milner, the Declaration of Katherine Bradley, and a number of supporting exhibits attached to the Declarations. (Docket Nos. 65, 66, 68, 69.) While the Complaint does not expressly state which of the six counts are brought against which defendants, DIRECTV, in its Arbitration Motion, takes the position that only the horizontal allocation claim and the unjust enrichment claim could potentially implicate DIRECTV. DIRECTV appears to argue that the tying claim cannot apply to DIRECTV because the tying claim arises from tying the purchase of residential lots in the Neighborhoods to the purchase of Crystal Clear's telecommunications services, neither of which involved DIRECTV. DIRECTV also argues that the claim for violating the FCC Exclusivity Order, the unconscionability claim, and the self-dealing claim cannot apply to DIRECTV because, in the Complaint, these claims are all expressly aimed at invalidating the Agreements, to which DIRECTV was not a party.

On March 28, 2016, the Plaintiffs filed an Omnibus Response in opposition to the Motions to Dismiss.[8] (Docket No. 77.)

On April 1, 2016, Carbine and Crystal Clear filed a Reply in further support of their Motion to Dismiss. (Docket No. 83.)

On April 4, 2016, the Plaintiffs filed a Response in opposition to DIRECTV's Arbitration Motion. (Docket No. 85.) In their Response, the Plaintiffs concede that the only two claims they are bringing against DIRECTV are the horizontal allocation claim (which is based on the alleged

---

[8] The Omnibus Response also responds to a Motion To Dismiss filed by the Canterbury POA on March 14, 2016 (Docket No. 63). That motion is no longer pending because the claims against the Canterbury POA were voluntarily dismissed on May 13, 2016, pursuant to a settlement agreement. (Docket No. 93.)

agreement between DIRECTV and Crystal Clear) and the claim for violating the FCC Exclusivity Order.  (Docket No. 85 p. 10.)  Counter to DIRECTV's position, the Plaintiffs appear to concede that the unjust enrichment claim is not brought against DIRECTV.

On April 18, 2016, DIRECTV filed a Reply in further support of its Arbitration Motion. (Docket No. 90.)

## ANALYSIS

For the reasons discussed below, the court finds that the Plaintiffs have failed to state a claim with respect to the federal claims in this action – the tying claim and unlawful market allocation claims, brought under the Sherman Act, and the claim for violation of the FCC Exclusivity Order – and those claims will, therefore, be dismissed.  The court will dismiss these claims as against all defendants, even though Hood and DIRECTV have not moved for dismissal.  Finally, the remaining claims in this action – the claims against all defendants except DIRECTV for self-dealing, unjust enrichment, and unconscionability under Tennessee law – will also be dismissed for lack of jurisdiction for the reasons discussed more fully below.

## I.     THE CLAIMS AT ISSUE

The Complaint is not entirely clear with respect to which of the six counts are being brought against which of the nine defendants.  In the Arbitration Motion briefing, however, the plaintiffs have expressly conceded that no claims other than those for unlawful market allocation and violation of the FCC Exclusivity Order are being brought against DIRECTV.  For purposes of this motion, then, the court will assume that all six counts are brought against each of the defendants, except DIRECTV, and that only the claims for unlawful market allocation and violation of the FCC Exclusivity Order are brought against DIRECTV.

Despite DIRECTV's assumption, in its Arbitration Motion, that the unjust enrichment claim might apply to DIRECTV, the Plaintiffs concede, in their Response, that the unjust enrichment claim – along with the tying claim, the unconscionability claim, and the self-dealing claim – is not brought against DIRECTV. Indeed, there are no allegations in the Complaint to suggest that DIRECTV actually received an unjust rate from Crystal Clear for the services it provided (only that Crystal Clear charged an unjust premium to the homeowners for procuring these services from DIRECTV). The court further notes that, while the Plaintiffs assert that the claim for violating the FCC Exclusivity Order is also brought against DIRECTV, this claim is pled in the Complaint as relating *only* to the Agreements, to which DIRECTV is not a party, as DIRECTV points out in its Arbitration Motion. Moreover, the Plaintiffs' only argument, in their Response to DIRECTV's Arbitration Motion, for why DIRECTV should be liable for violating the FCC Exclusivity Order is that DIRECTV was a *beneficiary* of the rights given to Crystal Clear by the Agreements. For these reasons, it is not entirely clear that that the claim for violating the FCC Exclusivity Order has been properly brought against DIRECTV. To the extent that this claim is brought against DIRECTV, based on DIRECTV's agreement with Crystal Clear, this claim cannot survive anyway for the reasons discussed below.

