**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **COURTNEY CATES, BRIAN STOVER, and JASON MILLER, on behalf of themselves and all others similarly situated,** | ) ) ) ) | |
| **Plaintiffs,** | ) ) | |
| **v.** | ) ) | **Case No. 3:16-cv-08** |
| | ) | **Judge Aleta A. Trauger** |
| **CRYSTAL CLEAR TECHNOLOGIES, LLC; CARBINE & ASSOCIATES, LLC; HOOD DEVELOPMENT, LLC; TOLLGATE VILLAGE ASSOCIATION, INC.; BRIDGEMORE VILLAGE OWNERS' ASSOCIATION, INC.; CANTERBURY HOMEOWNERS ASSOCIATION, INC.; TOLLGATE FARMS, LLC; BRIDGEMORE DEVELOPMENT GROUP, LLC; and DIRECTV, LLC,** | ) ) ) ) ) ) ) ) ) ) ) | |
| **Defendants.** | ) | |

## MEMORANDUM & ORDER

Pending before the court is the plaintiffs' Motion to Set Aside the Judgment and Amend the Complaint (Docket No. 98), to which defendants Crystal Clear Technologies, LLC ("Crystal Clear") and Carbine & Associates, LLC ("Carbine") have filed a Response (Docket No. 101), defendants Tollgate Village Association, Inc. (the "Tollgate POA") and Bridgemore Village Owners' Association, Inc. (the "Bridgemore POA") have filed a Response (Docket No. 102), defendant DIRECTV, LLC ("DIRECTV") has filed a Response (Docket No. 103), and the plaintiffs have filed a Reply (Docket No 104). Defendants Hood Development, LLC ("Hood") and Canterbury Homeowners Association, Inc. ("Canterbury") have not responded because all claims against them have purportedly been settled. For the reasons stated herein, the motion will be denied.

1

## BACKGROUND AND PROCEDURAL HISTORY

On February 15, 2016, the plaintiffs, residents of three planned residential communities in Thompson's Station, Tennessee (the "Neighborhoods") filed the Amended Complaint in this proposed class action against the Neighborhoods' developers and homeowners' associations, as well as Crystal Clear, an intermediary through which the plaintiffs are bound to purchase their telecommunications services, and DIRECTV, the telecommunications provider that has contracted with Crystal Clear to provide basic services to the Neighborhoods.  The Amended Complaint, which was premised on the theory that Crystal Clear is operated by the same entity as the original developers and homeowners' associations (the "Carbine Family") and that its contracts with these other defendants are not the result of arms-length transactions, contained the following counts:

- Count I for unlawful tying in violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1 (the "Sherman Act")

- Count II for unlawful market allocation in violation of the Sherman Act

- Count III for self-dealing under Tennessee common law

- Count IV for violation of the following Federal Communications Commission Order: *In the Matter of Exclusive Service Contracts for Provision of Video Services in Multiple Dwelling Units and Other Real Estate Developments*, 22 FCC Rcd. 20235 (2007) (the "FCC Exclusivity Order")

- Count V for unjust enrichment under Tennessee common law

- Count VI for unconscionability under Tennessee common law

On August 17, 2016, the court issued an order dismissing the Amended Complaint in this action without prejudice, along with an accompanying Memorandum (the "Prior Decision").

