# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE

| | |
|---|---|
| COURTNEY CATES, BRIAN STOVER, and JASON MILLER, on behalf of themselves and all others similarly situated<br><br>         Plaintiffs,<br><br>    v.<br><br>CRYSTAL CLEAR TECHNOLOGIES LLC; CARBINE & ASSOCIATES LLC; TOLLGATE FARMS. LLC; BRIDGEMORE DEVELOPMENT GROUP, LLC; TOLLGATE VILLAGE ASSOCIATION INC.; and BRIDGEMORE VILLAGE OWNERS' ASSOCIATION INC.,<br><br>         Defendants. | Case No. 3:16-cv-00008<br><br>JURY DEMAND REQUESTED |

## SECOND AMENDED CLASS ACTION COMPLAINT

1.      Plaintiffs, on behalf of themselves and all others similarly situated, for their complaint against the Defendant Crystal Clear Technologies, LLC ("Crystal Clear") and Carbine & Associates, LLC ("Carbine & Associates"), Tollgate Village Association Inc. ("Tollgate POA"), Bridgemore Village Owners' Association Inc. ("Bridgemore POA"), Tollgate Farms, LLC ("Tollgate Farms"), and Bridgemore Development Group, LLC ("Bridgemore Development"), (collectively with Crystal Clear, Carbine & Associates, the Tollgate POA, the Bridgemore POA, a, the "Defendants"), allege as follows based on (a) personal knowledge; (b) the investigation of their counsel; and (c) information and belief.  Carbine & Associates, Tollgate Farms, Bridgemore Development, and Crystal Clear shall be referred here in as the "Carbine Family Companies".

## I.      INTRODUCTION

2.      This case concerns anti-competitive and otherwise illegal practices related to the provision of telecommunications services to residents of three neighborhoods in Thompson's Station, Tennessee.  Through housing associations that have represented the interests of these neighborhoods only nominally, the developer defendants – through concealed self-dealing – have created and maintained an illegal monopoly over telecommunications services to these three neighborhoods.  The agreements that created this monopoly purport to bind the residents of these neighborhoods to utilize defendant Crystal Clear's telecommunications network for over a quarter century, even though Crystal Clear is not, in any practical sense, an actual provider of telecommunications services.  In fact, Crystal Clear operates only as a shill for the developers to soak the residents for more money than they would actually spend (if any) on telecommunications services provided by DirecTV or another legitimate service provider.  No rational actor would have entered into agreements on these terms, and the residents of these neighborhoods were not (at the time of purchase) aware of the self-dealing nature of these

arrangements.  The sweetheart deals involving Crystal Clear – along with the relationships that those deals purported to create – are illegal under both federal and state law.

3.    The Plaintiffs are individual residents who own homes in the Bridgmore, Tollgate, and Canterbury neighborhoods in Thompson's Station (collectively, the "Neighborhoods").  The Neighborhoods are located close to one another.  Tollgate is located along Columbia Pike just north of the intersection with Tennessee State Route 840.  Bridgemore and Canterbury are located on Critz Lane, which intersects with Columbia Pike just south of the intersection with Tennessee State Route 840.   Each Neighborhood consists of hundreds of houses with common facilities.

4.    The Neighborhoods all receive telecommunications services exclusively from Crystal Clear, and the residents of these Neighborhoods, whom the Plaintiffs seek to represent, have all been victimized by the defendants' unlawful conduct.

5.    As a result of Defendants' illegal conduct, Plaintiffs seek monetary damages, a declaration that the Defendants' conduct is unlawful, and an injunction that prevents the Defendants from preventing other telecommunications providers to serve the Neighborhoods.

## II.    JURISDICTION AND VENUE

6.    This action arises under § 2 of the Sherman Act (15 U.S.C. § 2) and § 4 of the Clayton Act (15 U.S.C. § 15(a)).  Plaintiffs and the Class seek preliminary and/or permanent injunctive relief pursuant to § 16 of the Clayton Act (15 U.S.C. § 26).

7.    The Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1337(a), and 15 U.S.C. § 15.

8.    This Court has personal jurisdiction over the Defendants because the Defendants transact business within this District, carry out interstate trade and commerce in substantial part in this District, have an agent or agents in this District, or can be found in this District.

9.      Venue is appropriate within this District under § 12 of the Clayton Act (15 U.S.C. § 22) and 28 U.S.C. §§ 1391(b) and (c).

### III.     PARTIES

10.      Plaintiff Courtney Cates is a resident of the Canterbury neighborhood and owns and resides at the residence of 2196 Chaucer Park Lane, Thompsons Station, TN 37179. Plaintiff Courtney Cates purchased her residence in November of 2014.

11.      Plaintiff Dr. Jason Miller is a resident of the Bridgemore neighborhood and owns and resides at the residence of 3738 Covered Bridge Rd., Thompson's Station, TN 37179.

12.      Plaintiff Brian Stover is a resident of the Tollgate neighborhood and owns and resides at the residence of 2059 Bungalow Drive Thompson's Station, TN 37179.

13.      Defendant Crystal Clear is a Tennessee limited liability corporation with its principal place of business at 621 Bradley Ct., Franklin, TN 37067, and may be served through its resident agent James Carbine at the same address.