## II.    LEGAL STANDARD FOR MOTIONS TO DISMISS

In deciding a motion to dismiss for failure to state a claim under Rule 12(b)(6), the court will "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007); *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002). The Federal Rules of Civil Procedure require only that a plaintiff provide "a short and plain statement of the claim that will give the defendant fair notice of what the plaintiff's claim is and the

grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957). The court must

determine only whether "the claimant is entitled to offer evidence to support the claims," not

whether the plaintiff can ultimately prove the facts alleged. *Swierkiewicz v. Sorema N.A.*, 534

U.S. 506, 511 (2002) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

The complaint's allegations, however, "must be enough to raise a right to relief above the

speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). To establish the

"facial plausibility" required to "unlock the doors of discovery," the plaintiff cannot rely on

"legal conclusions" or "[t]hreadbare recitals of the elements of a cause of action," but, instead,

the plaintiff must plead "factual content that allows the court to draw the reasonable inference

that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79

(2009). "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss."

*Id.* at 679; *Twombly*, 550 U.S. at 556.

## III. THE FEDERAL LAW CLAIMS

The court now turns to the merits of the Motions to Dismiss with respect to the federal

law claims for tying, unlawful market allocation, and violation of the FCC Exclusivity Order.

For the reasons discussed below, the court finds that these claims are not sufficiently supported

by the allegations in the Complaint and they will, therefore, be dismissed.

### A. Tying Claim

A tying arrangement is defined as an agreement by a party to sell one product . . .
only on the condition that the buyer also purchases a different (or tied) product, or
at least agrees that he will not purchase that product from any other supplier. In
other words, a supermarket that will sell flour to consumers only if they will also
buy sugar is engaged in tying. Flour is referred to as the *tying* product, sugar as
the *tied* product. The typical case involves a seller's attempt to exploit its
economic power over one product or in one market to force a less desirable, tied
product on a buyer. Illegal tying therefore occurs only if the seller has
appreciable economic power in the tying product market and if the arrangement
affects a substantial volume of commerce in the tied market.

*Michigan Division-Monument Builders of North Am. v. Michigan Cemetery Ass'n*, 524 F.3d 726,

732 (6th Cir. 2008) (internal citations omitted).  While the questions of whether a tying product

market has been properly defined and whether a defendant has sufficient power within that

market are fact-intensive questions that generally require discovery, the Sixth Circuit has held

that dismissal is appropriate where a plaintiff fails to identify a potentially relevant market for

the tying product.  *Id*. at 733 (quoting *Found. for Interior Design Educ. Research v. Savannah

Coll. of Art & Design*, 244 F.3d 521, 531 (6th Cir. 2001).  The plaintiff must identify "the

geographic area in which consumers can practically seek alternative sources of the product."  In

*Michigan Division-Monument*, the plaintiffs attempted to define the market for the tying product

at issue as the market for the defendant's specific product itself, namely burial lots within an

individual cemetery being sold by a defendant cemetery owner.  The Sixth Circuit rejected this

argument, holding that a market cannot be defined to include solely the defendants' own

products (over which the defendant necessarily has significant, if not exclusive, market power)

but must include all other interchangeable product options within a reasonable geographic range.

While some products may be unique so as to not be interchangeable with any alternative,

the Sixth Circuit specifically held that this is not the case with real property, absent a specific

showing that the location of the land "'lends the defendant a competitive advantage others cannot

meet.'"  *Michigan Division-Monument*, 524 F.3d at 733 (quoting *Baxley-DeLamar Monuments,

Inc. v. Am. Cemetery Ass'n*, 938 F.2d 846, 852 (8th Cir. 1991)).  The Plaintiffs have not alleged

that the residential lots in the Neighborhoods are unique in this way, nor have they argued any

basis for establishing that the residential lots in the Neighborhoods cannot be interchanged with

residential lots in other planned neighborhoods in the region.