(Docket Nos. 95, 96.) The Prior Decision, familiarity with which is presumed, contains a more detailed discussion of the factual allegations in the Amended Complaint and the grounds for dismissal, which will not be repeated herein. Briefly, the Prior Decision held that the plaintiffs had failed to sufficiently plead the elements of their federal law claims, and the court declined to extend supplemental jurisdiction over the remaining Tennessee common law claims, which the plaintiffs conceded were not brought against defendant DIRECTV (the only out-of-state defendant) and, therefore, could not proceed on grounds on diversity jurisdiction. (*Id.*) In particular, the court found that the plaintiffs' Sherman Act unlawful tying claim could not proceed because the plaintiffs had failed to a) identify a market for the tying product and allege that the defendants had substantial power in that market, and b) allege that the tying had a substantial effect on the tied market. (*Id.* at pp. 15-18 (citing *Michigan Division-Monument Builders of North Am. v. Michigan Cemetery Ass'n*, 524 F.3d 726, 732-33 (6th Cir. 2008).) The court also found that the plaintiffs' claim for violating the FCC Exclusivity Order could not proceed because the plaintiffs had not alleged that Crystal Clear is either a cable provider under the specific relevant statutory definition, nor that it had exclusive rights to provide cable services to the neighborhoods at issue. Instead, the plaintiffs had alleged facts to the contrary, namely that Crystal Clear is unable to provide telecommunications services on its own and that the relevant agreements specifically provided for the provision of telecommunications services by other providers. (*Id.* at pp. 22-24.) Finally, the Prior Decision held that the unlawful allocation claim could not proceed because the plaintiffs had not alleged an agreement between horizontal competitors. (*Id.* at p. 20.)

Following the Prior Decision, the clerk of court issued an entry of judgment and the matter was closed. (Docket No. 97.)

On September 14, 2016, the plaintiffs filed a Motion to Set Aside the Judgment and Amend the Complaint, along with an accompanying Memorandum, asking the court to set aside the Prior Decision and allow the plaintiffs to file their attached proposed Second Amended Class Action Complaint. (Docket Nos. 98, 99.)

In their Memorandum, the plaintiffs state that, pursuant to a settlement agreement with the Canterbury POA, their proposed Second Amended Complaint does not name the Canterbury POA or Hood as defendants. (Docket No. 99, p. 2.) Additionally, the plaintiffs state that, while the proposed Second Amended Complaint retains Count II from the Amended Complaint in order to preserve this claim for appeal, the plaintiffs do not actually contest the court's dismissal of this claim or intend to pursue the unlawful market allocation claim at this time if the case is reopened. (*Id.*) Additionally, the proposed Second Amended Complaint does not name DIRECTV as a defendant. (*Id.*) Finally, the proposed Second Amended Complaint adds an additional breach of contract claim under Tennessee law. (Docket No. 99-1 at ¶¶ 127-131.)

The plaintiffs argue that the court should reopen this action and allow the plaintiffs to file the Second Amended Complaint because 1) the deficiencies with respect to the tying claim have been cured by new allegations that the relevant tying market is the market for homes in planned communities similar to the Neighborhoods within the unique city of Thompson's Station and 2) the court erred in the Prior Decision by holding that Crystal Clear is not an exclusive provider of telecommunications services to the Neighborhoods in violation of the FCC Exclusivity Order, despite the plaintiffs' allegations that it is, allegations which are further supported by the evidence added to the proposed Second Amended Complaint.

The Second Amended Complaint clarifies that the plaintiffs' tying claim is brought only against Carbine, Crystal Clear, and the developer defendants, and adds the following allegations with respect to that claim:

> The Neighborhoods are located in Thompson's Station, Tennessee. Thompson's Station is a small town located in Williamson County, Tennessee that is just south of the much larger town of Franklin, TN and just north of the larger town of Spring Hill, Tennessee. Thompson's Station according to the U.S. Census had a population of 2,194 people. By comparison, Franklin, TN had a population of 62,487 in 2010 according to the U.S. Census and Spring Hill had a population of 29,036. In other words, Thompson's Station is a unique town in Williamson County in that it has retained its small town nature where as other neighboring areas have experienced considerably more growth and development in the current century. This positions Thompson's Station with unique qualities not applicable to other geographically-near areas in Williamson County. Being within Williamson County also means that residents of Thompson's Station also have access to Williamson County Schools, which is one of the best public school systems in Middle Tennessee, and an important decision factor for people looking for homes in middle Tennessee, and specifically in Williamson County as the Williamson County School district is seen by home buyers as more superior to the Franklin Special School District which also services areas around Thompson's Station. A 2014 National Association of Realtors survey found that 29% of home buyers ranked the quality of schools as a high determining factor on where to buy a home. As a result of its small town nature and its access to Williamson County schools, Thompson's Station presents unique qualities for individuals looking to purchase homes in Williamson County. As can be seen from the attached Exhibit D, which is a map of Thompson's Station showing its urban growth boundaries and those of other communities in Williamson County, the Neighborhoods are one of the few, if only, areas in Thompson's Station that are large, centrally planned communities within Thompson's Station. The Neighborhoods also require homeowners to build certain types of homes that comply with each Neighborhood's design code or other covenants governing the restrictions of each individual lot. One effect of these design codes is to limit the use of a lot to the construction of homes whose ultimate value is around $350,000-500,000 (approximately). Homes of this nature and design are typically purchased by customers with middle to upper middle incomes. For the period relevant to this claim, the Carbine Family Companies have or had sufficient market power in the sale of lots in Thompson's Station for centrally planned communities that service households with middle to upper middle incomes.

(Docket No. ¶¶ 84-89.) The proposed Second Amended Complaint also reiterates, as stated in the First Amended Complaint, that "[t]he amount of interstate commerce affected in the market

for the sale of lots in the Neighborhoods and/or the sale of telecommunications in the Neighborhoods is substantial." (*Id*. at ¶ 90.) No additional allegations are added with respect to the relevant market for telecommunications services.

The Second Amended Complaint repeats, as stated in the First Amended Complaint, that Crystal Clear has the "exclusive right to provide television service" in the Neighborhoods (*id*. at ¶ 111) and adds the following allegations in support of the plaintiffs' claim for violation of the FCC Exclusivity Order:

- "Crystal Clear is a multichannel video programming distributor as that term is used in the [FCC Exclusivity Order] in that it has subscribers and/or customers and is in the business of making available for purchase multiple channels of video programming." (*Id*. at ¶ 110.)

- "As can be seen from Exhibit F, which is a letter from the current owners of the Bridgemore development, Crystal Clear's exclusive easements within the Neighborhoods prevent additional television service providers, other than Crystal Clear, from providing television service in the Neighborhoods. By way of background, the Carbine Family Companies lost control of the Bridgemore and Tollgate developments in or around 2011 and other investors purchased these developments. Notwithstanding the Carbine Family Companies from controlling the relevant POAs, these new entities, despite expressing a desire to rid the Neighborhoods of Crystal Clear's exclusive rights, have been unable to do so because of the exclusive Private Service Easements held by Crystal Clear that prevent other providers from laying the necessary infrastructure to serve the Bridgemore and Tollgate Neighborhoods." (*Id*. at ¶113.)

Attached to the proposed Second Amended Complaint, as referenced in the quoted language above, is a letter to the residents of Bridgemore, one of the Neighborhoods, from a representative of the development's new owner, MBSC. (Docket No. 99-7.) This letter refers to Crystal Clear's "exclusive easements," granted by the original developers to allow Crystal Clear to install telecommunications infrastructure, and indicates that Crystal Clear will not cede its easement to allow access to potential telecommunications providers. (*Id*.) Additionally, the proposed Second Amended Complaint adds that "the existence of the Private Service Easements

make it physically impossible for another television provider to provide service in the Bridgemore and Tollgate neighborhoods." (*Id*. at 114.)