14.      Defendant Carbine & Associates is a Tennessee limited liability corporation with its principal place of business at 621 Bradley Ct., Franklin, TN 37067, and may be served through its registered agent James Carbine at the same address.

15.      Defendant Tollgate Farms, LLC is a Tennessee limited liability corporation with its principal place of business at 621 Bradley Ct., Franklin, TN 37067, and may be served through its registered agent James Carbine at the same address.

16.      Defendant Bridgemore Development Group, LLC is a Tennessee limited liability with its principal place of business at 621 Bradley Ct., Franklin, TN 37067, and may be served through its registered agent James Carbine at the same address.

17.     Defendant Tollgate POA is a Tennessee non-profit corporation with its principal place of business at 50 Vantage Way, Ste 100, Nashville TN and may be served through its registered agent Ghertner and Company at 50 Vantage Way, Ste. 100, Nashville, TN 37228.

18.     Defendant Bridgemore POA is a Tennessee non-profit corporation with its principal place of business at 50 Vantage Way, Ste 100, Nashville TN and may be served through its registered agent Ghertner and Company at 50 Vantage Way, Ste. 100, Nashville, TN 37228.

## IV.     FACTUAL BACKGROUND

### A.     The Defendants' Relationships

19.     Crystal Clear, Carbine & Associates, Tollgate Farms, and Bridgemore Development operate from the same business address, have the same registered agent (James Carbine), and upon information and belief, share the overlapping boards of directors, officers, or shareholders.  Upon information and belief, although these companies purport to be independent entities, they are functionally the same: all are members of the "Carbine" family of companies and operate under common direction and control.

20.     For example, although Tollgate Farms (a Carbine entity) is nominally the original developer of the Tollgate neighborhood, Carbine & Associates advertises homes in the Tollgate neighborhood for sale on its website, www.carbineandassociates.com, as "featured Carbine and Associates quality built properties."  In the "Communities" section of the website, Carbine & Assocaites states that it "specializes in building dream homes in Nashville and the surrounding areas," including Thompson's Station, and that "people are enjoying the superior homes our teams work so hard to create.  Each Nashville home we build features the finest materials . . . ." That section contains a link to "Tollgate Village".  The Carbine & Associates website also contains a separate page for "Tollgate Village Properties," in which the company advertises

housing in the Tollgate community, boasting that "Carbine and Associates has several new homesites available in this beautiful community." The page also contains separate links to "Carbine Properties" available for sale in Tollgate, including both homes and land. Furthermore, the "Home Building" section states that consumers will "find Carbine homes in fine communities around the area including . . . , Tollgate Village . . . ."

21.     Similarly, although Bridgemore Development (a Carbine entity) is nominally the original developer of the Bridgemore neighborhood, the Carbine & Associates website advertises Bridgemore as one of the "fine communitities" within "[t]he company's land development" portfolio. Finally, in the "Our Team" section of the Carbine & Associates website, the biography for Carbine & Associates' Vice President of Operations, Daryl Walny, states that he "manages construction operations in the Kings' Chapel, Bridgemore and Tollgate communities."

22.     Exhibit A contains a collection of supporting screencaptures from the www.carbineandassociates.com website.

23.     The fact that Carbine & Associates claims ownership and development of the Tollgate and Bridgemore neighborhoods demonstrates that it in fact developed the neighborhoods, regardless of whatever corporate formalities purportedly separate it from the developments or the POAs. Upon information and belief, Carbine & Associates controls, directly or indirectly, the operations of its related family of companies, including but not limited to Tollgate Farms, Bridgemore Development, and Crystal Clear. In the alternative, upon information and belief, Carbine & Associates and other companies in the Carbine corporate family operate under common direction or control. In either case, all of the Carbine entities act as *alter egos* of each other, irrespective of any corporate formalities that separate them.

24.     In the alternative, upon information and belief, Carbine & Associates allowed Tollgate Farms and Bridgemore Development to act as its apparent agents, or vice versa.

**B.     Crystal Clear: The First Step in Building a Monopoly**

25.     Crystal Clear is a Carbine entity that purports to be a telecommunications service provider.  Upon information and belief, as of October 2005, Crystal Clear had no actual subscribers and did not own, lease, or otherwise maintain any telecommunications lines.

26.     On October 11, 2005, Crystal Clear obtained a non-exclusive franchise agreement from the City of Thompson's Station.  The franchise agreement permitted Crystal Clear to use the streets and dedicated easements within a certain service area for the construction, operation, and maintenance of a cable system to provide television and high-speed internet to Crystal Clear's subscribers.  The territory covered by this franchise agreement includes the Neighborhoods.

27.     The franchise agreement was non-exclusive: by its terms, Crystal Clear obtained only a <u>non-exclusive right</u> to construct and operate a telecommunications network (including lines, switches, conduct fiber, electrical stations, *etc.*), within the public right of way.

28.     Because the franchise agreement was non-exclusive, Crystal Clear by default would have had to compete with other telecommunications companies to provide services to the the three Neighborhoods.