The Plaintiffs argue that *Michigan Division-Monument* is not relevant to this case because the plaintiffs there were competitors rather than customers and, therefore, the relevant market was right to access customers rather than the product itself, citing *Apani Southwest, Inc. v. Coca-Cola, Enters.* (300 F.3d 620 (5th Cir. 2002)) and *Illinois ex rel. Hartigan v. Panhandle E. Pipe Line Co.* (730 F.Supp. 826, 899 (C.D. Ill. 1990)).  (Docket No. 77 pp. 10-11.)  There is nothing in these cases, however, to support an inference that the standard differs depending on who the plaintiffs are, or that customers, rather than competitors, can hinge a market analysis on the market for one particular product rather than the entire market of interchangeable alternatives.  Indeed, it would make no sense for such a differentiation to exist when the question at the heart of a tying claim is whether the defendants had the power to induce customers to purchase the tying product rather than an alternative, despite the alleged tying.

Similarly, a Second Circuit case cited by the Plaintiffs also holds that, where a claim turns on a defined product market, "[t]o survive a Rule 12(b)(6) motion to dismiss, an alleged product market must bear a rational relation to the methodology courts prescribe to define a market for antitrust purposes – analysis of the interchangeability of use or the cross-elasticity of demand and it must be plausible."  *Todd v. Exxon Corp.*, 275 F.3d 191, 199 (2d Cir. 2001) (internal citations omitted).  Another case cited by the Plaintiffs, *Southeastern Milk Antitrust Litigation*, similarly found that an antitrust claim could proceed where the plaintiffs had "clearly allege[d] relevant product and geographic markets."  555 F.Supp.2d 934, 946 (E.D. Tenn. 2008). Here, the Complaint references *no* market for the tying product (residential homes in the Neighborhoods), let alone one that the court can find plausible.

The Complaint makes only the conclusory assertion that the defendants "have sufficient market power in the sale of lots in the Neighborhoods and/or the sale of telecommunications in

the Neighborhood" and that "the amount of interstate commerce affected in the market for the sale of lots in the Neighborhoods and/or the sale of telecommunications in the Neighborhoods is substantial." (Docket No. 31 ¶¶ 89, 90.) It is self-evident that the developer defendants have substantial market power over the sale of their own particular product – residential lots in the Neighborhoods – just as the defendants in *Michigan Division-Monument* had substantial market power over burial lots in their own cemeteries. This does not on its own, however, explain why they might have the type of market power that would deprive consumers of a meaningful choice as to whether to purchase those lots and, therefore, coerce them to also purchase the tied product of Crystal Clear's telecommunications services. Nowhere in the Complaint do the Plaintiffs attempt to define the geographic product market within which the defendants compete in their sale of lots in the Neighborhoods. Nor do the Plaintiffs raise any allegations or arguments to show that the defendants control a substantial share of that market. They make no allegations regarding how many other interchangeable residential lots in planned neighborhoods might be available in the relevant geographic region, or even what that region would be. While it would ultimately be a fact-intensive question, subject to discovery, whether a particular geographic region and product type does in fact encompass the entire relevant market, and whether the defendants' power over that market is sufficient, the Plaintiffs have made no attempt to define the market, so as to even warrant beginning the discovery process. Moreover, the Plaintiffs have made no allegations that the defendants have any power within that market (above and beyond the power they necessarily have in selling lots in the *Neighborhoods*).

The Complaint does not indicate that the tying claim is brought solely against the developer defendants, and, thus, the court must consider whether this claim can proceed as against any of the defendants, aside from DIRECTV. As discussed in this section, a tying claim

requires conditioning the sale of a tying product (in this case the residential lots in the Neighborhoods) on the buyer's purchase of a tied product (in this case Crystal Clear's telecommunications services). Without reaching the question of whether a party other than the seller of a tying product can ever be liable for such a claim, or which of the defendants in this action were actually sellers of the lots in the Neighborhoods, the court notes that the Plaintiffs have not alleged that *any* of the defendants has power within the market that encompasses lots in the Neighborhoods.[9] In their briefing, the Plaintiffs ignore the question of the tying product market and argue only that the defendants have substantial market power over sale of *telecommunications* services to the Neighborhoods. This confuses the burden to show market power over the *tying* product with the burden to also show a significant volume of commerce in the *tied* market.