Meanwhile, the proposed Second Amended Complaint retains the allegations, as stated in the First Amended Complaint, that Crystal Clear "is not, in any practical sense, an actual provider of telecommunications services," but "operates only as a shill" (Docket No. 99-1 at ¶ 2) and that Crystal Clear has contracted with DIRECTV such that DIRECTV is the actual "exclusive provider of telecommunications within the Neighborhoods" (*Id*. at ¶ 96). As with the First Amended Complaint, the proposed Second Amended Complaint also attaches the agreements between Crystal Clear and the other defendants, which expressly state that "the Homeowner has the option in his/her sole discretion, to obtain Services, including the Basic Services, from any and all Alternate Providers, but the Homeowner will not be relieved of his/her obligation to pay for" basic services from Crystal Clear and that:

> [i]n furtherance of clause (ii) above and without limiting the effect of the foregoing Required Disclosures, the parties agree that no resident within Bridgemore Village, whether tenant or owner, shall be denied access to an available franchised or licensed cable television service, nor shall such resident or cable television service be required to pay anything of value in order to obtain or provide such service except those charges normally paid for like services by residents of, or providers or such services to, single-family homes within the same franchised or licensed area and except for installation charges as such charges may be agreed to between such resident and the provider of such services.

(Docket No. 99-3 at Article 3.5; Docket No. 99-4 at Article 3.5.)

On September 30, 2016, Crystal Clear and Carbine filed a Response in opposition to the plaintiffs' Motion, arguing that the proposed Second Amended Complaint contains the same defects as the previous pleadings with respect to the federal law causes of action at issue and that

it would, therefore, be futile to grant the plaintiff's Motion.[1]  (Docket No. 101.)  Carbine and

Crystal Clear's Response does not challenge the sufficiency of the pleadings with respect to the

Tennessee common law claims.  (*Id*.)

Also on September 30, 2016, the Tollgate POA and the Bridgemore POA filed a

Response in opposition to the plaintiffs' motion, incorporating the arguments put forth in Crystal

Clear and Carbine's Response regarding the deficiencies of the plaintiffs' proposed Second

Amended Complaint.  (Docket No. 102.)  Finally, on September 30, 2016, DIRECTV filed a

Response, stating its agreement with the Prior Decisions' dismissal of all claims against

DIRECTV, noting that the plaintiffs have not named DIRECTV as a defendant in their proposed

Second Amended Complaint, and taking no position on the currently pending Motion.  (Docket

No. 103.)

On October 11, 2016, the plaintiffs filed a Reply.  (Docket No. 104.)

## ANALYSIS

The plaintiffs filed the currently pending Motion seeking to alter the Prior Decision for

the sole purpose of reopening this case so that they may amend their pleadings by filing their

proposed Second Amended Complaint.  A motion for leave to amend a pleading under Rule

15(a)(2) should be freely granted where justice so requires.  *Foman v. Davis*, 371 U.S. 178, 230

(1962).  However, a motion to amend may be denied where there is "undue delay, bad faith or

dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments

---

[1] The plaintiffs assert that this Response was also filed on behalf of Tollgate Farms, LLC
("Tollgate Farms") and Bridgemore Development, Group, LLC ("Bridgemore Development")
because, the plaintiffs claim, these parties, along with Carbine and Crystal Clear, are all part of
the "Carbine Family Companies."  (Docket No. 104, p. 1.)   The Response does not expressly
state that it is filed on behalf of Tollgate Farms and Bridgemore Development, but the same
counsel represents Tollgate Farms, Bridgemore Development, Carbine, and Crystal Clear, and
Tollgate Farms and Bridgemore Development did not file a separate response.

previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc." *Riverview Health Institute LLC v. Medical Mutual of Ohio*, 601 F.3d 505, 520 (6th Cir. 2010) (quoting *Foman,* 371 U.S. at 182). "A proposed amendment is futile if the amendment could not withstand a Rule 12(b)(6) motion to dismiss." *Rose v. Hartford Underwriters Ins. Co.*, 203 F.3d 417, 420 (6th Cir. 2000) (citing *Thiokol Corp. v. Dep't of Treasury, State of Michigan, Revenue Div.*, 987 F.2d 376, 382–83 (6th Cir. 1993)). For the reasons discussed below, the court finds that the plaintiffs' proposed Second Amended Complaint would not survive a motion to dismiss under Rule 12(b)(6). Accordingly, allowing the plaintiffs to file the Second Amended Complaint would be futile and, therefore, the court will deny the Motion to Set Aside the Judgment and Amend the Complaint and will not reopen the case.