**C.     Developer-Controlled Homeowners' Associations**

29.     When a developer creates a planned neighborhood similar to the Neighborhoods at issue here, the developer customarily creates a homeowners' association for the neighborhood. At the outset, the association is created for the benefit of the "owners" – if there are any – on a nominal basis only.  The association, which at this stage functionally acts at the behest of the

developer, creates rules and enters into agreements that purportedly promote neighborhood cohesion and facilitate the administration of common areas.

30.     For these reasons, a developer-controlled association may also enter into an agreement with providers of certain services to the neighborhood, such as the provision of cable and internet services.  In its ideal form, the developer-controlled association could enter into an arrangement with an independent telecommunications provider, such as Comcast, AT&T, or DirecTV) that locks in advantageous service rates or other terms beneficial to future owners and the community as a whole.

31.     Typically, a developer will "promise" that control of the association will be turned over to the homeowners once a specified percentage of homes are built and sold.  In its ideal form, the homeowners would therefore acquire control of the association within a reasonable time frame per the original terms of incorporation or bylaws, and the homeowners can act in their own best interests.

32.     Although there may be no inherent illegality in the creation of a developer-controlled homeowners association at the outset of a development, a canny or unscrupulous developer can abuse this process.  For example, despite its promise to turn over control of the association once a specified percentage of units are sold, the developer can delay the homeowners from acquiring control by creating new units that reduce the percentage of units sold to stay below that threshold.  In other words, developers can change the denominator to maintain control of the association indefinitely.

33.     At least as of March 1, 2006, and at least through 2011, Tollgate Farms was a Carbine entity that controlled the Tollgate POA.  Upon information and belief, Carbine & Associates controlled Tollgate Farms and the Tollgate POA during this time, Tollgate Farms and

8

the Tollgate POA acted as *alter egos* of Carbine & Associates, or these three entities were in an apparent agency relationship.  Accordingly, directly or indirectly, the Tollgate POA acted as a Carbine entity at least through 2011, when York Capital assumed control of the Tollgate POA.  Upon information and belief, Carbine entities, including Carbine & Associates, maintained control of the Tollgate POA by the means referenced in the previous paragraph.

34.     Even after York Capital assumed control of the Tollgate POA, the Tollgate POA remained out of the homeowners' control.

35.     In other words, despite the passage of nearly ten years since the formation of the neighborhood, the Tollgate homeowners still do not, and never have, controlled the Tollgate POA.

36.     At least as of January 2007 and at least through 2013, Bridgemore Development was a Carbine entity that controlled the Bridgemore POA.  Upon information and belief, Carbine & Associates controlled Bridgemore Development and the Bridgemore POA.  Thus, directly or indirectly, the Bridgemore POA acted as a Carbine entity at least through 2013.

37.     Even after another entity assumed control of the Tollgate POA, the Bridgemore POA has remained out of the homeowners' control since that time.

38.     In other words, the Bridgemore homeowners have never controlled the Bridgemore POA.

**The Communications Services Agreements in Tollgate, Bridgemore, and Canterbury**

39.     The Carbine entities devised a unique scheme of self-dealing to benefit themselves at the expense of future homeowners.

40.     In March 2006, the Tollgate POA (functionally a Carbine entity at the time) executed a "Communication Services Agreement" with Crystal Clear for the provision of

9

telecommunications services to Tollgate. The Tollgate Communications Agreement is attached as Exhibit B hereto.

41. By its own terms, the Tollgate Communications Agreement purported to be "a contractual agreement **between independent parties**." (Ex. B, ¶ 13.12 (emphasis added).)

42. The representation in ¶ 13.12 of the Tollgate Communications Agreement is materially false: Crystal Clear and the Tollgate POA were not in fact independent contracting parties. Instead, they were both Carbine entities subject to common direction and control. Thus, Carbine entities stood on both sides of agreement, meaning that the Tollgate Communications Agreement was not the product of an arms' length transaction.

43. In January of 2007, the Bridgemore POA (functionally a Carbine entity at the time) entered into a nearly identical agreement with Crystal Clear for the provision of telecommunications services in Bridgemore. A copy of this agreement is attached as Exhibit C, (the "Bridgemore Communications Agreement").

44. As with the Tollgate Communications Agreement, the Bridgemore Communications was not the product of an arms' length transaction between independent parties. Instead, Carbine entities, acting under common direction and control, stood on both sides of the transaction. Thus, ¶ 13.12 of the Bridgemore Communications Agreement, which states that the contracting parties are "independent parties," is materially false.

45. For these reasons, the Tollgate Communications Agreement and the Bridgemore Communications Agreement are both the result of self-dealing among Carbine entities.

46. Upon information and belief, the circumstances related to the Canterbury neighborhood are similar but not identical. Upon information and belief, in 2007, Crystal Clear and the Canterbury Homeowners Association, Inc. ("Canterbury POA") entered into negotiations

for the Communications Services Agreement (the "Proposed Canterbury Communications Agreement") that is similar to the Tollgate Communications Agreement. Despite repeated requests for copies of this agreement, Crystal Clear and its affiliates have refused to provide a copy of the Proposed Canterbury Communications Agreement.

47.     Hood Development, Inc. ("Hood") developed the Canterbury neighborhood. Hood controlled the Canterbury POA at the time that it began negotiating the Proposed Canterbury Communications Agreement.