In fact, the Sixth Circuit expressly rejected this sort of circular reasoning in *Michigan Division-Monument*. There, too, the plaintiffs argued that their tying claim could be supported by the fact that once the burial lots (the tying products) were purchased, the customers had no choice but to buy monuments (the tied product) for the particular cemetery where the lots were purchased. The Sixth Circuit held that "[f]ocusing on what happens only after a grave site is purchased ignores the competitive market for the initial sale of burial lots." 524 F.3d at 735. In other words, the fact that the purchase of the tied product is rendered necessary by the sale of the tying product does not make up for a failure to allege market power in selling the tying product itself in the first place. The Plaintiffs have sufficiently alleged that, once they purchased their homes in the Neighborhoods, they were bound to purchase telecommunications services through

[9] This applies equally to defendant Hood, which has not moved for dismissal, but which is likewise not alleged in the Complaint to have the requisite power within the market that includes lots in the Canterbury neighborhood to be liable for an antitrust violation based on tying the purchase of those lots to the purchase of Crystal Clear telecommunications services.

Crystal Clear, but they have not made any allegations that the purchase of their homes was induced by the defendants' market power, a necessary element of an unlawful tying claim.

Finally, even with respect to the *tied* product, an unlawful tying claim requires more than simply showing that the purchase of the tied product was forced by the sale of the tying product. The plaintiffs must further allege that the tying affects a substantial volume of commerce in the tied market. The tied market, for the purposes of this action, is not simply telecommunications services in the Neighborhoods, which are clearly substantially affected by the alleged tying, but telecommunications services in the region more generally. The Plaintiffs have, again, made no allegations as to how that telecommunications market in the region might be impacted by a transaction that affects the sales of telecommunications services in the Neighborhoods.

For these reasons, the court finds that the Plaintiffs have not pled a tying claim as a matter of law, and this claim will be dismissed.

### B.     Unlawful Market Allocation Claim

An unlawful market allocation claim requires that two horizontal competitors agree not to compete with one another in a certain market and, instead, allocate among themselves portions of the market to which they will each sell their products. *See In re Cardizem CD Antitrust Lit.*, 332 F.3d 896, 907 (6th Cir. 2003); s*ee also Expert Masonry, Inc. v. Boone County, Ky*, 440 F.3d 336 (6th Cir. 2006).

> 'One of the classic examples of a per se violation of § 1 [of the Sherman Act] is an agreement between competitors at the same level of the market structure to allocate territories in order to minimize competition. Such concerted action is usually termed a 'horizontal' restraint, in contradistinction to combinations of persons at different levels of the market structure, e.g. manufacturers and distributors, which are termed 'vertical' restraints. This court has reiterated time and time again that horizontal territorial limitations . . . are naked restraints of trade with no purpose except stifling of competition.'

*In re Cardizem*, 332 F.3d at 907 (quoting *United States v. Topco Assocs.*, 405 U.S. 596,

608 (1972)).

The Plaintiffs make the conclusory allegation, in Count II of the Complaint, that DIRECTV and Crystal Clear are horizontal competitors and that the agreement by which Crystal Clear purchased cable and internet services for the Neighborhoods from DIRECTV improperly restricts competition between them. As an initial matter, this claim fails because the notion that DIRECTV and Crystal Clear are horizontal competitors is directly belied by all of the other allegations in the Complaint. Specifically, the Complaint states that Crystal Clear is unable, on its own, to provide the type of cable and internet services that are sold by DIRECTV. For this reason, according to the Complaint, Crystal Clear was forced to purchase these services from an outside provider and resell them to the homeowners in the Neighborhoods, in order to fulfill Crystal Clear's obligation under the Agreements to provide basic cable and internet services to the Neighborhoods. Crystal Clear chose to purchase these services from DIRECTV. In doing so, Crystal Clear did not eliminate competition between itself and DIRECTV, nor did it eliminate competition with other outside providers. Arguably, DIRECTV, in fact, had to compete with other outside providers to secure Crystal Clear's business. For these reasons, Crystal Clear and DIRECTV are not horizontal competitors.[10]