As noted above, the plaintiffs have conceded that they do not intend to pursue their unlawful market allocation claim (though they may wish to preserve objections to the court's dismissal of that claim to raise on appeal). (Docket No. 99 at p. 2.) The plaintiffs do attempt, however, to resurrect their tying claim and their claim for violation of the FCC Exclusivity Order. As to the unlawful tying claim, the proposed Second Amended Complaint adds allegations sufficiently identifying the relevant market for the *tying* product (homes in the Neighborhoods). The plaintiffs allege this is the market for newly built homes in the $350,000 to $500,000 price range in planned communities in the city of Thompson's Station, Tennessee, and that homes in the Neighborhoods dominate this market. The defendants argue that this definition of the relevant market is too narrow, because the plaintiffs do not account for the fact that homes in similar cities and towns throughout Williamson County (or even the surrounding region) may also be interchangeable with homes in the Neighborhoods. As stated in the Prior Decision,

however, the question of how to define the market is ultimately a fact question for the jury, and the plaintiffs need only allege a plausible market for their claim to proceed at this stage, which they have done.  *Michigan Division-Monument Builders of North Am. v. Michigan Cemetery Ass'n*, 524 F.3d at 733.  Nevertheless, the proposed Second Amended Complaint does not allege that the tying of home sales in the Neighborhoods to sales of Crystal Clear's services has an impact on the relevant *tied* market.  The plaintiffs allege only that the agreements at issue have a substantial effect on the market for telecommunications services in the *Neighborhoods*.  (Docket No. 99-1, ¶ 90.)  Of course, any time a product is tied to another product, there is a substantial impact on the market for the tied product among *purchasers of the tying product*.  An unlawful tying claim, however, requires a more substantial showing that the general market within which the tied product is sold, such as in this case the market for telecommunications services throughout the region more generally, has been substantially impacted.  There is no such allegation in the proposed Second Amended Complaint.  Indeed, to the contrary, the Second Amended Complaint alleges that Crystal Clear does not even provide telecommunications services on its own, nor does it provide any services outside of the Neighborhoods, undermining any claim that its role in the Neighborhoods affects the broader market for telecommunications services at all, let alone substantially.

Next, with respect to the claim for violating the FCC Exclusivity Order, the proposed Second Amended Complaint reiterates the same facts that the court relied on in the Prior Decision to find that that there was no basis for this claim to proceed.  The plaintiffs argue that the court erred in the Prior Decision by finding that Crystal Clear is not an exclusive provider of telecommunications services to the Neighborhoods, despite the plaintiffs' allegations that Crystal Clear *is* an exclusive provider (as noted above), which the court was obliged to take as true for

purposes of a Motion to Dismiss. (Docket No. 104 at p. 5.) Reading the pleadings and attached agreements in their entirety, however, it is clear that Crystal Clear is neither a true provider of telecommunications services, nor does it have the right to preclude the plaintiffs from accessing services from any outside provider of their choice. The court is not swayed by the additional allegations in the Second Amended Complaint suggesting that Crystal Clear has an exclusive easement to establish telecommunications infrastructure in the Neighborhoods, or that Crystal Clear blocks other providers from providing service, an allegation that is clearly belied by other allegations in the Second Amended Complaint and by the attached agreements between the parties. Rather, the only way to understand the allegations comprehensively is to find that Crystal Clear has the role of an exclusive *buyer* of services on behalf of the plaintiffs, and functions in a role akin to a property owner for the Neighborhoods. Crystal Clear's exclusive right to negotiate with third-party providers and its ability to earn compensation for this intermediary role may be improper and give rise to the state law claims identified by the plaintiffs, but these allegations do not give rise to a federal claim for violation of the FCC Exclusivity Order. The allegations simply do not establish that Crystal Clear's property rights in the Neighborhoods render it a telecommunications *provider* with exclusive access, as opposed to merely allowing Crystal Clear to step into the role of property owner for purposes of negotiating with, and purchasing services from, actual outside providers such as DIRECTV.