48.     In or around 2007 Crystal Clear and Hood began operating under the Proposed Communications Agreement, although such agreement was never formally executed. As a result, Crystal Clear became for a period of time the exclusive communications provider to portions of the Canterbury Neighborhood. This arrangement continues to persist today although an agreement has been entered that Hood and the Canterbury POA will permit access by other telecommunications providers in the very near future. Regardless, due to the situation as it persisted from in or around 2007 through the present, Crystal Clear was the sole provider of telecommunications service to portions of the Canterbury neighborhood.

## THE CONTRACTUAL TERMS REFLECT SELF-DEALING

49.     The Bridgemore and Tollgate Communications Agreements, and upon information and belief, the Canterbury Communications Agreement, are the product of self-dealing and contain terms that are not in the Neighbhorhoods' best interests.

50.     As an initial matter, when these agreements were executed, Crystal Clear was not a legitimate telecommunications provider. Crystal Clear had no previous experience in building complex and modern communications infrastructure, it had never operated a communications network or otherwise been in the business of providing telecommunications, and it did not have a

separate telecommuniciations network to allow it to deliver television content or high speed internet to residences in the Neighborhoods.

51.     In fact, Clear Crystal was – and remains – simply a pass-through entity created and managed by the same **real estate developers** that created and managed Carbine & Associates, Tollgate Farms, and Bridgemore Development, who in turn controlled the Bridgemore and Tollgate POAs.

52.     Aside from its purported provision of telecommunications services to the Neighborhoods, Crystal Clear does not purport to provide telecommunications services or conduct business in the area of telecommunications.   Crystal Clear's **only business** is the result of sweetheart deals that it entered into with each's Neighborhood's POA, including at least two agreements (the Tollgate and Bridgemore agreements) in which the Carbines essentially contracted with themselves.

53.     Instead of providing legitimate telecommunications services, Crystal Clear contracts with actual providers, such as DirecTV, for provide cable and internet services.  Upon information and belief, Crystal Clear charges through to the Neighborhoods' POAs (and therefore its homeowners) a **premium** that Crystal Clear adds to the rates it negotiates with DirecTV.

54.     Under the circumstances, no rational POA would have contracted with Crystal Clear for telecommunications services in the first place.  Crystal Clear simply stood to charge a premium for services beyond what the POAs otherwise would have negotiated in an arms' length transaction.  Furthermore, Crystal Clear would be unable to provide the quality of services that DirecTV or another telecommunications company could have provided directly.  In a legitimate

arms' length transaction, a POA (even one controlled by a developer) would not rationally bargain to pay **more money** for **inferior** services.

55.      Nevertheless, the Tollgate and Bridgemore Communications Agreements (and upon information and belief, the Canterbury Communications Agreement), which contain identical paragraph numbering, essentially create a binding monopoly by Crystal Clear for the provision of telecommunications services to the Neighborhoods.  The agreements include the following terms:

- The POAs agree that Crystal Clear will be the sole and exclusive providers of telecommunications services to Bridgemore and Tollgate.  (Recitals, ¶ E).

- The POAs grant Crystal Clear an exclusive right to "promote and market Services" within each neighbhorhood (¶ 3.1).  The agreement forbids the POA from promoting, marketing, or providing access to other companies to promote or market competing services.  (¶¶ 3.1 and 7.1(a).)  The POA is forbidden from negotiating with, soliciting, discussing, or even cooperating with any competing service provider that expresses an interest in providing services.  (¶ 3.1.)

- Crystal Clear is authorized to act as the "exclusive agent" to respond to requests from other service providers, and Crystal Clear is authorized to negotiate with those providers for "compensation payable to Crystal Clear" for providing competing services.  Furthermore, any requests from a service provider or from a homeowner seeking alternate services must be referred to Crystal Clear for handling.  (¶ 4.1)

- The contract provides that homeowners must pay for telecommunications services (including certain base rates, taxes, franchise fees, and regulatory fees), regardless of whether the homeowner uses those services or (somehow) has managed to secure the telecommunications services from an alternate service provider.  (¶ 5.5.)

- The exclusivity agreement binds each POA for twenty-five years (¶¶ 3.1 and 10.1) with an automatic renewal for an additional twenty-five years (¶ 10.1).

- In the agreement, Crystal Clear disclaims any warranty concerning "the content, stability, or usability of services, including any warranty of

merchatability or fitness for a particular purpose, or any other express or implied warranty." (¶ 8.3)

- Homeowners have no remedy for a service disruption (even one due to "extraordinary or unreasonable" interruption of services). unless (1) the disruption lasted 12 hours in a 24-hour period, and (2) the homeowner provides notice of loss of services. Even then, the homeowner only receives an receive a *pro rata* credit for the lost services. (¶ 8.4)

- The agreement contains a byzantine, time-consuing, and (practically speaking) useless dispute resolution mechanism. If any party is accused of breaching the agreement, the breaching party has at least 45 days in which to cure. (¶ 9.2.) The agreement requires an informal dispute resolution procedure to take place in the interim. (¶¶ 9.1-9.7.) The Agreement also requires that any dispute that cannot be resolved through direct discussions must proceed to binding arbitration or through expedited alternative dispute resolution procedures. (See ¶¶11.1-11.2)

- Even if the POAs (which are not, and never have been, under the homeowners' control) were to initiate and exhaust the time-consuming dispute resolution procedures, the grounds for terminating Crystal Clear are so stringent as to make termination a practical impossibility. In relevant part, termination may only occur upon a showing that (1) Crystal demonstrates "consistent gross negligence and/or incompetence" or (2) Crystal Clear "persistently and materially fails to meet the performance standards" for a twelve-month period and its failure resulted in a "severe degredation of the overall quality" of provision of telecommunications services to the neighborhoods. (¶ 9.9.)