---

[10] A vertical agreement, between entities that occupy different levels of the distribution chain but are not horizontal competitors, such as manufacturers and retailers, *can* violate antitrust laws in certain circumstances. *See, e.g., Expert Masonry*, 440 F.3d at 345 (holding that, in order to allege an antitrust violation based on a vertical agreement, the pleadings must outline a relevant market, the defendants' power in that market, and the basis for a finding that the agreement restrained trade according to the "rule of reason"). Because vertical agreements are a necessary component of trade, these agreements are scrutinized under a heightened standard and "market allocation" is not a recognized basis for unlawfulness in these types of agreements; rather they must be the sort of agreement that restrain competition among horizontal competitors of one of the parties to the agreement. *See id.*; *see Southeastern Milk*, 555 F.Supp. at 720 (*citing Denny's Marina, Inc. v. Renfro Productions, Inc.*, 8 F.3d 1217 (7th Cir. 1993)). Here, there is no claim of an unlawful *vertical* agreement between DIRECTV and Crystal Clear. Moreover, there are no

The Plaintiffs argue that Crystal Clear and DIRECTV cannot enter into an agreement that transforms their nature as horizontal competitors by becoming a buyer and supplier when, in fact, they are really both providers of cable services. This argument, however, ignores the plain facts alleged in the Complaint, which states that 1) Crystal Clear, irrespective of how it defined itself in its transactions with the POAs, is not a provider of cable services and cannot be, because it is incapable of providing cable service; and 2) in entering the contract with DIRECTV, Crystal Clear occupied the role of an intermediary and reseller of DIRECTV's service and did not operate as a provider. The agreement between DIRECTV and Crystal Clear did not, as the Plaintiffs argue, eliminate competition between two entities that provide the same product, and then disguise itself as a vertical agreement. It truly is a vertical agreement between parties that provide very different services, in which each party profits solely from a different level of the chain of commerce.

The fact, as the Plaintiffs assert, that Crystal Clear has a website whereby it bills itself as a provider of cable and internet services does not change the fact that it did not operate as a horizontal competitor of DIRECTV. In fact, many distributors may advertise products or services for sale while, in reality, they are reselling products or services from other providers. Similarly, the fact that DIRECTV can and does distribute its services directly to homeowners in other areas (without relying on an intermediary) does not render it a horizontal competitor of Crystal Clear for distribution services in the Neighborhoods. DIRECTV and Crystal Clear did not enter into a contract because they were both poised to distribute services directly to

---

allegations that the agreement between DIRECTV and Crystal Clear sought to restrain trade among competitors of either party. If anything, the record suggests that DIRECTV would have had to compete with other providers to obtain the contract with Crystal Clear to provide service to the Neighborhoods (and will have to continue to do so going forward in order to retain Crystal Clear's business).

homeowners in the Neighborhoods but decided, instead, to share the territory. Rather, Crystal Clear already had exclusive agency rights to procure services from outside providers and distribute them in the Neighborhoods. Crystal Clear then chose to enter into a contract to purchase those services from DIRECTV. DIRECTV and Crystal Clear each profit from the arrangement in which Crystal Clear purchases services from DIRECTV and then Crystal Clear resells those services at a premium. DIRECTV is profiting from the sale of cable and internet services, and Crystal Clear is profiting from the sale of its services as an agent, reseller, and intermediary.

The essence of the alleged injury to the Plaintiffs appears to be in the fact that the POAs allowed Crystal Clear to hold this position as exclusive agent and reseller of services and to effectively charge the homeowners in the Neighborhoods a premium above the price they would pay for DIRECTV services, with no benefit conferred to the homeowners in exchange. This allegation, however, does not support an unlawful market allocation claim.

For these reasons, the unlawful market allocation claims will be dismissed.

### C.      Claim for Violation of FCC Order

The FCC Exclusivity Order specifically prohibits contractual agreements that grant *exclusive* rights to cable operators[11] to serve a multiple dwelling unit or real estate development. 22 FCC Rcd. 20235. For the purposes of the FCC Exclusivity Order, these prohibited agreements are defined as contracts by which only one provider is permitted to sell cable

---

[11] The FCC Exclusivity Order uses a distinct definition of cable operators that are covered by this Order, namely multichannel video programming distributors or "MVPDs." It is not entirely clear that Crystal Clear would meet this definition of a cable provider, given the allegations in the Complaint that it is unable to itself provide cable services to the Neighborhoods, and does not provide such services elsewhere. The court need not reach this question, however, because – as discussed in this section – there are simply no allegations of exclusivity that would render the Agreements or the contract between Crystal Clear and DIRECTV subject to the FCC Exclusivity Order.