The plaintiffs argue that this case is factually the same as a Fourth Circuit case that found a defendant liable for violating the FCC Exclusivity Order based on its exclusive right to sell cable services to residents of a development, *Lansdowne on the Potomac Homeowners Ass'n, Inc. v. OpenBand at Lansdowne, LLC*, 713 F.3d 187 (4th Cir. 2013). *Lansdowne*, however, is distinguishable from the instant action for the critical reasons that 1) the defendant in *Lansdowne*

was affiliated with the *actual* cable service provider servicing the development, and 2) there were no allegations in *Lansdowne* that the defendant was a part of the same entity that controlled the residential development itself, or that its easement to be an exclusive cable provider was not the result of an arms-length transaction with the development. 713 F.3d at 193-94, 203. Moreover, unlike in this case, there are no facts in *Lansdowne* to suggest that the residents actually had the right procure services from any other providers, even if they were obliged to purchase those services through the defendant. *See id*. at 195-96. In *Lansdowne*, the fact that the defendant was found to be, essentially, one and the same entity as the actual cable provider and to have an exclusive easement for the provision of cable services to the development meant that there was no competition with other cable providers. Also, because the defendant was a separate entity from the development itself, there was no reason for it to have obtained an exclusive easement other than to eliminate competition with other providers.

In this case, to the contrary, the allegations simply indicate that Crystal Clear is one and the same entity as the *developers* and *homeowners' associations*. There are no allegations that it is affiliated with DIRECTV or any other actual cable provider. As a result, there is still incentive for competition among actual providers to sell their cable services to Crystal Clear (as DIRECTV did). While it may be actionable, under Tennessee law, for Crystal Clear to have taken on a role as an allegedly "shill" intermediary between the Neighborhoods and telecommunications providers, the allegations do not give rise to the same type of federal law violation as was found in *Lansdowne*, where the defendant took actions that inhibited competition among actual telecommunications providers. Rather, the allegation that Crystal Clear is an exclusive cable provider because it has an exclusive easement and the residents of the Neighborhoods must purchase their telecommunications services from Crystal Clear appears to be a red herring that is

intended to shoehorn the plaintiffs' grievance into a federal claim. A property owner will necessarily have exclusive access rights and must allow a cable provider to enter the property before services can be provided. There is no legal basis to find that it would violate the FCC Exclusivity Order for the owners of a development to act as intermediaries between residents and outside cable providers. The fact that Crystal Clear, as part of the same family of entities as the original developer, occupies yet an additional intermediary role that allegedly serves no purpose other than lining the pocket of the Carbine Family is the injury that is at the heart of this action. Yet, this injury does not give rise to a claim that Crystal Clear is a cable provider that has been given exclusive access to the Neighborhoods to block competition among cable providers in violation of federal law.

For these reasons, the plaintiffs' federal law claims cannot survive, even as stated in the proposed Second Amended Complaint. Nor has the currently pending motion changed the court's decision to decline supplemental jurisdiction over the plaintiffs' state law claims. Accordingly, the court finds that allowing the plaintiffs to file the Second Amended Complaint would be futile. There is, thus, no reason to alter the Prior Decision or to reopen this action.

**CONCLUSION**

For the foregoing reasons, the plaintiffs' Motion to Set Aside the Judgment and Amend the Complaint is hereby **DENIED**.

It is so **ORDERED**.

Enter this 14th day of November, 2016.

ALETA A. TRAUGER
United States District Judge