56.     In sum, taken collectively, the Communications Agreements bar homeowners from contracting directly with other service providers, bar other service providers from promoting competing services to homeowners or the POAs, obligate homeowners to pay for telecommunications services from Crystal Clear regardless of whether they use the service, require Crystal Clear to act as a go-between with respect to other providers, authorize Crystal Clear to charge other providers an additional fee for the provision of services to homeowners, bind the POAs (and by extension the homeowners) to utilize Crystal Clear for over twenty-five

years, and make it functionally impossible to penalize Crystal Clear or terminate Crystal Clear for service disruptions.

57.     Furthermore, the agreement entrusts the <u>developer-controlled POAs</u> – which as to Tollgate and Bridgemore, are the same real estate developers who manage Crystal Clear – with responsibility for enforcing the dispute provisions of the agreement.  In light of that fact, the homeowners have no practical ability, and have never had any practical ability, to obtain relief against Crystal Clear.  Indeed, with respect to Tollgate and Bridgemore, a "dispute" between the POA and Crystal Clear would have required the developers **to accuse themselves of breach**.  These homeowners still do not control the POAs.  Similarly, the Canterbury homeowners have had no practical ability to obtain relief against Crystal Clear, because it would have required the developer or developers (at least including Hood) to abrogate a pre-existing financial benefit from the arrangement, and the homeowners still do not control the Canterbury POA.

58.     The Communications Agreements also reference the existence of an "easement" granted to Crystal Clear to provide telecommunications to Tollgate and Bridgemore.  (Recitals, ¶ D.)  Given that Crystal Clear had obtained only a <u>non-exclusive</u> franchise agreement with Thompsons Station, the contracts were (to future purchasers) materially misleading.  In effect, the contracts sought to create a private service easement ("Private Service Easement") that would serve as an unlawful barrier to entry for other telecommunications providers to install equipment to provide telecommunications in the Neighborhood.

**D.     The Developers Did Not Execute the Agreements for the Benefit of the POAs and Future Homeowners.**

59.     The intention of the developers in entering into the Communications Services Agreements was not to benefit the HOAs and the underlying homeowners.  Instead, the intention was to lock in a sweetheart deal for the developers while they controlled both sides of the

15

transaction, thereby guaranteeing the developers a future stream of income that would be effectively impossible to displace for the next quarter-century, regardless of the nature and quality of "service" provided by the developers/Crystal Clear.

60.     The developers executed the Communication Agreements with full knowledge that Crystal Clear did not have, and would never have, its own telecommunications network to deliver television content or high-speed internet to residences in the Neighborhood.  The developers knew that Crystal Clear would contract an actual telecommunications service providers – in this case DirecTV – tack on a premium for the services, charge the higher rate to the homeowners, and pocket the difference.

61.     Crystal Clear has contracted with DirecTV to allow it to provide television and internet to the residences in the Neighborhoods.  Absent the arrangement between Crystal Clear and DirecTV, and absent the existence of the Communications Agreements, homeowners would be able to purchase television and internet from other satellite providers or landline providers.

62.     On information and belief, every homeowner who has purchased a home in the Neighborhoods has also had to pay the developer and/or Crystal Clear $1,500 to cover installation of the lines and infrasturcture for Crystal Clear's telecommunications network.  Absent the arrangements between Carbine, Crystal Clear, and Hood, homeowners would not be responsible for this expense.  Such infrastructure costs are normally absorbed by the developer as part of developing a subdivision like the Neighborhoods.

63.     The net effect of the allegations set forth in the foregoing paragraphs, which include the required minimum fees regardless of usage, Private Service Easements, and the inability to negotiate directly with other providers, was to allow Crystal Clear a monopoly on providing television and home internet to the Neighborhoods and to allow DirecTV to be the

exclusive provider of telecommunications to Crystal Clear.  In this arrangement, Crystal Clear has acted as nothing more than a reseller of DirecTV's telecommunications.

64.     At the time that they purchased their homes, the Plaintiffs were not made aware that the developers controlled both sides of the Communications Agreements at the the time that they were execute, or that, upon information and belief, Hood had entered into a side agreement with Crystal Clear with respect to Canterbury.  Had the Plaintiffs known the true nature of the transaction, they would not purchased the homes in the first place, or at least would have sought more information  before deciding whether to purchase.  Upon information and belief, no other purchasers of homes in the Neighborhoods were made aware of the self-dealing nature of the Communications Agreements either.

65.     Upon information and belief, the developers intentionally concealed or materially omitted the self-dealing nature of the Communications Agreements from the Plaintiffs and other purchases, knowing that a fully informed party would not have purchased (or would have been less likely to purchase) a home within one of the Neighborhoods.