services to a development (precluding even future competition from other providers). These prohibited arrangements are expressly differentiated from contracts that provide exclusive rights to *market* cable services to residents (agreements which are not prohibited) and are also differentiated from "bulk billing" contracts in which a development chooses to purchase cable services for all residents from one provider at an agreed upon bulk rate. *Id*. at 20265. In a second order supplementing the FCC Exclusivity Order, the FCC found that bulk billing arrangements, unlike exclusive provider contracts, are *not* prohibited, despite the fact that bulk billing may mean, as a practical matter, that only one provider is servicing a particular development at any given time. *In the Matter of Exclusive Service Contracts For Provision of Video Services in Multiple Dwelling and Other Real Estate Developments*, 25 FCC Rcd. 2460 (2010). The distinction appears to lie in the ability for market competition among providers to continue after the agreement is in place. If a development offers a provider exclusive rights to serve that development for a set period of time, there is no ability for other providers – including new providers who were not in existence at the time the agreement was entered – to compete for that business. If, on the other hand, a development establishes a bulk billing arrangement with a provider, it has not only already selected that provider through the competitive market process, but it will continue to have the opportunity to reevaluate that relationship and switch providers if a better competitor comes along. Likewise, competitors may find other ways of selling additional services to residents beyond those provided in a bulk billing agreement.

The agreement between Crystal Clear and DIRECTV, as alleged in the Complaint, is clearly a bulk billing arrangement and not an exclusive contract. There are no allegations that DIRECTV has exclusive rights to service the Neighborhoods (though they may have exclusive rights to market there, but this arrangement is expressly exempted from the FCC Exclusivity

Order's prohibition). To the extent that DIRECTV functions as a *de facto* exclusive cable provider in the Neighborhoods at this time, this is a result of the competition that allowed DIRECTV to receive Crystal Clear's contract in the first place, and it is the same result as would occur with any bulk billing arrangement. With respect to the Agreements rendering Crystal Clear the exclusive entity through which plaintiffs purchase telecommunications services, again, these do not grant an exclusive right to Crystal Clear to provide cable services. As the Complaint alleges, Crystal Clear is not even able to provide cable services on its own and has to purchase these service from DIRECTV (or another provider) and resell them to the homeowners. For this reason, it is not even clear that Crystal Clear is a cable provider for the purposes of the FCC Exclusivity Order. Moreover, the Agreements expressly provide that outside providers may serve the Neighborhoods, and at least one outside provider – DIRECTV – actually does.

The fact that Crystal Clear has exclusive rights to serve as an *agent* for the homeowners in negotiations with outside providers does not implicate the prohibitions of the FCC Exclusivity Order. Nor does the fact that the POAs mandate the purchase of basic services for all homeowners through Crystal Clear at a set rate. At best, this represents just another bulk billing agreement, this time between the POAs and Crystal Clear. As with the agreement between Crystal Clear and DIRECTV, it was ostensibly necessary for Crystal Clear to compete with other intermediary service providers in order to secure the POAs' business. The Complaint, of course, alleges that this is not the case because any such competition was stifled by the relationship between the POAs and Crystal Clear. If there is anything wrong with the Agreements, however, it is not that they are exclusive contracts that violate the FCC Exclusivity Order, but that they are the product of self-dealing, as addressed by the state law claims at issue in this action.

For these reasons, the claims for violating the FCC Exclusivity Order will be dismissed.

## IV.    REMAINING STATE LAW CLAIMS

The remaining claims – for self-dealing, unjust enrichment, and unconscionability – arise under Tennessee common law, rather than federal law.  As discussed above, the Plaintiffs have conceded that these claims are not brought against DIRECTV, but only against the remaining defendants, who are all residents of Tennessee, as are the Plaintiffs.  Accordingly, neither diversity jurisdiction nor federal question jurisdiction applies to these claims.