E.     **The Quality of Crystal Clear Services**

66.     Crystal Clear's provision of television and home internet to the Neighborhoods is terrible.  Originally, Crystal Clear's model was meant to allow homeowners to be able to tie directly into Crystal Clear's fiber-optic network to receive both television and home-internet.  However, Crystal Clear, having no previous experience in building complex and modern communications infrastructure, failed to properly build the systems through the Neighborhoods.  As a result, homeowners must have a satellite dish on their home to receive television service, but cannot by themselves deal directly with the satellite television company that provides that service, but rather must go through Crystal Clear as a middle man.  This simply makes service more difficult for customers while cheating residents of the Neighborhoods out of promotional

deals offered by the large satellite television providers because the homeowners are not considered "customers" of those providers but rather customers of Crystal Clear. Crystal Clear does not pass on any promotional activities to its customers.

67. Crystal Clear has had significant service disruptions and has been historically slow to respond to customer complaints about outages, service interruptions, and other customer problems with receiving television or home internet from Crystal Clear.

68. These difficulties are not surprising, given that Crystal Clear, apart from providing television and home internet to the Neighborhoods, has never operated another communications network or otherwise been in the business of providing telecommunications. Crystal Clear is operated by the same people who run Carbine: in essence, they are real estate developers, not telecommunications providers.

69. To date, homeowners in the Neighborhood have no other option to provide television or home internet other than Crystal Clear. Upon information and belief, AT&T would provide television and home internet in at least one of the Neighborhoods, but for Crystal Clear's monopoly on the provision of television and home internet.

70. Upon information and belief, despite the consistent and widespread failure of Crystal Clear to provide services, the developer-controlled POAs have never pursued Crystal Clear for breach. Again, this is not surprising, given that for most of the relevant time frame the Carbines had no incentive to accuse themselves of breach, and Hood had no incentive to sue Crystal Clear.

71. At present, absent legal intervention, the homeowners have no recourse for the predicament in which they have been placed, and they are subject to the mercy of an otherwise binding monopoly of which they were not originally made aware.

72.    All conditions precedent to the maintenance of this case have been satisfied.

## V.    CLASS ALLEGATIONS

73.    Plaintiffs bring this action pursuant to Rule 23(a) and Rule 23(b)(1), (2) and (3) of the Federal Rules of Civil Procedure on behalf of themselves and all other homeowners of the Neighborhoods (the Class") together with the following subclasses:

    a.    All homeowners in the Tollgate neighborhood (the "Tollgate Sub-Class")

    b.    All homeowners in the Bridgemore neighborhood (The "Bridgemore Sub-Class")

    c.    All homeowners or residents in the Canterbury neighborhood (the "Canterbury Sub-Class")

74.    The Class is so numerous that joinder of all class members is impractical.  The class consists of over a thousand homeowners in the Neighborhoods.

75.    Plaintiffs' claims are typical of the claims of other class members in that Plaintiffs and the Class have been damaged by the same wrongful conduct of the Defendants and Plaintiffs have no interest that are adverse to members of the Class.

76.    There are questions of law and fact that are common to Plaintiffs and all class members:

    a.    Whether at the time of execution of the Tollgate Communications Agreement, the Bridgemore Communications Agreement, and the Proposed Canterbury Communications Agreement each respective property owners' association was developer controlled;

    b.    Whether the Tollgate Communications Agreement, the Bridgemore Communications Agreement, and the Proposed Canterbury Communications Agreement represent unlawful tying arrangements in violation of federal antitrust laws;

    c.    Whether the barriers for entry outlined above are violations of the Federal Communications Commission's rules and regulations;

19

d.  Whether homeowners have any other choice in the provision of television or home internet other than purchasing these from Crystal Clear.

77.     Plaintiffs will fairly and adequately protect the interests of the Class and Subclasses and has retained counsel experienced and competent to prosecute this class action to full completion.  Plaintiffs seek the appointment of Brian Stover as class representative for the Tollgate Subclass, Dr. Jason Miller as class representative for the Bridgemore Subclass, and Courtney Cates as class representative of the Canterbury Subclass.  Collectively, these Plaintiffs will also be referenced as the "Class Representatives."

78.     Plaintiffs seek appointment of Branstetter, Stranch, and Jennings PLLC as class counsel ("Class Counsel").  Class Counsel has the expertise, experience, and resources necessary to see this class action to completion.

79.     Prosecuting this case as a class action will avoid the risk of inconsistent or varying adjudciations with respect to the individual class members and/or adjudication of the rights of the Plaintiffs will, as a practical matter, be dispositive of the interests of the class.

80.     A class action is superior to other available methods for the fair and efficient adjudication of the controversy.  Such treatment will permit a large number of similarly situated persons to prosecute common claims in a single forum simultaneously, efficiently, and without duplication of effort and expense that numerous individual claims would engender.  Class treatment will also permit the adjudication of relatively small claims by many Class members who could not afford on their own to individually litigate an antitrust claim against a corporate defendant.  There are no difficulties likely to be encountered in the management of this class action that would preclude the maintenance of the class action, and no superior alternative exists for the fair and efficient adjudication of the claims.

81.     Further, the Defendants have acted or refused to act on grounds that apply generally to the Class and final injunctive or corresponding declaratory relief is appropriate respecting the Class as a whole.

## VI.     CAUSES OF ACTION

### COUNT I
### (Unlawful Tying Claim For Violation Of Section I Of The Sherman Antitrust Act Asserted Against Carbine Family Companies)

82.     Plaintiffs reallege, restate, and incorporate by reference the allegations made in the paragraphs above.

83.     The sale of lots in the Neighborhoods is a separate good from the sale of telecommunications by Crystal Clear.

84.     The Neighborhoods are located in Thompson's Station, Tennesssee.   Thompson's Station is a small town located in Williamson County, Tennessee that is just south of the much larger town of Franklin, TN and just north of the larger town of Spring Hill, Tennessee. Thompson's Station according to the U.S. Census had a population of 2,194 people.  By comparison, Franklin, TN had a population of 62,487 in 2010 according to the U.S. Census and Spring Hill had a population of 29,036.  In other words, Thompson's Station is a unique town in Williamson County in that it has retained its small town nature where as other neighboring areas have experienced considerably more growth and development in the current century.  This positions Thompsons' Station with unique qualities not applicable to other geographically-near areas in Williamson County.

85.     Being within Williamson County also means that residents of Thompson' Station also have access to Williamson County Schools, which is one of the best public school systems in Middle Tennessee, and an important decision factor for people looking for homes in middle

Tennessee, and specifically in Williamson County as the Williamson County School District is seen by home buyers as more superior to the Franklin Special School District which also services areas around Thompson's Station.  A 2014 National Association of Realtors survey found that 29% of home buyers ranked the quality of schools as a high determining factor on where to buy a home.

86.     As a result of its small town nature and its access to Williamson County schools, Thompson's Stations presents unique qualities for individuals looking to purchase homes in Williamson County.

87.     As can be seen from the attached Exhibit D, which is a map of Thompson's Station showing its urban growth boundaries and those of other communities in Williamson County, the Neighborhoods are one of the few, if only, areas in Thomposon's Station that are large, centrally planned communities within Thompson's Station.

88.     The Neighborhoods also require homeowners to build certain types of homes that comply with each Neighborhoods' design code or other covenants governing the restrictions of each individual lot.  One effect of these design codes is to limit the use of a lot to the construction of homes whose ultimate value is around $350,000-500,000 (approximately). Homes of this nature and design are typically purchased by customers with middle to upper middle incomes.

89.     For the period relevant to this claim, the Carbine Family Companies have or had sufficient market power in the sale of lots in Thompson's Station for centrally planned communities that service households with middle to upper middle incomes.

90.     The amount of interstate commerce affected in the market for the sale of lots in the Neighborhood and/or the sale of telecommunications in the Neighborhood is substantial.

91.     The Carbine Family Companies forced residents and homeowners in the Neighborhoods to purchase telecommunications from Crystal Clear when they might otherwise prefer to purchase such telecommunications from other providers.

92.     The Carbine Family Companies' actions of tying the purchase of lots in the Neighborhoods to the purchase of telecommunications from Crystal Clear unreasonably restrains trade and is unlawful *per se* under Section 1 of the Sherman Act.

93.     Carbine Family Companies' actions and anticompetitive agreements are not reasonably necessary to further any procompetitive purpose.

94.     Through the unlawful acts of tying the purchase of lots in the Neighborhoods to the purchase of telecommunications from Crystal Clear, Defendants have harmed competition for the provision of telecommunications and have damaged Plaintiffs and the Class in an amount to be proved at trial.

## COUNT II

**(Declaratory Action That Transactions Are Void For Self-Dealing Asserted Against The Carbine Family of Companies, The Tollgate POA and the Bridgmore POA)**

95.     Plaintiffs reallege, restate, and incorporate by reference the allegations made in the paragraphs above.

96.     The Tollgate Communications Agreement was the product of a self-dealing transaction between Carbine and Crystal Clear in that the Tollgate POA at the time it executed the Tollgate Communications Agreement was under the exclusive control of Carbine.

97.     The Bridgemore Communications Agreement was the product of a self-dealing transaction between Carbine and Crystal Clear in that the Bridgemore POA at the time it executed the Bridgemore Communications Agreement was under the exclusive control of Carbine.

98.     With regard to the Tollgate Communications Agreement and the Bridgemore Communications Agreement, Carbine was able to obtain additional revenue that a developer does not typically obtain by giving a Carbine-controlled entity the exclusive right to provide telecommunications to the Tollgate and Bridgemore neighborhoods. The Tollgate Communications Agreement and the Bridgemore Communications Agreement were executed for the exclusive benefit of Carbine and did not benefit the homeowners in Tollgate and/or Bridgemore.

99.     The material facts of the Tollgate Communications Agreement, the Bridgemore Communications Agreement, and the Canterbury Communications Agreement, including the self-dealing nature of the agreements, were never disclosed to homeowners or potential homeowners, and such homeowners did not ratify or approve the agreements.

100.    These transactions are unfair to the Tollgate POA and the Bridgemore POA and their resident members and homeowners and they have damaged the Plaintiffs and the Class.

101.    Accordingly, Plaintiffs seek a declaration from this Court that the Tollgate Communications Agreement, the Bridgemore Communications Agreement, and the Canterbury Communications Agreement are null and void.

## COUNT III
**(Unjust Enrichment Against The Carbine Family Companies)**

102.    Plaintiffs reallege, restate, and incorporate by reference the allegations made in the paragraphs above.

103.    Plaintiffs and the members of the Class conferred an economic benefit on the the Carbine Family Companies by their payments to Crystal Clear for television and payment of the $1,500 fee to allegedly cover Crystal Clear's communications network infrastructure.

104.    The Carbine Family Companies, including but not limited to Crystal Clear, appreciated, accepted, and retained this economic benefit to the detriment of Plaintiffs and members of the Class.

105.    Allowing Defendants to retain the economic benefit it received from telecommunications or the $1,500 fee would be inequitable to Plaintiffs and members of the Class because of the wrongful conduct alleged herein.  The Carbine Family Companies' retention of the economic benefit it received violates the fundamental principles of justice, equity, and good conscience because the Carbine Family Companies knowingly entered into anticompetitive agreements in an attempt to curtail Plaintiffs and class members choice in their provider of telecommunications.

106.    As a result, Plaintiffs seek an Order requiring the Carbine Family Companies to disgorge all of the profits, benefits, and other compensation it obtained from Plaintiffs and members of the Class as a result of its wrongful conduct.

## COUNT IV

**(Declaratory Action Voiding Communications Agreements As Unconscionable Against Crystal Clear, The Tollgate POA and the Bridgemore POA)**

107.    Plaintiffs reallege, restate, and incorporate by reference the allegations made in the paragraphs above.

108.    As explained above, the inequality of the bargan struck in the Tollgate Communications Agreement and the Bridgemore Communications Agreement is so manifest that it should shock the judgment of a person of common sense.  No rational person would enter into the agreements as drafted and executed.  The terms are so beneficial to Crystal Cear on the one hand, and so oppressive to the homeowners that are ultimately stuck with these agreements on the other that no honest and fair person would accept the terms of the agreements as offered.

109. In the view of all the facts and circumstances, homeonwers subject to these agreements were denied any opportunity for meaningful choice and were stuck with these agreements once they purchased homes and/or lots in the three neighborhoods.

110. The terms of the Tollgate Communications Agreement, the Bridgemore Communications Agreement, and the Canterbury Communications Agreement are beyond the reasonable expectations of an ordinary person, oppressive, and unconscionable.

111. As a result, the Court should enter an order declaring the Tollgate Communications Agreement, the Bridgemore Communications Agreement, and the Canterbury Communications Agreement as unconscionable and void each such agreement.

### COUNT V
**Declaratory Action Voiding Tollgate Communications Agreement As Violation Of The Tollgate Declaration Of Restrictions, Covenants, and Easements Asserted Against Tollgate Farms, Carbine & Associates, Crystal Clear, and the Tollgate POA**

112. Plaintiffs reallege, restate, and incorporate by reference the allegations made in the paragraphs above.

113. A true and correct copy of the Tollgate Declaration of Restrictions, Covenants and Easements is attached as Exhibit E.

114. Under the terms of the Tollgate Covenants, the Tollgate Communications Agreement is required to "be at such compensation and on such terms as would be usual, customary, and obtainable in an arms-length transaction with any other third party providing comparable services for any real estate development in the southeastern United States of the size, quality and nature of Tollgate."

115. The Tollgate Communications Agreement does not comply with this provision as it was not negotiated at arms-length and does not reflect an arms-length transaction that would

typically be entered into by a third party providing comparable services for any real estate

development in the southeastern United States of the size, quality, and nture of Tollgate.

116.     As a result, the Court should enter an order declaring the Tollgate

Communications Agreement, as in violation of the Tollgate Covenants and declar it null and

void and unenforceable.

## VII.     PRAYER FOR RELIEF

117.     WHEREFORE, Plaintiffs on behalf of themselves and the class, respectfully

request that the Court:

a.     Determine that this action may be maintained as a class action pursuant to Fed. R. Civ. P. 23(a) and (b)(2); find Plaintiffs to be adequate representatives of the class; and appoint the undersigned class counsel;

b.     Enjoin Crystal Clear from enforcing any term of the Tollgate Communications Agreement, the Bridgemore Communications, and the Canterbury Communications Agreement;

c.     Declare the Tollgate Communications Agreement, the Bridgemore Communications, and the Canterbury Communications Agreement unenforceable and void;

d.     Award Plaintiffs and the Class monetary damages, including treble damages, for the unlawful conduct alleged herein;

e.     Grant Plaintiffs the costs of suit, including reasonable attorney's fees as provided by law; and

f.     Grant to Plaintiffs such other or further relief as the nature of the case may require or as may be determined to be just, equitable, and proper by this Court.

Dated: January 31, 2018

Respectfully submitted,

By: /s/ Benjamin A. Gastel
J. Gerard Stranch, IV, Esq.
Benjamin A. Gastel
BRANSTETTER, STRANCH & JENNINGS PLCC
223 Rosa L. Parks Avenue, Suite 200

Nashville, TN 37201-1631
(615) 254-8801
gerards@BSJFirm.com
beng@BSJFirm.com

*Attorneys for Plaintiffs and the Proposed Class*