As discussed above, the state law claims appear to be at the heart of the Plaintiffs' action, as they touch upon the inherent unfairness in the Agreements as alleged in the Complaint. Nevertheless, there are arguments raised in the Motions to Dismiss that these claims should not proceed.  The court need not reach the merits of these arguments, however, because these are all Tennessee state law claims among parties within the state of Tennessee.  Therefore, the court must decide, as an initial matter, whether it will exercise supplemental jurisdiction over the Plaintiffs' remaining state law claims.

There is a strong presumption against the exercise, under 28 U.S.C. § 1367, of supplemental jurisdiction over remaining state law claims, once all federal claims have been dismissed, and residual supplemental jurisdiction should be exercised sparingly.  *Packard v. Farmers Ins. Co. of Columbus Inc.*, 423 F. App'x 580, 584 (6th Cir. 2011); *see also Experimental Holdings, Inc. v. Farris*, 503 F.3d 514, 522 (6th Cir. 2007) ("[R]esidual supplemental jurisdiction [should] be exercised with hesitation, to avoid needless decisions of state law."); *Moon v. Harrison Piping Supply*, 465 F.3d 719, 728 (6th Cir. 2006) ("[A] federal court that has dismissed a plaintiff's federal-law claims should not ordinarily reach the plaintiff's state-law claims.").  There is little reason, at this early stage of the litigation, for the court to retain supplemental jurisdiction over the state law claims.  The parties have not yet engaged in

discovery, set any trial or pretrial deadlines, and there is no indication that any statute of limitations concerns would be implicated, were this matter to be filed in state court. The court, therefore, declines to exercise supplemental jurisdiction over the plaintiff's remaining state law claims.

## V.     DIRECTV'S ARBITRATION MOTION

Because the court finds that the Plaintiffs have failed to state a claim with respect to the claims brought against DIRECTV, the court need not reach DIRECTV's Arbitration Motion, wherein DIRECTV has moved for any claims against it to be decided through arbitration rather than by this court. The court notes, however, that it is unlikely that any claims against DIRECTV in this action would be subject to the arbitration provision contained in the Customer Agreements that DIRECTV asserts it sent to the Plaintiffs upon their receipt of DIRECTV service. Without deciding whether the Plaintiffs even entered into any contractual relationship with DIRECTV that is governed by the Customer Agreements (the Plaintiffs argue that they never did, because all price negotiations and payments for their DIRECTV service, as well as all service calls, went through Crystal Clear, while DIRECTV argues that simply by receiving DIRECTV services, the Plaintiffs were bound by the terms of the Customer Agreements they received) the conduct giving rise to this action takes place separate and apart from any such relationship.

This action is about the transactions between DIRECTV and the other defendants that allegedly unfairly limited the Plaintiffs' ability to choose their own telecommunications service provider and receive quality of service and pricing consistent with an unencumbered market. This alleged injury took place at the point in time that the agreements among the defendants were reached and occurred irrespective of whether the Plaintiffs ever received DIRECTV service at

all, let alone entered into any kind of contractual relationship with DIRECTV that would be governed by the terms of DIRECTV's Customer Agreements. The court is neither bound, nor swayed, by the Central District of California case cited by DIRECTV:  Bischoff v. DIRECTV, Inc., 180 F. Supp. 2d 1097, 1006 (C.D. Cal. 2002) (holding that antitrust claims brought by customers relating to DIRECTV's alleged conspiracies were arbitrable under DIRECTV's customer agreement, over Plaintiffs' objections that the antitrust action had nothing to do with the terms of their contractual relationship with DIRECTV). Instead, this court is bound by the Sixth Circuit's holding that an action is outside of the scope of an arbitration clause where the action "could be maintained without reference to the agreement containing the arbitration clause." NCR Corp. v. Korala Assocs., Ltd., 512 F.3d 807, 813-14 (6th Cir. 2008). There would be no need for the court to reference the DIRECTV Customer Agreements, or otherwise reference any direct contractual relationship that may exist between the Plaintiffs and DIRECTV, in order to decide whether DIRECTV injured the Plaintiffs through DIRECTV's dealings with Crystal Clear.

## CONCLUSION

For the foregoing reasons, the Motions to Dismiss will be granted, and all of the claims in this action, including the claims against DIRECTV and Hood, which did not file motions to dismiss, will be dismissed without prejudice. The Arbitration Motion will be denied as moot.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge